1 | Janice F. Mulligan (SBN 99080)
*mulligan@janmulligan.com*
2 | Elizabeth A. Banham (SBN 131734)
*banham@janmulligan.com*
3 | Brian K. Findley (SBN 251172)
*findley@janmulligan.com*
4 | **MULLIGAN, BANHAM & FINDLEY**
2442 Fourth Avenue, Suite 100
5 | San Diego, California 92101
Telephone: (619) 238-8700
6 | Facsimile: (619) 238-8701

7 | Harvey C. Berger (SBN 102973)
*berger@bwrllp.com*
8 | Timothy G. Williams (SBN 193810)
*williams@bwrllp.com*
9 | Stephanie Reynolds (SBN 220090)
*reynolds@bwrllp.com*
10 | **BERGER, WILLIAMS & REYNOLDS, LLP**
401 B Street, Suite 2000
11 | San Diego, California 92101
Telephone: (619) 595-1366
12 | Facsimile: (619) 236-9677

13 | Attorneys for Plaintiffs

14 | **UNITED STATES DISTRICT COURT**

15 | **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SELENA MOORER, individually and on behalf of others similarly situated, | Case No.: 3:16-cv-02816-AJB-NLS<br>Class Action |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION** |
| vs. | **[30-Page Brief Permitted by Order Entered July 10, 2018, Dkt. No. 84]** |
| STEMGENEX MEDICAL GROUP, INC., a California corporation; STEMGENEX, INC., a California corporation; STEM CELL RESEARCH CENTRE, INC., a California Corporation; ANDRE P. LALLANDE, D.O., an Individual; SCOTT SESSIONS, M.D., and Individual; RITA ALEXANDER, an Individual; and DOES 1-100, | Hearing:<br>Judge: Hon. Anthony J. Battaglia<br>Courtroom 4A<br>Hearing Date: October 11, 2018<br>Hearing Time: 2:00 p.m. |
| Defendants. | |

27 | / / /

28 | / / /

Plaintiffs SELENA MOORER, REBECCA KING, JENNIFER BREWER, and ALEXANDRA GARDNER, individually and on behalf of others similarly situated ("Plaintiffs"), submit this Memorandum of Points and Authorities in support of their Motion for Class Certification.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# **TABLE OF CONTENTS**

I.   INTRODUCTION AND STATEMENT OF THE ISSUES ……..   1

II.  FACTS COMMON TO THE CLASS …………………………..   3

    A.  StemGenex's Uniform Misrepresentation …………………   3

    B.  The PSR Is False ……………………………………………..   4

    C.  The Misrepresentation Is Material …………………………   9

    D.  The Class Was Exposed to the Misrepresentation ………...   10

    E.  Plaintiffs Can Develop a Class-wide Damages Model …….   12

    F.  The Roles of Each of the Defendants ……………………..   12

III. LEGAL ARGUMENT SUPPORTING CLASS CERTIFICATION   15

    A.  Class Certification Should Be Granted ……………………   15

    B.  The Class Is Adequately Defined and Ascertainable ………   16

    C.  Plaintiffs Satisfy Rule 23(a) Prerequisites …………………   18

        1.  The Proposed Class Is Sufficiently Numerous ……..   18

        2.  Plaintiffs' Claims Raise Issues Common to
            The Class …………………………………………   18

        3.  Plaintiffs' Claims Are Typical of the Class …………   19

        4.  Plaintiffs and Their Counsel Will Adequately
            Represent the Class ……………………………….   20

    D.  The Requirement of Rule 23(b)(3) Are Satisfied ………….   21

        1.  Common Issues Predominate ………………………   21

            a.  Reliance and Causation Do Not Defeat
               Predominance of Plaintiffs' UCL "Fraudulent"
               Prong, CLRA, Negligent Misrepresentation
               and Fraud Claims ……………………………   23

            b.  Plaintiffs' UCL "Unfair" Claim ……………...   27

        2.  Relief Can Be Calculated on an Aggregate
            Class-wide Basis …………………………………   27

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      3.  This Class Action Is Superior to Other Available
           Methods for Adjudicating Class Members' Claims ...    28

IV.  CONCLUSION ……………………………………………    29

ii

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>:

*Abbit v. ING USA Annuity*
    No. 13CV2310-GPC-WVG, 2015 WL 7272220
    (S.D. Cal. Nov. 16, 2015) ……………………………………    27

*Amchem Prods. v. Windsor, Inc.*
    521 U.S. 591 (1997) …………………………………………    15, 22

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*
    133 S. Ct. 1184 (2013) …………………………………...    16, 22,
                                                                                                    28

*Bateman v. Am. Multi-Cinema, Inc.*
    623 F.3d 708 (9th Cir. 2010) ………………………………    15

*Beck-Ellman v. Kaz USA, Inc.*
    283 F.R.D. 558 (S.D. Cal. 2012) ………………………….    24

*Berrien v. New Raintree Resorts Int'l, LLC*
    276 F.R.D. 355 (N.D. Cal. 2011) ……………………… .    27

*Briseno v. ConAgra Foods, Inc.*
    844 F.3d 1121 (9th Cir. 2017) ……………………………..    17

*Brown v. Hain Celestial Grp. Inc.*
    No. 11–cv–03082–LB, 2015 WL 3398415
    (N.D. Cal. May 26, 2015) …………………………………. .    25

*Bruno v. Quten Research Inst., LLC*
    280 F.R.D. 524 (C.D. Cal. 2011) …………………………..    19, 22,
                                                                                                    24

*Chavez v. Blue Sky Nat. Bev. Co.*
    268 F.R.D. 365 (N.D. Cal. 2010) ……………………… ..    27

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*
    No. 3:12-CV-04000-SC, 2015 WL 6638929
    (N.D. Cal. Oct. 29, 2015) ………………………………… ..    25

*Colgan v. Leatherman Tool Grp., Inc.*
    135 Cal. App. 4th 663 (2006) …………………………... .    25

*Delarosa v. Boiron, Inc.*
    275 F.R.D. 582 (C.D. Cal. 2011) …………………………..    24, 29

*Ehret v. Uber Technologies, Inc.*
    148 F.Supp.3d 884 (N.D. Cal. 2015) ……………………    19, 26

iii

*Edwards v. The First Am. Corp.*
251 F.R.D. 454 (C.D. Cal. 2008) ……………………………….. 21

*Ellis v. Costco Wholesale Corp.*
657 F.3d 970 (9th Cir. 2011) …………………………………… 16, 19

*FTC v. National Urological Group, Inc.*
645 F. Supp. 2d 1167 (N.D. Ga. 2008) ………………………… 10

*F.T.C. v. QT, Inc.*
448 F. Supp. 2d 908 (N.D. Ill. 2006) …………………………… 10

*Gartin v. S & M Nutec, LLC*
245 F.R.D. 429 ………………………………………………….. 22

*Gutierrez v. Wells Fargo Bank NA*
589 Fed. Appx. 824 (9th Cir. 2014) ……………………….. .. 25

*Forcellati v. Hyland's, Inc.*
No. CV 12-1983-GHK (MRWx), 2014 WL 1410264
(C.D. Cal. Apr. 9, 2014) ………………………………………... 16, 18, 23, 24

*Gaudin v. Saxon Mortgage Servs., Inc.*
297 F.R.D. 417 (N.D. Cal. 2013) ……………………………….. 27

*Guido v. L'Oreal, USA, Inc.*
Nos. CV 11–1067 CAS (JCx), CV 11–5465 CAS (Jcx), 2013 WL 3353857
(C.D. Cal. July 1, 2013) …………………………………………. 18, 19, 26

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1998) …………………………………… 19-22

*Hanon v. Dataproducts Corp.*
976 F.2d 497 (9th Cir. 1992) …………………………………….. 19

*In re Google Referrer Header Privacy Litigation*
869 F.3d 737 (9th Cir. 2017) …………………………………….. 28

*In re Heritage Bond Litigation*
No. CV 01-5752 DT, 2004 WL 1638201
(C.D. Cal., July 12, 2004) ………………………………………. 29

*In re High-Tech Emple. Antitrust Litig.*
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ……………………….. 22

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*
268 F.R.D. 652 (S.D. Cal. 2010) ………………………………. 27

*In re POM Wonderful Mktg. & Sales Practices Litig.*
No. ML 10-02199 DDP (RZx), 2012 WL 4490860
(C.D. Cal. Sept. 28, 2012) …………………………………….. 26

iv

*In re Tobacco II Cases*
    46 Cal.4[th] 298 (2009) ………………………………………..    2, 16, 23-25

*In re Vioxx Class Cases*
    180 Cal. App. 4th 116 (2009) ………………………………    24

*Johns v. Bayer Corp.*
    280 F.R.D. 551 (S.D. Cal. 2012) (Battaglia, J.) …………………    25

*Keegan v. Am. Honda Motor Co.*
    284 F.R.D. 504 (C.D. Cal. 2012) ………………………………    16

*Keegan v. Am. Honda Motor Co.*
    838 F. Supp. 2d 929 (C.D. Cal. 2012) ……………………………    24

*Krueger v. Wyeth, Inc.*
    No. 03CV2496 JAH AJB, 2011 WL 8971449
    (S.D. Cal. Mar. 30, 2011) ………………………………………    17, 23

*Krueger v. Wyeth, Inc.*
    310 F.R.D 468 (S.D. Cal. 2015) ………………………………    17

*Kwikset Corp. v. Superior Court*
    51 Cal. 4th 310 (2011) …………………………………………    2, 23

*Lavie v. Proctor & Gamble Co.*
    105 Cal. App. 4th 496 (2003) ………………………………    24

*Loritz v. Exide Techs.*
    No. 2:13-CV-02607-SVW-E, 2015 WL 6790247
    (C.D. Cal. July 21, 2015) ………………………………………    28

*Lozano v. AT & T Wireless Servs., Inc.*
    504 F.3d 718 (9th Cir. 2007) ………………………………    27

*Marsu, B.V. v. Walt Disney Co.*
    185 F.3d 932 (9th Cir.1999) …………………………………… ..    27

*Mass. Mutual Life Insurance Company*
    97 Cal. App. 4th 1282 (2002) ………………………………    25, 26

*Mazza v. Am. Honda Motor Co.*
    666 F.3d 581 (9th Cir. 2012) ………………………………    18

*McCrary v. Elations Co., LLC*
    No. EDCV 13–00242 JGB (Opx), 2014 WL 1779243
    (C.D. Cal. Jan. 13, 2014) ………………………………………    17

*McKinnon v. Dollar Thrifty Auto. Grp. Inc.*
    No. CV 12–cv–04457–SC, 2015 WL 4537957
    (N.D. Cal. July 27, 2015) ………………………………………    25

v

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*
    311 F.R.D. 590 (C.D. Cal. 2015) ……………………………….. 28

*Moorer v. StemGenex Medical Group., Inc.*
    2017 WL 1281882 (S.D. Cal. Apr. 6, 2017) …………………… 4, 23, 24

*O'Donovan v. CashCall, Inc.*
    278 F.R.D. 479 (N.D. Cal. 2011) ……………………………… .. 22

*Parsons v. Ryan*
    754 F.3d 657 (9th Cir. 2014) ……………………………….. 18

*Pulaski & Middleman, LLC v. Google, Inc.*
    802 F.3d 979 (9th Cir. 2015) ……………………………….. 23, 27

*Rodriguez v. Hayes*
    591 F.3d 1105 (9th Cir. 2010) ……………………………… 19

*Romero v. Producers Dairy Foods, Inc.*
    235 F.R.D. 474 (E.D. Cal. 2006) ……………………………… 18

*Rose v. Bank of Am., N.A.*
    57 Cal. 4th 390 (2013) ……………………………………… 23

*Sali v. Corona Regional Medical Center*
    889 F.3d 623 (9th Cir. 2018) ……………………………….. 15

*Soto v. Diakon Logistics (Delaware), Inc.*
    No. 08-CV-33-L WMC, 2013 WL 4500693
    (S.D. Cal. Aug. 21, 2013) ……………………………………... 29

*Spann v. J.C. Penney Corp.*
    307 F.R.D. 508 (C.D. Cal. 2015) ……………………………….. 28

*Stearns v. Ticketmaster Corp.*
    655 F.3d 1013 (9th Cir. 2011) ……………………………….. 19, 23, 26

*Steroid Hormone Product Cases*
    181 Cal. App.4th 145 (2010) ……………………………….. 23

*Tait v. BSH Home Appliances Corp.*
    289 F.R.D. 466 (C.D. Cal. 2012) ……………………………… 2

*Vinole v. Countrywide Home Loans, Inc.*
    571 F.3d 935 (9th Cir. 2009) ……………………………….. 29

*Wal-Mart Stores, Inc. v. Dukes*
    564 U.S. 338 (2011) ……………………………………… 18

*Wiener v. Dannon Co.*
    255 F.R.D. 658 (C.D. Cal. 2009) ……………………………… 20-22

*Wolin v. Jaguar Land Rover North America, LLC*
    617 F.3d 1168 (9th Cir. 2010) …………………………………   28

<u>STATUTES & RULES</u>:

Fed. R. Civ. P. 23 …………………………………………………   16

Fed. R. Civ. P. 23(a)(1) …………………………………………   18

Fed. R. Civ. P. 23(a)(3) …………………………………………   19

Fed. R. Civ. P. 23(a)(4) …………………………………………   20

Fed. R. Civ. P. 23(b)(3) …………………………………………   21

Cal. Civ. Code § 1760 …………………………………………..   24

<u>SECONDARY AUTHORITY</u>:

5-23 J. Moore Fed. Prac. – Civil § 23.22[1][b] …………………   18

William B. Rubenstein, Newberg on Class Actions § 18:40
    (4th ed. 2017) …………………………………………………..   28

PLAINTIFFS' POINTS AND AUTHORITIES ISO
MOTION FOR CLASS CERTIFCATION                    3:16-cv-02816-AJB-NLS

# I.  <u>INTRODUCTION AND STATEMENT OF THE ISSUES</u>

The crux of Plaintiffs' case is that the defendants[1] (collectively, "Defendants" or "StemGenex") promoted false and misleading advertisements to induce medically disabled individuals into purchasing "stem cell therapy treatment." Defendants target vulnerable individuals mostly suffering from terminal, incurable, and often painful diseases such as multiple sclerosis, rheumatoid arthritis, and Parkinson's disease. These are desperate people hopeful for a return to the lives they once had. The likely success and outcome of a costly medical procedure is one of the most important factors such patients consider in deciding whether to obtain the treatment. StemGenex promised improvement in their lives through representations of a "100%" patient satisfaction rate ("PSR") with its stem cell therapy treatment ("SCTT").[2] Yet, StemGenex's records show, and even StemGenex's employees admit that patients **were not 100% satisfied** with the treatments. At a minimum, Defendants knew or should have known that their advertised claims were false or highly misleading.

Every consumer who purchased a StemGenex SCTT suffered a common economic injury when he or she paid for a medical service from a company that misrepresented the rate of satisfaction with its treatment. The economic injury—the difference between what Plaintiffs and Class Members paid, and the value of SCTT had the PSR accurately reflected the satisfaction rate—is susceptible to class-wide proof. This case is well-suited for class certification because Defendants provided a uniform PSR misrepresentation to all Class Members; Defendants provided all Class Members with the same treatment; and Defendants had a typical price of $14,900 set as the cost to Class Members for the SCTT. Class Members are readily identifiable by the Defendants' records, and indeed most have already been identified.

---

[1] For purposes of this motion, the term "Defendants" includes STEMGENEX MEDICAL GROUP, INC.; STEMGENEX, INC.; STEM CELL RESEARCH CENTRE, INC.; ANDRE P. LALLANDE, D.O.; and RITA ALEXANDER. SCOTT SESSIONS, M.D. was previously dismissed without prejudice, and no other "DOE" defendants have been added as parties.

[2] This treatment involves liposuction of belly fat, and reinjection of those "processed" cells into other body parts. All StemGenex patients in the proposed Class–no matter their ailment or condition—had exactly the same procedure.

1

The issue presented by this motion is not whether Defendants' PSR misrepresentation is, in fact, false or misleading (which are questions of fact common to the Class that will be resolved by the trier-of-fact), but whether Plaintiffs' claims present common questions that predominate over individual ones. They do. The issue of whether Defendants' PSR misrepresentation is false or misleading is one susceptible to common proof, and which will drive the outcome of this litigation.

Plaintiffs' claims must be judged according to a single, objective standard, namely, whether the statements at issue were likely to deceive a "reasonable" person. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) ("*In re Tobacco II*"); *see also Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 332-33 (2011). Likewise, under the objective "likelihood of deception" standard, Plaintiffs' claims can be demonstrated by proof common to the Class based on the materiality of Defendants' PSR. Misrepresentation and false advertising cases like this, which are based on uniform misrepresentations, are routinely certified as class actions under federal and California law because common questions of fact and law predominate. *See, e.g.*, *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) (certifying a class of California purchasers of front-loading washing machines stating "district courts in California routinely certify consumer class actions arising from alleged violations of the CLRA, FAL, and UCL"). Because both the veracity and the materiality of the PSR representation can be determined through common proof on a class-wide basis, Plaintiffs respectfully request that the Court certify the following Class regarding Defendants' deceptive PSR representation:

**All persons residing in the United States who purchased Stem Cell Therapy Treatment from StemGenex for at least $14,900 between December 8, 2013 and the time of trial, after (a) visiting www.stemgenex.com when the website contained Patient Satisfaction Ratings and/or (b) receiving an email from StemGenex with Patient Satisfaction Ratings.**

2

## II.  <u>FACTS COMMON TO THE CLASS</u>

### A. StemGenex's Uniform Misrepresentations

On or about December 8, 2013, StemGenex, through the direction of Defendant RITA ALEXANDER ("Alexander"), began advertising PSR's on its website's home page, and elsewhere on the website. (*See* Plaintiffs' Exhibits ("Ex.") 1, Affidavit of Custodian and copies of the ratings in the format it first appeared on the StemGenex.com website.) According to a December 17, 2013 StemGenex press release, the PSR's were meant to "allow the public transparency into patient satisfaction in multiple categories which are now posted and updated monthly on the StemGenex website." (Ex. 2.) Over time, the PSR was presented in a circular pie-chart depicting surveyed patient responses to questions, such as: *How would you describe your overall experience with StemGenex?"* or *"How would you describe your overall experience with StemGenex, in terms of meeting your expectation?"* An example of how the chart looked on the StemGenex website is below:



**StemGenex Medical Group Patient Ratings**

**StemGenex Medical Group Patient Satisfaction Ratings**

Patients trust our stem cell clinic, StemGenex, to provide them with access to cutting edge stem cell therapies and the absolute highest level of care.  Our stem cell clinic takes this to a whole new level.  Our mission with the benefits of stem cell research is to treat every patient with the same level of care that we would use when treating one of our own loved ones.  We call this The StemGenex Medical Group Family Standard.  Hope, support, compassion, and empowerment are what StemGenex Medical Group lives by.  We monitor patient satisfaction in the following four categories of care and update them on a monthly basis.

StemGenex® Patient Satisfaction Ratings

Through August, 2016

How would you describe your overall experience with StemGenex, in terms of meeting your expectation?

83% Exceed My Expectations

17% Met My Expectations

PLAINTIFFS' POINTS AND AUTHORITIES ISO
MOTION FOR CLASS CERTIFCATION                    3:16-cv-02816-AJB-NLS

1    (*See* Ex. 1; Ex. 3, pp. 18 & 27.)[3]

2    StemGenex's PSR, which was sometimes animated to make the circle "bounce"

3    for added effect, always represented satisfaction of 100% from December 2013

4    through at least March 1, 2017, when it was ordered removed from the website by

5    StemGenex several months after the filing of this suit. (*See e.g.*, Ex. 1; Ex. 3; Ex. 4,

6    web manager emails; Ex 5, former StemGenex Patient Advocate Director Joseph

7    Perricone Deposition, pp. 34:15-35:23.)

8    Even after its removal from the website, StemGenex still continued to send the

9    PSR to prospective customers via email. (*See* supporting Declarations from

10   Customers/Putative Class Members C. Lo. and I. Pe., with attached StemGenex

11   emails noting PSR included at dates well after March 1, 2017; *contra* Ex. 32,

12   Deposition of Jamie Schubert (taken as a StemGenex Corporate Designee), pp. 43:14-

13   46:11.) Whether this was done intentionally or negligently is not before the Court in

14   this motion; **prospective customers were still exposed to the PSR by StemGenex**

15   after it was removed from the website. (*Id.*) Those customers can be identified and are

16   also entitled to relief.

17   **B. The PSR Is False**[4]

18   StemGenex did not have 100% satisfaction with its treatment. To the contrary,

19   StemGenex had received and acknowledged receipt of numerous complaints over the

20   class period. (*See generally* supporting Declarations from Customers/Putative Class

21   Members [partially redacted pending "Joint Motion to File Documents Under Seal,"

22   Dkt. No. 91] D. Ab., A. Ag., A. An., L. Ar., R. Be., N. Br., S. Ch., K. Co., L. De., J.

---

[3] *See* Ex. 3, which is a complete exemplar of the StemGenex website homepage with charts from March 21, 2015 and May 16, 2016. The chart for March 21, 2015 represents that 100% of patients are satisfied with their experience with StemGenex (73% responding that their experience exceeded expectations, and 27% responding that their expectations were met). (*Id,* at 18.) The chart for May 16, 2016 similarly represents 100% of patients satisfied; notably, 0% were "unsatisfied." (*Id,* at 12.)

[4] Even if the PSR were accurate, which it is not, it would still be actionable due to its tendency to deceive. *Moorer v. StemGenex Medical Group., Inc*., 2017 WL 1281882, at *8 (S.D. Cal., Apr. 6, 2017).

4

De., W. Dy., M. Fa., S. Fr., C. Fr., D. Go., M. Gu., W. Ha., T. Ho., W. Hu., Z. Iz., S. Le., C. Le., C. Lu., M. Ma., L. Ma., K. Mc., P. Mi., J. Mi., D. Na., S. Na., G. OL., I. Pe., T. Pi., K. Ro., R. Ro., A. Ro., N. Sa., D. Sa., Y. Sa., L. Sc., K. St., K. Sz., T. Th., S. Tu., D. Uh., C. Va., K. Va., N. Wo., and R. Za. (altogether, "Class Member Decl."); *see also* Declaration of Anne Carter, past Patient Advocate ("Carter Decl."), ¶¶ 1-7.) Defendants knew they could not report 100% satisfaction with the outcome or effect of the treatment. StemGenex knew it was false that 100% of their patients were satisfied and saw positive benefits from the SCTT. (Ex. 6, Deposition of StemGenex Medical Director Defendant ANDRE P. LALLANDE, D.O. ("Lallande"), pp. 188:22-189:8.) Indeed, Defendants were keenly aware of customer complaints because they had publicly responded to some of them. (Ex. 7, Deposition of StemGenex owner/President Defendant Alexander, pp. 134:15-139:21 and 149:24-153:2; Ex. 8, Deposition of former StemGenex Vice President Candace Henderson, pp. 164:14-167:10; *see also* StemGenex's BBB review response and Nov. 2015 Google review response, shown at Ex. 14.)

In fact, the company was aware of people claiming **no benefit whatsoever**, even a year after treatment. (Ex. 6, pp. 132:15-135:10.) Patients were asking for refunds, even though the company had a policy of no refunds. (See e.g. Declarations of Customer/Putative Class Member T. Pi.; Ex. 6, pp. 191:18-23 and 196:13-16; Ex. 9, Deposition of former StemGenex Patient Advocate Director Gibrahn Verdault, pp. 134:19-25 and 135:19-136:5; Ex. 10, Deposition of Director of Media and Community Relations Jamie Schubert (taken in her individual capacity), pp. 183:24-186:12.) Complaints following treatment went from the sales team, to Alexander, to the medical team (including STEMGENEX MEDICAL GROUP, INC. during its tenure). (Ex. 9, p. 154:11-21.) **Mr. Perricone testified that 50% of people had very little response to the SCTT, which included 30-40% of people who had no response at all to the treatment**. (Ex. 5, pp. 92:17-93:8.)[5] Thus, inconsistent with the

---

[5] Testimony by Henderson, that there were only five or so people a year who were complaining of no results to the company after follow-up over time (Ex. 8, pp.

1  advertising, and with the reasonable interpretation of it, a high percentage of patients

2  complained of: (a) seeing **no benefits** from the expensive treatment, and/or (b) that the

3  treatment **failed to meet their expectations**.

4  In an effort to project an aura of universal satisfaction, however, StemGenex

5  had its customers answer a survey on the first day after the SCTT (*see* Ex. 14; *see also*

6  Ex. 8, pp. 48:9-51:24 and 106:18-107:4), usually while still at their hotel room before

7  departing San Diego. This survey, done while patients were still recuperating from the

8  injection with no reason yet to be unsatisfied with the service, was then tallied

9  monthly (or thereabout) and sent to the web company to "update" its pie charts of

10  PSR's. (Ex. 7, p. 125:13-16; Ex. 8, pp. 48:9-51:24 and 184:16-186:11; Ex. 11,

11  Deposition of Franca Gardner (former employee/nurse and mother of patient/Named

12  Plaintiff ALEXANDRA GARDNER), pp. 316:13-319:1 and 322:13-324:18; Ex. 6,

13  pp. 58:9-59:4, 59:20-60:12, and 60:22-61:7; Ex 10, pp. 18:2-5, and 154:18-157:3.)[6]

14  In April 2016 (*see* Ex. 15), **because of the complaints and confusion to the**

15  **public which led to this lawsuit**, a "disclaimer" was added to the bottom of these

16  charts, stating: "The patient satisfaction ratings above represent data received from

17  patients' exit surveys evaluating patient experience and care, accommodations, staff

18  and facilities." (*See* example at Ex. 3, p. 12 (2016 graph); Ex. 8, pp. 120:22-121:19

---

19  102:21-106:10, and 191:17-194:17) is contradicted by other testimony, and the sheer

20  volume of people responding to StemGenex that they had no effect whatsoever, and the accompanying Class Member Declarations in that regard.

21  [6] StemGenex may argue its post-op survey was intended to query satisfaction related to the staff, facilities, etc., on the day after injection or thereabout. Even if that

22  were true, the surveys were **false**, because not every patient was asked to do the post-op day survey. (*See, e.g.*, Ex. 12, Deposition of Customer/Putative Class Member G.

23  OL., p. 242:4-7; and not all who were questioned, provided answers. (Ex. 13; note customers' responses, e.g., "Too soon to know, pending" and "Time will tell.")

24  Therefore, it was not true, even on the first post-op day, that 100% of patients reported being satisfied. And, some were shocked that it was only intended to depict the next

25  day. (Ex. 12, p. 242:8-17.) In addition, Defendants advertised these ratings at first in a cumulative manner, but at some point uncertain to even those "most knowledgeable"

26  at the company, the ratings began to depict only month-over-month tallies. (Ex. 4, web manager Clique Studios ratings emails; *see also* Ex. 10, pp. 155:24-157:3 and

27  163:9-20.) The monthly publication of ratings at times only represented the opinions of approximately twenty people on the first post-op day. (Ex. 13; Ex. 16, verified

28  numbers of patients of StemGenex per month during the proposed Class Period, with authentication by Ex. 5, p. 89:1-13; Ex. 7, p. 210:8-25.)

(Henderson): "*Q: And what was your understanding of why it [the disclaimer] was being added? A: Because people were confused. Q: And why were they confused? A: I don't know. Q: How did you know people were confused? A: I believe this [lawsuit] started. This, the case, started.*"; Ex. 10, pp. 164:12-166:2.) This addition was too little, too late. It did not dispel confusion. (*See e.g.,* Ex. 12, pp. 239:1-241:17; *see also* Declaration of Plaintiffs' expert Dr. Michael A. Kamins, Ph.D. ("Kamins Decl."), Exhibit 1 thereto (which includes his findings/opinions), concluding that the disclaimer/exit survey did not eliminate confusion in the reasonable consumer.)

Basing the statistics of "patient satisfaction" with an expensive product on an "exit survey" done the day after injection is deceitful because StemGenex managing agents have publicly acknowledged "it can take months to fully realize the effectiveness of your treatment." (Ex. 14; Ex. 7, pp. 151:12-153:2 and 128:17-129:3; Ex. 8, pp. 163:7-16 and  164:14-167:10; *see also* attached Customer Declarations showing that upon complaints, customers would be told it can take months or a year.) Lallande knew he was taking part in the survey collection and its intended use (Ex. 30, Lallande's Response to Requests for Admission, No. 25), but he continued to allow this misleading information to be disseminated to the public. (Ex. 6, pp. 49:21-50:23; Ex. 11, pp. 316:13-319:1 and 322:13-324:18.)

The PSR postings and the meaning they conveyed to the public (as confirmed by the survey discussed below, and Class Member Declarations), was further supported by the fact that prospective customers were sent PSR's via email (Ex. 17; Declaration of patient/Named Plaintiff JENNIFER BREWER ("Brewer"), ¶ 11), and were also told of high "satisfaction" rates in emails (which even used the word "success") and over the phone by Patient Advocates who were often non-medically trained salespeople. (Ex. 5, pp. 62:9-63:23; Ex. 20, Patient Advocate Job Listing.[7])

---

[7] StemGenex had written materials in regard to making these statements, scripts, and templates. Defendants' "Patient Advocates" were trained to make these statements. (Ex. 18, training materials produced showing the PSR within the training materials; Ex. 19, Porter Novelli (reputation management company), PN 000101, "*Isn't this really just a placebo effect that patients are experiencing?*," the answer to this "Tough Question" appears in the script: "More than 95% of clients surveyed

7

Customers viewed these graphs as depicting past-patient satisfaction with outcome/effectiveness of the treatment in treating diseases, and as rates of positive effect, equating with success. (*See* Class Member Decl.) The success rates, however, are clearly false. (Ex. 5, p. 134:15-25.) Success rates were not tracked by StemGenex (Ex. 9, pp. 65:6-66:9.) The success rates have no supporting scientific evidence, nor basis upon reasonable patient expectations relating to the treatment. (Ex. 6, pp. 174:2-177:2 (Lallande): "*The studies aren't back, so I'm not sure how they would make a claim like that.*"; Ex. 7, pp. 193:22-194:1; Ex. 5, pp. 134:15-25 and 177:12-22 (Alexander): "*Yeah, the 90 percent success rate can be considered a temporary energy improvement in there. It could be any type of improvement whatsoever . . . I don't think patients expected a temporary energy improvement to be considered part of the success rate. Temporarily? No. For long term? Absolutely*"; Ex. 21, Deposition of Stephen Brody, former StemGenex Chief Scientific Officer, hired part-time to analyze "studies" and to speak before the FDA on behalf of StemGenex: "*Impossible*" to say [the success rate] as the studies were not completed, pp. 19:20-20:23, 38:9-18, 42:4-25, 72:20-25, 74:22-75:15, 77:17-78:1, 95:2-96:4, 97:5-15, 98:23-25, 153:15-20, and 164:14-165:15.)

Despite those important facts, StemGenex salespeople continued to repeat the satisfaction rates over and over (Ex. 5, pp. 72:21-74:16), with the full ratification of Alexander (Ex. 5, pp. 73:19-73:24), even at times while knowing of their falsity. (*Id*, at 122:20-124:12.) This bolstered the natural understanding prospective customers were applying  to the misleading and deceptive 100% satisfaction rates shown on www.stemgenex.com, and in the emailed PSR's. (*See also* Ex. 11, p. 267:15-18 (Franca Gardner): "*You don't spend $14,000 to have–for hope. You expect something.*") StemGenex further assured the public was kept in the dark as to the true

---

would recommend StemGenex to a friend or family member.") StemGenex will neither confirm nor deny that this produced script was used; but it was created for the company by its reputation manager and produced under subpoena. (Ex. 31, Defendant STEMGENEX, INC.'s Response to Requests for Admissions, No. 18.) Thus, the campaign was orchestrated by StemGenex to fuel the PSR as a strong decision factor.

PLAINTIFFS' POINTS AND AUTHORITIES ISO
MOTION FOR CLASS CERTIFCATION                    3:16-cv-02816-AJB-NLS

nature of what was being sold and patient satisfaction with this product/service because of its:

- **Failure to keep accurate or complete records** (Ex. 32, pp. 85:2-92:25, 94:5-95:21, and 101:6-102:5 (Corporate Designee Schubert): *"Unfortunately, it was a very unorganized system. It could have been a paper copy. They could have been in Salesforce. They could have all been in Salesforce. Some could have been paper and Salesforce..."*; Ex. 6, pp. 102:21-103:2),

- **Disconnect in follow-up between medical personnel and management and patients** (Ex. 6, pp. 38:3-23, 118:5-9, 129:12-25, 131:14-132:11, and 136:8-138:10; Ex. 8, pp. 191:17-192:11; Ex. 29, Lallande's Responses to Interrogatories, Nos. 8 & 9; Class Member Decl.), and

- **Campaign to remove negative reviews from the internet** (Ex. 10, pp. 89:15-102:14; Ex. 7, pp. 140:7-148:23; and Ex 33, produced emails re on-line reputation management).

Finally, the idea that there may be no result at all was only briefly and unclearly described in the middle of a brochure (Ex. 26, Deposition of Plaintiff ALEXANDRA GARDNER ("Gardner"), pp. 116:1-121:12), and then stated only in fine print in multi-page disclaimers that people signed only after paying a **non-refundable** $2,500 deposit and **only after traveling to California** for the treatment. This is at odds with the "proudly displayed" prominent, front-page colorful graphs stating universal satisfaction achieved. (*Id*, pp. 61:24-66:25 and 160:9-161:5; Ex. 12, pp. 103:11-106:12; Ex. 7, pp. 130:11-21, 226:4-227:4, 262:13-263:23, and 268:24-269:7.)

### C. The Misrepresentation Is Material

As discussed in Plaintiffs' expert witness reports, StemGenex's PSR's were material to consumers considering a medical treatment. StemGenex placed the PSR's in a prominent location on its website homepage. (Class Member Decl.; Ex. 7, pp. 129:9-131:15; Kamins Decl., Exhibit 1 thereto (conclusions at ¶ 68).) At the time StemGenex introduced the PSR, it was promoted through a press release, indicating

9

StemGenex was proud of the results and desired transparency. (Ex. 2; Ex. 7, pp. 123:7-126:2 and 233:9-14.) StemGenex also included the PSR's in solicitation emails. (*See* Class Member Decl.; Ex. 17 exemplar; Brewer Decl., ¶ 11.)

It is no surprise, then, that a survey of reasonable consumers confirmed the materiality of the PSR's. (*See generally* Declaration of Eliot C. Hartson, Ph.D., and Kamins Decl.) Based on that survey, Dr. Kamins, has opined that the PSR's are material to consumers' decisions to purchase SCTT. (Kamins Decl., Exhibit 1, ¶ 68.) Specifically, Dr. Kamins concludes that the PSR "is material in motivating the reasonable qualified consumer to consider getting StemGenex stem cell therapy to treat their disease, and that as presented, the claim is confusing to a significant percentage of consumers and is misinterpreted as meaning that the treatment is effective in treating their disease." (*Id.*) Numerous putative Class Members have also submitted sworn testimony that they viewed and relied on the PSR's in deciding whether to pursue SCTT. (*See* Class Member Decl.; *see also* Ex. 11, pp. 328:8-329:8.)

Further, courts recognize that "claims that 'significantly involve health, safety or other issues that would concern reasonable customers' to be presumptively material." *FTC v. National Urological Group, Inc*., 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008) quoting *F.T.C. v. QT, Inc*., 448 F. Supp. 2d 908, 960 (N.D. Ill. 2006). Therefore, the PSR is material and an inference of reliance may be made on a class-wide basis.

### D. The Class Was Exposed to the Misrepresentation

StemGenex admits that its most prominent interface with consumers is its website. (Ex. 8, p. 148:12-15). The website was the main tool, beyond word-of-mouth, that StemGenex used to drive interest in its SCTT. (Ex. 6, p. 41:10-18.) Indeed, numerous Class Members have attested not just that they saw and relied upon the PSR's on www.stemgenex.com, (Class Member Decl.), but many also were emailed the PSR separately. (Class Member Decl.; Ex. 17; Ex 5, p. 66:4-68:20; Ex. 32, p. 114:4-11.)

10

StemGenex has produced verified Class Member "Lead Source" lists (filed with names redacted in Ex. 22 "A" & "B").[8] List 22 "A" shows over 700 people who came to StemGenex during the Class Period through the website. List 22 "B" shows over 500 people who came to StemGenex during the Class Period through the website. The largest number of patients indicated the web was the source, as opposed to referral from another patient, for example. (Patient Source Lists, Ex. 22 "A" & "B.") Regardless, the misrepresentation was also actively reinforced by StemGenex salespeople in follow-up calls.[9]

/ / /

/ / /

---

[8] Two Class Member "source" lists were produced by StemGenex. The first (Ex. 22 "A") was taken from web applications and produced with a verification, but later had its completeness questioned by Defendants' own Corporate Designee. (Ex. 32, pp. 123:23-128:21 and 141:21-149:24.) The second list (Ex. 22 "B") produced after that deposition is purportedly more reliable. (*Id*, at 115:16-117:22 and 128:22-129:2.) StemGenex does not dispute that the sources of patients are ascertainable, to at least some degree of certainty, through StemGenex's records. (*Id*.) Patients have also self-identified. (*See* Class Member Decl.) Contact information exists for every customer. (Ex. 32, p. 154:5-8.) Obviously, the patients with source of *web* are numerous, in the many hundreds.

[9] Mr. Perricone, Defendants' former Patient Advocate Director in charge of salespeople from at least the time the PSR went onto the web in 2013 to May of 2015, testified (Ex. 5, pp. 72:21-74:12):

"*Q: To your knowledge, did patient advocates ever give patients information such as this which says: 'Today we see more than 90 percent success rate in positive responses', while you worked at StemGenex?'*

*A: Verbally, but never written like this.*

*...Q... But you were aware of patient advocates giving out that information verbally?*

*A. Yes.*

*Q. And how are you aware of that?*

*A. .... It almost seems like – to be honest, it was just something that went around that kind of snowballed, that number..."  ... "I think one rep started saying it, one patient advocate started saying it, and then another one started saying it, and then everybody started saying it, the 90 percent success rate.*

*Q. And was Rita Alexander aware of this while you worked at StemGenex?*

*A. Yes.*

*Q. Did Rita Alexander allow that to continue while you worked at StemGenex?*

*A. Yes.*

*Q. How prevalent was that statement while you worked at StemGenex?*

*A. Very. Objection. Vague. Probably every call. . . .*

*Q. Do you know whether there is any scientific basis to make such a claim?*

*A. There is none.*

11

### E. Plaintiffs Can Develop a Class-wide Damages Model

A common price transcends the time period in question: a typical price of $14,900 was charged throughout the Class Period, sometimes with minor increases or discounts to the base price. (Ex. 6, pp. 51:25-52:7, 52:19-21; Ex. 23, ad brochure packet page by StemGenex showing $14,900, and produced page PN 0000029 from StemGenex agent Porter Novelli; *see also* Class Member Decl.) One of Plaintiffs' retained expert witnesses, Dr. David Stewart, Ph.D., has submitted a declaration in which he concludes that he can use common evidence to prove damages or restitution under Plaintiffs' theory of liability. (Declaration of Plaintiffs' expert Dr. David W. Stuart, Ph.D. ("Stewart Decl."), Exhibit 1 thereto (which includes his findings/opinions), pp. 7-18.) Specifically, Dr. Stewart identifies the methodology he will use to determine the discount consumers would expect to pay for the SCTT had the PSR accurately reported the patient satisfaction rate. (*Id.*)

### F. The Roles of Each of the Defendants

STEMGENEX, INC. ("StemGenex, Inc.") acted as a Management Services Organization, selling the product/service which was adipose (belly fat)-based SCTT. It is responsible for the advertising at issue, which was done for its own benefit and the benefit of the other Defendants. StemGenex, Inc. is owned by Alexander, a non-physician, who could not lawfully have full ownership of a medical organization. (Ex. 7, p. 277:6-10; Ex. 8, pp. 82:24-83:2) At its inception, StemGenex, Inc. was a "referral" company, acting as if it simply connected patients with doctors. (Ex. 8, pp. 83:13-84:24.) It then transformed into a management/sales service, determining policy, making statements re: treatment of patients, handling medical records or data and influencing patient decisions, such as by having patients meet with Alexander at an "orientation" meeting. (Ex. 8, pp. 99:13-102:16; Class Member Decl.; Ex. 7, pp. 264:22-265:3.)

StemGenex, Inc. is a for-profit business. It had sales goals and its salespeople worked on commissions, including direct referral fees if an existing client made a

referral of someone who became a patient. (Carter Decl., ¶ 4, and Exhibit 1 thereto; Ex. 7, pp. 89:1-25, 235:8-22; Ex. 9, p. 130:1-24; Ex. 5, pp. 90:14-91:11 and 93:13-16.) This structure caused heavy sales pressure to be exerted onto prospective customers. (*See* Class Member Decl.)

All advertising began in the name of StemGenex, Inc. and proceeded under that banner on the website until approximately April of 2016. (Ex. 28, StemGenex, Inc.'s Response to Interrogatories, No. 1.) The advertising at issue in this case was disseminated to lure patients for all of the named defendants at one time or another during that same period. This ad campaign was uniform, highly orchestrated, concentrated and very focused on its intended audience. It was a long-term campaign lasting years. The effect was to make it highly likely that each member of the putative class was exposed to the same misrepresentations of tremendous satisfaction. (Class Member Decl.), and the survey performed by Dr. Kamins utilized the same material and came to the same conclusion. (*See generally* Kamins Decl., Exhibit 1 thereto.)

STEMGENEX MEDICAL GROUP, INC. ("SMG") is the operating business name for Lallande, its President and owner. (Ex. 6, pp. 33:3-13 and 33:23-34:11.) Advertising on the StemGenex website was done under the banner of SMG from April of 2016 to February of 2018. (Ex. 28, StemGenex, Inc.'s Response to Interrogatories, No. 2, example seen at Ex. 3, pp. 9, 12-13.)

STEM CELL RESEARCH CENTRE, INC. ("SCRC") is a corporation formed by Alexander, which at times was used to advertise for StemGenex and its agent doctor or doctors in this case. Advertising began under the banner of SCRC in February of 2018 and continued under that banner until present. (Ex. 7, pp. 288:18-23; Ex. 28, StemGenex's Response to Interrogatories, No. 3.) The PSR was removed from the web before that time. (Ex. 4, Clique Studios order to remove.) However, at times certain representations were made by Patient Advocates using the SCRC heading. (*See, e.g.*, Ex. 17.) Also, money for treatments came to SCRC, or funneled through it at certain times. (Ex. 7, pp. 179:1-180:21 and 287:11-18.) This company is alleged to

13

be an alter ego for StemGenex, Inc. and Alexander. (*See* Plaintiffs' operative Fourth Amended Complaint ("FAC"); Ex. 7, p. 171:5-14; Ex. 8, pp. 82:24-83:12, 192:8-10, 193:1-4.)

In late February/early March of 2015, Lallande became affiliated with StemGenex, Inc. through a series of verbal and written agreements, with him and his company, SMG. (See Ex. 24, Lallande C.V., and Ex. 25, agreement with StemGenex, Inc. and SMG; Ex. 6, pp. 28:22-29:12 and 35:12-17). He was the Medical Director responsible until at least January 2018, and working most closely with StemGenex, Inc. for carrying out the actual work of StemGenex: delivery of the medical service sold by StemGenex to the public, and advertised under the banner of his own company. (Ex. 6, p. 29:13-15; Ex. 28, StemGenex's Response to Interrogatories, No. 2.) At times, Dr. Lallande was observed to be "constantly" interacting with StemGenex President Alexander. (Ex. 9, pp. 153:17-154:4.) There is evidence that Lallande also collaborated in the development of marketing with V.P. Candace Henderson. (Ex. 8, pp. 87:16-88:12.) Lallande/his company was contractually and otherwise responsible to ensure the accuracy of the advertising done on his behalf. (*See* Ex. 25, p. 2 – Responsibilities of Operator [SMG] Section 2.2 (v) "Approve all advertising and marketing"; although Lallande testified to a different understanding, Ex. 6, pp. 28:22-29:15, 35:12-17, and 37:3-5.) He did have ability to, and was requested to review the website. (Ex 34.) He was aware of the PSR and he was involved in the gathering of the surveys forming the basis of the published PSR. (*See* Ex. 30, Lallande's Response to Request for Admissions, No. 25.) Lallande knew these were post-op questions reflecting only customer service, rather than satisfaction with outcome, but he did nothing by which to clarify that on the advertising done on his behalf, or even really to look at the advertising. (Ex. 6, pp. 85:3-86:22, 126:6-127:21, 48:4-50:23, and 40:6-13.)

Lallande was also aware customer expectations with outcome were not being met; nevertheless, he continued to disseminate misleading ads and information to

14

consumers. And, when patient confusion was clearly known to him upon the service of this lawsuit, he waited months and allowed the misleading PSR to continue to be disseminated at the very time when the name of his company was at the banner of the website containing the deceptive material on its home page. (Ex. 6, pp. 189:18-191:17; Ex. 28, StemGenex, Inc.'s Response to Interrogatories, No. 2.)

Alexander is the founder and leader of StemGenex, Inc. She was, and is still responsible for approval of all public statements on its behalf, including all advertising. She is the alter ego of the corporate defendants StemGenex, Inc. and SCRC. (Ex. 8, pp. 82:24-83:12.) It was Ms. Alexander who originally approved the PSR and retained its use even after knowledge of customer complaints and the misleading nature of the PSR. (Ex. 7, pp. 226:4-227:4, 282:4-9, and 135:23-139:20; Ex. 5, pp. 26:7-29:8 and 123:21-124:12.) In fact, efforts to deceive the public continued after the filing of this action because StemGenex maintained the ratings on its website, even though diminishing emphasis of the previous "perfect" scores. (Ex. 35, StemGenex-produced email.)

## III.  LEGAL ARGUMENT SUPPORTING CLASS CERTIFICATION

### A. Class Certification Should Be Granted

As the foregoing facts demonstrate, the merits strongly support Plaintiffs' claims for consumer fraud and misrepresentation. Nonetheless, the issue presented by this motion is not whether Defendants' PSR misrepresentation is, in fact, false and misleading, but whether Plaintiffs' claims can be adjudicated on a class-wide basis. The Court has broad discretion to grant class certification. *See Bateman v. Am. Multi-Cinema, Inc*., 623 F.3d 708, 712 (9th Cir. 2010). "Inadmissibility alone is not a proper basis to reject evidence submitted in support of class certification." *Sali v. Corona Regional Medical Center*, 889 F.3d 623, 632 (9th Cir. 2018).

Consumer protection claims are ideal for class certification. *See, e.g.*, *Amchem Prods. v. Windsor, Inc.*, 521 U.S. 591, 625 (1997). In fact, false advertising cases based on uniform misrepresentations are routinely certified as class actions under

15

California law within this Circuit–as well as in this Court–because common questions of fact and law predominate. *See*, *e.g.*, *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK (MRWx), 2014 WL 1410264, at *8, n.5 (C.D. Cal. Apr. 9, 2014) (collecting cases).

> [C]onsumer class actions and representative UCL actions serve important roles in the enforcement of consumers' rights. . . . These actions supplement the efforts of law enforcement and regulatory agencies. This court has repeatedly recognized the importance of these private enforcement efforts.

*In re Tobacco II*, 46 Cal.4th at 313 (internal citations and quotation marks omitted).

Courts certify a class pursuant to Rule 23 when: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and adequately protect the interests of the class[,] and the class satisfies the predominance and superiority prongs. Fed. R. Civ. P. 23. In deciding motions for class certification, the Court "examine[s] the merits of the underlying claim . . . only in as much as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011); *see also Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) ("Merits questions may be considered to the extent–but only to the extent–that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. . . . [A]n evaluation of the probable outcome on the merits is not properly part of the certification decision." (Citation and quotation marks omitted.)

## B. The Class Is Adequately Defined and Ascertainable

Although not specifically stated in Rule 23, courts have held the class must be adequately defined to proceed. *See Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504,

16

521 (C.D. Cal. 2012). A class definition is sufficient when it relies on objective, verifiable criteria. *Id,* at 521. "Under the law of th[e] [Ninth [C]ircuit, it is enough that the class definition describes 'a set of common characteristics sufficient to allow' an individual to determine whether she is a class member with a potential right to recover." *Krueger v. Wyeth, Inc.*, 310 F.R.D 468, 475 (S.D. Cal. 2015) ["[T]he language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017). Here, Plaintiffs seek to certify the following class of individuals:

**All persons residing in the United States who purchased Stem Cell Therapy Treatment from StemGenex for at least $14,900 between December 8, 2013 and the time of trial, after (a) visiting www.stemgenex.com when the website contained Patient Satisfaction Ratings and/or (b) receiving an email from StemGenex with Patient Satisfaction Ratings.**

The class definition ensures only those patients who were exposed to the offending misrepresentation qualify to make a claim. *See McCrary v. Elations Co., LLC*, No. EDCV 13–00242 JGB (OPx), 2014 WL 1779243, at *13 (C.D. Cal. Jan. 13, 2014) ("[T]he class definition presupposes exposure to the clinical proof claims. Any person who did not view the claims is not a class member and cannot raise any individualized issues."); *see also Krueger v. Wyeth, Inc.*, No. 03CV2496 JAH AJB, 2011 WL 8971449, at *15 (S.D. Cal. Mar. 30, 2011) (certifying class of consumers defined as those who "were exposed to a representation from [defendant]"). And, although not required at the class certification stage, a significant number of Class Members have been shown to be capable of identification through Defendants' records. (*See* Ex. 5, p. 131:16-24; Ex. 22 "A" and "B" re: Web Source; *see also* Ex. 17, p. 2 example, as to records of the Defendants about the emailing of PSR's.) Here, the class is certainly ascertainable.

17

### C. Plaintiffs Satisfy Rule 23(a) Prerequisites

#### 1. The Proposed Class Is Sufficiently Numerous

The proposed Class is "so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1). As a general rule, classes of 40 or more suffice. 5-23 J. Moore's Fed. Prac. - Civil § 23.22[1][b]; *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006) ("A class with over forty members is presumed to satisfy the numerosity prerequisite.") Defendants' records, as well as the declarations of Class Members, indicate the Class is comprised of hundreds, at a very minimum 500, who purchased SCTT and were exposed to the PSR during the Class Period. (Ex. 22 "A" and "B.")

#### 2. Plaintiffs' Claims Raise Issues Common to the Class

Commonality requires that class members share a common claim that is "capable of class-wide resolution," meaning that determination of the claims' "truth or falsity will resolve an issue that is central to [the claims'] validity. . . in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("*Dukes II*"). Commonality is a "limited burden": there need be only one common question. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012). "Where the circumstances of each particular class member vary, but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (alteration in original). "What matters to class certification . . . [is] the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes II*, 564 U.S. at 350 (quotation marks and citation omitted).

Here, Plaintiffs' claims arise from a uniform misrepresentation, meaning Class Members were exposed to the same patient satisfaction ratings, the truth or falsity of which will resolve a common issue central to all claims "in one stroke." *Guido v. L'Oreal, USA, Inc*., Nos. CV 11–1067 CAS (JCx), CV 11–5465 CAS (JCx), 2013 WL 3353857, at *4 (C.D. Cal., July 1, 2013); *Forcellati,* 2014 WL 1410264 at *9 (same).

18

Materiality is also a common issue because "this inquiry focuses on *the [d]efendants'* representations." *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 537 (C.D. Cal. 2011) (collecting cases) (emphasis added). As Dr. Kamins concludes, the PSR misrepresentation is material to a reasonable consumer. As such, class-wide reliance is presumed or inferred. *Ehret v. Uber Technologies, Inc.,* 148 F.Supp.3d 884, 901-902 (N.D. Cal. 2015) [citing *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (*abrogated on other grounds*)]. Importantly, materiality is evaluated through "a single, objective 'reasonable consumer' standard–not, as [d]efendants urge, a subjective test that inquires into each class member's experience with the product." *Bruno,* 280 F.R.D. at 537. Thus, commonality is also satisfied.

### 3. Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) typicality is satisfied where a named plaintiff's claims are "reasonably co-extensive" with absent class members' claims. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). The interests and claims of named plaintiffs and class members need not be identical; if their claims are based on the same legal or remedial theory, differing fact situations do not defeat typicality. *Ellis,* 657 F.3d at 984; *see also Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 475, n.6 (whether the misrepresentation at issue "may not have had the 'same impact on all consumers' and may not have informed an individual's buying decision is not relevant, because the standard is an objective one").

Typicality is met here because Plaintiffs and the proposed Class assert the same claims arising from the same course of conduct: Defendants' uniform misrepresentation of patient satisfaction via the PSR, receipt of the same SCTT, and

19

payment of a similar fee to StemGenex.[10] Plaintiffs' economic injuries arose in the same manner as every other Class Member.

### 4. Plaintiffs and Their Counsel Will Adequately Represent the Class

Plaintiffs Ms. Brewer and Ms. Gardner seek to be appointed as Class Representatives. Rule 23(a)(4) requires Plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." Class representatives are adequate when: (1) there is no conflict of interest between the representatives, their counsel, and absent class members; and (2) the representative and their counsel will "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F. 3d at 1020; *see also Wiener v. Dannon Co.*, 255 F.R.D. 658, 667 (C.D. Cal. 2009).

Here, Ms. Brewer and Ms. Gardner's interests are aligned with those of the Class Members because they have been harmed by the same common misconduct and seek the same or similar relief. Ms. Brewer and Ms. Gardner each claim Defendants have committed acts of fraud and misrepresentation for which they seek the same or similar amount of restitution and damages as the Class. Ms. Brewer and Ms. Gardner have actively participated in this litigation on behalf of the Class by consistently communicating with counsel; responding to discovery, and sitting for lengthy depositions. They are fully aware that they are pursuing this action as potential Class Representatives of a Class of StemGenex patients misled by the PSR, and they are knowledgeable and informed about the claims in this action and the relief they are requesting. (*See* Declarations of Jennifer Brewer, ¶¶ 11-19, and Alexandra Gardner ¶¶ 12-20.) Their interests are aligned with those of other Class Members, they have no conflicts of interest, and they understand the risks associated with pursuing these claims; thus, they are adequate and qualified to be appointed as Class Representatives. (*Id.*; s*ee also* Declarations of Plaintiffs' counsel Elizabeth Banham ("Banham Decl."),

---

[10] While customers might have had different expectations because of their disease, its advancement, or their own sophistication, all of them thought they would achieve some positive relief from the $14,900 STCC that would last more than a few hours or days.

20

Janice Mulligan, Brian Findley, Harvey Berger, Timothy Williams, and Stephanie Reynolds (altogether, "Pl. Counsel Decl.")

Plaintiffs' counsel has also aggressively pursued this case for the past two years. This has included advancing over $100,000 in costs to date (Banham Decl., ¶ 16), engaging in extensive discovery and law-and-motion work (as demonstrated, in part, by this Court's electronic docket), and attending depositions of StemGenex patients in San Diego and across the country: for example, Selena Moorer (Florida), Rebecca King's physician (Missouri), G. OL. (Hawaii) and C. Wi. (Texas). (Pl. Counsel Decl.) Plaintiffs' counsel also have significant experience prosecuting complex and class action litigation, as well as medical consumer and negligence cases. (*Id.*)

### D. The Requirement of Rule 23(b)(3) Are Satisfied

Under Rule 23(b)(3), a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) encompasses cases "in which a class action would achieve economies of time, effort, and expense, and promote. . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc.,* 521 U.S. at 615; *Wiener*, 255 F.R.D. at 668.

### 1. Common Issues Predominate

Rule 23(b)(3) demands only predominance of common questions, not exclusivity or unanimity of them. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (citation omitted); *Edwards v. The First Am. Corp.*, 251 F.R.D. 454, 458 (C.D. Cal. 2008)

21

("Predominance is determined not by counting the number of common issues, but by weighing their significance"); *In re High-Tech Emple. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187 (N.D. Cal. 2013) ("The predominance inquiry is not a mechanical inquiry of 'bean counting.'"). Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof." *Amgen, Inc.*, 133 S. Ct. at 1196 (emphasis in original). As such, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper . . . even though other matters will have to be tried separately." *Gartin v. S & M Nutec, LLC*, 245 F.R.D. 429, 435 (C.D. Cal. 2007) (internal citation omitted; alteration in original); *see also Wiener*, 255 F.R.D. at 668.

The Supreme Court has noted that predominance is readily met in consumer fraud cases. *Amchem Prods., Inc.*, 521 U.S. at 625. And "[c]ourts in California routinely find that this inquiry focuses on the defendants' representations about the product and applies a single, objective 'reasonable consumer' standard—not, as defendants urge, a subjective test that inquires into each class members' experience with the product." *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. at 537.

Common issues unquestionably predominate in Plaintiffs' fraud-based claims. With respect to liability, as noted above, there are two overriding common questions: (1) whether Defendants misrepresented the PSR; and (2) whether the misrepresentation was likely to deceive a reasonable consumer. The first common question is binary–either the PSR has a tendency to mislead or not. This question, on its own, predominates over any potential individual questions. It is one of, if not *the* most significant aspect of this case and "can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. If each Class Member were to pursue his or her claim individually, the evidence regarding the falsity of Defendants' PSR would be identical in each case. *See O'Donovan v. CashCall, Inc.*, 278 F.R.D. 479, 493 (N.D. Cal. 2011) (in finding predominance, court found that each of the

22

1  common questions can be proven with "generalized evidence…on a class-wide
2  basis").

3      The second predominating question–whether the PSR misrepresentation is
4  likely to deceive a reasonable consumer–is an objective inquiry based on the
5  materiality of the representation which is the same test for all of Plaintiffs' claims.[11]
6  *See In re Tobacco II*, 46 Cal. 4th at 327 (CLRA and UCL claims); *see also Kwikset*
7  *Corp.,* 51 Cal. 4th at 332–33 (same). And, the misrepresentation need only be a
8  "factor"–not the only factor nor even a "predominating factor"–motivating the
9  purchase. *See In re Tobacco II*, 46 Cal. 4th at 326–27; *see also Kwikset Corp.*, 51 Cal.
10 4th at 327 (same). As the Court found in *Forcellati*, whether "a large number of
11 factors may have gone into each consumer's decision to purchase Defendants'
12 products is immaterial here given the objective materiality of the alleged
13 misrepresentations." 2014 WL 1410264, at *11. A class-wide inference of reliance is
14 permitted "notwithstanding a showing by defendant that some class members would
15 have bought the product with knowledge of the representation's falsity." *Krueger*,
16 2011 WL 8971449, *4 citing *Steroid Hormone Product Cases*, 181 Cal. App.4th 145,
17 157 (2010).

18      **a. Reliance and Causation Issues Do Not Defeat Predominance of**
19          **Plaintiffs' UCL "Fraudulent" Prong, CLRA, Negligent**
20          **Misrepresentation and Fraud Claims**

21      "The UCL reflects the Legislature's intent to discourage business practices that
22 confer unfair advantages in the marketplace to the detriment of both consumers and
23 law-abiding competitors." *Rose v. Bank of Am., N.A.*, 57 Cal. 4th 390, 396 (2013).
24 Relief under the UCL is available "without individualized proof of deception, reliance
25 and injury." *Stearns v. Ticketmaster Corp.*, 655 F.3d at 1020 (quoting *In re Tobacco*
26 *II*, at 326-27; *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985-

27  ───────────────
28  [11] This Court has previously held that "[c]laims under the UCL, FAL, and
    CLRA are governed by the reasonable consumer test . . . [and] [t]his standard also
    applies to common law fraud and negligent misrepresentation claims." *Moorer*, 2017
    WL 1281882, at *7.

23

986 (9th Cir. 2015). "[T]he UCL's focus [is] on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *In re Tobacco II,* at 312.

The CLRA is intended "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Cal. Civ. Code § 1760. It is to be "liberally construed and applied to promote its underlying purposes." *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 938 (C.D. Cal. 2012).

It is well established that to succeed on a consumer protection claim under the UCL, CLRA and FAL, Plaintiffs need only "show that members of the public are likely to be deceived." *Moorer,* 2017 WL 1281882, at *8; *see also Forcellati*, 2014 WL 1410264, at *9 ("For purposes of class certification, the UCL, FAL, and CLRA are materially indistinguishable. . . . Each statute allows Plaintiffs to establish the required elements of reliance, causation, and damages by proving that Defendants made what a reasonable person would consider a material misrepresentation.") (citing *Delarosa v. Boiron, Inc.,* 275 F.R.D. 582, 589 n.3 (C.D. Cal. 2011); *Bruno,* 280 F.R.D. at 534). Additionally, the California consumer protection laws take an objective approach – that of the **reasonable** consumer, not the **particular** consumer. A business practice is likely to deceive the public where "it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003); *see also In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 130 (2009) ("The question has arisen as to which members of the public need be likely to be deceived. The law focuses on a reasonable consumer who is a member of the target population.")

To prove a UCL claim, one need only show that the members of the public are likely deceived. *In re Tobacco II*, 46 Cal. 4th at 312. No proof of individual reliance, deception, or injury is required, because the test is an objective one. *Beck-Ellman v.*

24

*Kaz USA*, Inc., 283 F.R.D. 558, 568 (S.D. Cal. 2012); *Johns v. Bayer Corp.*, 280 F.R.D. 551, 558 n.4 (S.D. Cal. 2012) (Battaglia, J.). Thus, for the Class's UCL claim, reliance and causation must be established only for lead Plaintiffs. *In re Tobacco II*, 46 Cal. 4th at 326-27; *Mass. Mutual Life Insurance Company ("Mass Mutual")*, 97 Cal. App. 4th 1282, 1288 (2002). Customers/Putative Class Members, as well as the proposed Class Representatives have testified that they saw the PSR and relied on it in making their purchase decisions. (Brewer Decl. ¶ 6; Gardner Decl., ¶ 6; Class Member Decl.) Plaintiffs' testimony establishes causation as to the PSR misrepresentation and puts its falsity at issue, at least as to their individual claims. And, where, as here, the misrepresentations are uniform and all class members were "exposed" to them, proof of class-wide reliance is not a requirement for a class to recover under the UCL. *See Gutierrez v. Wells Fargo Bank NA*, 589 Fed. Appx. 824, 827 (9th Cir. 2014) (rejecting defendant's argument that district court was not "empowered" to award class-wide restitution under the UCL because class-wide reliance had not been established because "the record is replete with examples of [the defendant's] false and misleading statements" (citing *In re Tobacco II*); *McKinnon v. Dollar Thrifty Auto. Grp. Inc., No.* CV 12–cv–04457–SC2015, WL 4537957, at *7 (N.D. Cal. July 27, 2015) (all the UCL requires is evidence that "all members of the class were exposed to [the] deceptive practice"); *see also Circle Click Media LLC v. Regus Mgmt. Grp. LLC, No.* 3:12-CV-04000-SC, 2015 WL 6638929, at *13 (N.D. Cal. Oct. 29, 2015) (same); *Brown v. Hain Celestial Grp. Inc.,* No. 11–cv–03082–LB, 2015 WL 3398415, at *8 (N.D. Cal. May 26, 2015) (UCL does not require individualized proof of injury and causation).

Further, although the CRLA does require a showing of class-wide reliance, the CLRA is to be "liberally construed" and "[c]onduct that is 'likely to mislead a reasonable consumer' thus violates the CLRA." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 680 (2006). The Ninth Circuit has held that under the CLRA: "If the trial court finds that material misrepresentations have been made to the

entire class, an inference of reliance arises as to the class." *Ehret,* 148 F. Supp.3d at 902 (citing *Stearns*, 655 F. 3d at 1022 (internal citations and quotation marks omitted); *see also Guido,* 284 F.R.D. at 482 (citing *Mass. Mutual,* 97 Cal. App. 4th at 1292). As the court in *Mass Mutual* explained:

> Causation as to each class member is commonly proved more likely than not by materiality. That showing will undoubtedly be conclusive as to most of the class. The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all.

97 Cal. App. 4th at 1292. The same presumption of reliance is applicable to Plaintiffs' fraud and negligent misrepresentation claims. *See In re Brazilian Blowout Litig.*, No. CV 10-8452-JFW (MANx), 2011 WL 10962891, at *8 (C.D. Cal. Apr. 12, 2011) (recognizing presumption of reliance for and certifying common law fraud and negligent misrepresentation claims).

Materiality is "judged by an objective, 'reasonable man' standard," not individual subjective beliefs, and is "subject to common proof." *In re POM Wonderful Mktg. & Sales Practices Litig.*, No. ML 10-02199 DDP (RZx), 2012 WL 4490860, at *5 (C.D. Cal. Sept. 28, 2012), *decertified on other grounds*, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) (citations omitted); *see also Amgen, Inc.,* 133 S. Ct. at 1195-96 (because the "'[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor,' materiality can be proved through evidence common to the class. Consequently, materiality is a 'common question[n]' for purposes of Rule 23(b)(3)") (citations omitted.)

Here, an inference of class-wide reliance is warranted. Dr. Kamins' expert opinion, as well as the declarations of a significant number of Class Members support a finding of materiality. Furthermore, the PSR was prominently displayed on

26

www.stemgenex.com and was also emailed to prospective patients. (Ex. 3, pp. 12, 18-21, 27-35; Ex. 17; Brewer Decl., ¶ 11; Class Member Decl., e.g., W. Dy., C. Lu., G. OL., I. Pe., R. Za.).) Defendants believed that the PSR created "transparency" and expected prospective patients to rely on it. (Ex. 2, press release.) Because Plaintiffs demonstrate class-wide exposure through common evidence, proof of reliance under the CLRA and common law fraud negligent misrepresentation may be inferred from circumstantial evidence warranting submission to a jury without testimony from each Class Member. (*See, e.g.*, Ex. 2, Press Release; Ex. 1; Ex. 3, published PSR charts; Class Member Decl. re: exposure and reliance; Ex. 22 "A" & "B," Lead Source lists; Ex. 17, emailed PSR's.)

### b. Plaintiffs' UCL "Unfair" Claim

As with the fraudulent-prong UCL claim, the focus of the UCL is on the Defendants' conduct. As such, the recognized test for unfairness can be proved through the use of common evidence, including: Defendants' testimony and documents, as well as Class Member declarations. For this reason, courts routinely certify "unfair" prong claims under the UCL. *See, e.g., Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 737 (9th Cir. 2007); *Abbit v. ING USA Annuity*, No. 13CV2310-GPC-WVG, 2015 WL 7272220, at *11 (S.D. Cal. Nov. 16, 2015); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 669 (S.D. Cal. 2010); *Gaudin v. Saxon Mortgage Servs., Inc.*, 297 F.R.D. 417, 430 (N.D. Cal. 2013); *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355, 363 (N.D. Cal. 2011).

### 2.  Relief Can Be Calculated on an Aggregate Class-wide Basis

While a class plaintiff needs to demonstrate a likely method for determining class-wide damages, "it is not necessary to show that his method will work with certainty at this time." *Chavez v. Blue Sky Nat. Bev. Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010). It is enough that "some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Pulaski*, 802 F.3d at 989 quoting *Marsu, B.V. v. Walt Disney Co.,*

27

185 F.3d 932, 938–39 (9th Cir.1999). Further, if damages calculations are made more difficult because the defendant has failed to maintain organized records, the consequences of such failure fall on the defendant. *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 621 (C.D. Cal. 2015). Here, class-wide damages or restitution are capable of common proof. Dr. Stewart, a specialist in marketing and pricing, provides that the amount that each Class Member overpaid for SCTT can be determined by means of a survey and reasoned methodology. Therefore, common question predominate among Plaintiffs' and Class Member's claims.

Alternatively, Plaintiffs submit that the Court can certify a liability-only Class in this action, pursuant to Rule 23(c)(4). *Loritz v. Exide Techs.*, No. 2:13-CV-02607-SVW-E, 2015 WL 6790247, at *23 (C.D. Cal. July 21, 2015) ("where the only bar to certification is the failure to present a damages model, the Court may certify a liability-only class."); *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 533 (C.D. Cal. 2015), *modified,* 314 F.R.D. 312 (C.D. Cal. 2016) (certifying UCL and CLRA claims for liability issues only).

### 3. This Class Action Is Superior to Other Available Methods for Adjudicating Class Members' Claims

Rule 23(b)(3) also requires that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This superiority requirement is met where, as here, "recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis." *In re Google Referrer Header Privacy Litigation*, 869 F.3d 737, 743 (9th Cir. 2017); *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010); *Amgen*, 133 S. Ct. at 1202. Plaintiffs have incurred the costs of at least sixteen depositions, expert fees, as well as copying, document management, legal research and support costs. (Banham Decl., ¶16.) These costs would grossly exceed the potential recovery of a consumer pursuing an individual action. William B. Rubenstein, Newberg on Class Actions § 8:40 (4th

PLAINTIFFS' POINTS AND AUTHORITIES ISO
MOTION FOR CLASS CERTIFCATION                    3:16-cv-02816-AJB-NLS

1  ed. 2017) ("though the existence of small claims may be a strong factor in upholding a

2  class, the class should not be denied merely because individual claims are large.").

3  Further, hundreds of individual actions would consume significant judicial

4  resources, which is contrary to the goals of efficiency and judicial economy advanced

5  by Rule 23. *See Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 946-947 (9th

6  Cir. 2009); *Delarosa v. Boiron, Inc*., 275 F.R.D. at 594. Even if some case

7  management difficulties arise from certifying the class, a class action is still more

8  manageable than the alternative of hundreds of individual actions. *Soto v. Diakon

9  Logistics (Delaware), Inc*., No. 08-CV-33-L WMC, 2013 WL 4500693, *7 (S.D. Cal.

10  Aug. 21, 2013), *clarified on denial of reconsideration* (S.D. Cal., Nov. 5, 2013, No.

11  08CV0033 L WMC) 2013 WL 5939787 (prospect of 300 individual actions supported

12  finding of superiority where potential recovery could exceed $50,000 per class

13  member); *In re Heritage Bond Litigation*, No. CV 01-5752 DT, 2004 WL 1638201, at

14  *11 (C.D. Cal., July 12, 2004) (granting class certification where many class members

15  potential damages exceeded $50,000.)

16  There is also no evidence that any other patient is pursuing an individual claim

17  against StemGenex for the issues in this case, nor that any other class action is

18  pending against the Defendants on the issues presented here. Consequently, this case

19  stands as the only, and most appropriate vehicle by which the Class and all

20  Defendants can resolve the controversies raised by Plaintiffs' FAC.

21  Finally, the Southern District is a desirable forum in which to concentrate the

22  litigation of Plaintiffs' claims. Defendants have operated StemGenex in this District,

23  providing the STCC to Class Members in Del Mar. (See Ex. 3, p. 13.) All counsel

24  have offices in this District. And this case does not present any unique difficulties to

25  managing it as a class action here.

26  ## IV.  **CONCLUSION**

27  For all of the above reasons, Plaintiffs' motion should be granted. Plaintiffs

28  request the Court certify the proposed Class, designate Ms. Brewer and Ms. Gardner

29

as Class Representative, appoint Plaintiffs' counsel as Class Counsel, and direct Plaintiffs' PROPOSED Notice of Pendency of Certified Class Action (Ex. 36) to be sent to Class Members.

Respectfully submitted,

Dated: August 6, 2018            **MULLIGAN, BANHAM & FINDLEY**

                                                     **BERGER, WILLIAMS & REYNOLDS, LLP**

                                                     By: /s/ Harvey C. Berger
                                                     Harvey C. Berger
                                                     Attorneys for Plaintiffs

30