1   Janice F. Mulligan, SBN 99080
    mulligan@janmulligan.com
2   Elizabeth A. Banham, SBN 131734
    banham@janmulligan.com
3   Brian K. Findley, SBN 251172
    findley@janmulligan.com
4   **MULLIGAN, BANHAM & FINDLEY**
    2442 Fourth Avenue, Suite 100
5   San Diego, California 92101
    Telephone: (619) 238-8700
6   Facsimile: (619) 238-8701

7   Harvey C. Berger, SBN 102973
    berger@bwrllp.com
8   Timothy G. Williams, SBN 193810
    williams@bwrllp.com
9   Stephanie Reynolds, SBN 220090
    reynolds@bwrllp.com
10  **BERGER, WILLIAMS & REYNOLDS, LLP**
    401 B Street, Suite 2000
11  San Diego, California 92101
    Telephone: (619) 595-1366
12  Facsimile: (619) 236-9677

13      Attorneys for Plaintiffs and Putative Class Members

14              **UNITED STATES DISTRICT COURT**

15          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

16

17  SELENA MOORER, individually and on      Case No.: 3:16-cv-2816-AJB-NLS
    behalf of others similarly situated,
18
19          Plaintiffs,                      **DECLARATION OF**
                                             **MICHAEL A. KAMINS, Ph.D.**
20  vs.

21  STEMGENEX    MEDICAL    GROUP,
    INC., a California corporation;
22  STEMGENEX, INC., a California
    corporation; STEM CELL RESEARCH
23  CENTRE, INC., a California Corporation;
    ANDRE P. LALLANDE, D.O., an
24  Individual; SCOTT SESSIONS, M.D.,
    and Individual; RITA ALEXANDER, an
25  Individual; and DOES 1-100,

26          Defendants.

27

28

---
- 1 -
DECLARATION OF MICHAEL A. KAMINS

3:16-cv-02816-AJB NLS

I, Michael A. Kamins, declare as follows:

1. I have personal first-hand knowledge of the matters stated herein except those matters stated on information and belief, and as to those, I believe them to be true. I am competent to testify and if called as a witness, I could and would competently testify as follows under penalty of perjury under the Laws of the State of California and the United States:

2. I am Director of Online Programs, Full Professor, and Visiting Professor of Marketing at the Peter F. Drucker Graduate School of Management at Claremont University.

3. I was asked by the law firms of Mulligan, Banham, and Findley and Pope, Berger, and Williams to conduct an empirical study to examine various inferences made by qualified respondents when exposed to one of two homepages of a website for StemGenex, a company that provides stem-cell therapy to individuals who suffer from specific types of chronic illnesses and degenerative diseases.

4. A true and correct copy of my report containing a complete statement of all of my opinions, the bases for those opinions, and the facts and/or data considered in forming those opinions is attached. [EXHIBIT 1]. The information contained therein is true and accurate.

5. A true and correct copy of the relevant portions of the depositions of Gibrahn Verdault, Rita Alexander, Jamie Schubert, Candace Henderson, and Joe Perricone I reviewed are attached. [EXHIBIT 2].

6. A true and correct copy of my Curriculum Vitae is attached. [APPENDIX A].

7. A true and correct copy of all cases in which I have testified at deposition or at trial within the past 4 years is attached. [APPENDIX B].

/ / /
/ / /
/ / /

8.     I am compensated at the rate of $695/hour for consultation, deposition, and trial time in this case.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct, and that this Declaration was executed on ___JULY   14 TH___, 2018, in ___CLAREMONT___, (city), ___CALIFORNIA___ (state).

Dated: ___7 / 14 / 18___

Michael A. Kamins, Ph.D.

**DECLARATION OF MICHAEL A. KAMINS, PH.D.**


Re: Moorer, et. al. v. Stemgenex Medical Group,Inc., et. al.
Case No.: 3:16-cv-02816-AJB-NLS


# EXHIBIT 1

**EXHIBIT 1
PAGE 1**

I, Dr. Michael A. Kamins, declare under penalties of perjury that the following is true and correct:

## I.      PURPOSE OF THE REPORT AND OVERVIEW

1.      I was asked to conduct an empirical study to examine various inferences made by qualified respondents when exposed to one of two homepages of a website for StemGenex, a company that provides stem cell therapy to individuals who suffer from specific types of chronic illnesses and/or degenerative diseases.

2.      Through the use of the "Wayback Machine" (an internet based digital archive of the Worldwide Web) one can view archived digital versions of web pages across time from different entities.  In the present study, the website homepage of StemGenex was captured using this technology for two different dates: March 21st 2015 and May 16th 2016.  Approximately half of the sample was exposed to the 3/21/15 Website homepage (n = 126) and the remaining group (n = 127) was exposed to the 5/16/16 website homepage of the company.  The reason that two different stimuli were used is that, in part, it was of interest to examine whether or not an added disclaimer appearing below data presented in charts titled: "StemGenex Patient Satisfaction Ratings" at the very bottom of the website homepage impacted qualified respondent beliefs.  The disclaimer written in a small font size, I am informed first appeared on or after 5/5/16, noting: "The patient satisfaction ratings above, represent data received from patient exit surveys evaluating patient experience and care, accommodations, staff and facilities."

3.      The study which used the March 21st 2015 StemGenex website homepage therefore did not have the disclaimer present under the set of 4 charts indicative of StemGenex Patient Satisfaction Ratings. (Cell A); whereas the website homepage used as a stimulus in Cell B, from May 16th 2016 did have the disclaimer present under the set of 9 charts indicative of

EXHIBIT 1
PAGE 2

StemGenex Patient Satisfaction Ratings.  Hence the use of two different stimuli, one which recorded the disclaimer and one which did not, enabled the researcher to create a traditional test versus control experimental design when it came to respondent inferences relating to the StemGenex Patient Satisfaction Ratings set of charts. In this expert report, data were tabulated separately for the two cells (Cell A and Cell B).  The two cells each had a statistical confidence range within +/- 8.8 at a 95% confidence level.

4.     Specifically, the study was conducted to answer two primary questions of those qualified respondents who were likely to consider stem cell therapy from StemGenex relating to the statement on the bottom of the StemGenex website homepage relating to 100% patient satisfaction.  First, it was of interest to determine the relative influence that this statement among a set of nine other factors/statements appearing on the StemGenex website had on the respondent's willingness to consider StemGenex stem cell therapy. In particular, the research focus was on the relative importance of the information provided in the "StemGenex Patient Satisfaction Chart" that: patient satisfaction research revealed 100% of StemGenex patients described their "overall experience" with StemGenex as having exceeded (73%) or met (27%) their expectations.[1] This was an important component of the research effort because if qualified respondents valued this information in their decision to undergo a StemGenex procedure, then it could be considered as a material element of their decision process.  Whether or not this information is then determined to be deceptive, relates to how the information is interpreted by a reasonable and qualified respondent. This focus represented the second research objective.

---

[1] Note that these figures of 73% exceeding one's expectations and 27% having met their expectations relates to the March 21st webpage.  The stimulus involving the May 16th website respectively accurately reported 88% having exceeded one's expectations and 12% having met their expectations.

**EXHIBIT 1
PAGE 3**

5.      For our second research question, respondents were asked for their interpretation of the meaning of the "StemGenex Patient Satisfaction Ratings Chart" presented on the bottom of the homepage.  In particular, we asked respondents what the ratings referred to, and provided a series of answers inclusive of patients' ratings of their experience with care, accommodations, staff and facilities up through (a) the day after treatment, (b) up through a longer period of time after treatment and finally (c) patients ratings of the effectiveness of the stem cell therapy in treating their disease.[2]  I have been informed that the correct answer is (a) above and hence this question enables the researcher to examine the degree of confusion relating to the data presented in the patient satisfaction chart at the bottom of the StemGenex website.

6.      The third and fourth research goals of the study were secondary in importance and were directed on examining qualified respondents' perspective of the time-period represented by the StemGenex Patient Satisfaction Ratings chart as well as the number of individuals (patients) the chart is based upon.

## II.   OVERVIEW OF FINDINGS

7.   In terms of research Question #1, regarding the determination of the relative importance of the claim on the StemGenex website homepage that "Patient satisfaction research revealed 100% of StemGenex patients described their "overall experience" with StemGenex as having "exceeded" or "met" their expectations," this statement was ranked as #1 in importance in terms of motivating the qualified respondent to consider undergoing StemGenex stem cell therapy in Cell A without the disclaimer. In terms of Cell B, where the disclaimer was present, this statement finished 2nd in importance. The implication of this finding is that this claim appearing on the StemGenex website homepage **is material** to consumers in motivating their consideration of being treated by StemGenex.

---

[2] Options relating to "None of the above," as well as "No opinion/Don't know," were also provided.

EXHIBIT 1
PAGE 4

8.  When the data is generalized to consider whether-or-not a given statement was ranked within the top 4 of the nine statements presented to each individual, results showed in Cell A that 65% of individuals rated the 100% satisfaction statement in the top four, a percentage **higher than any other statement**. In Cell B, the same statement was ranked as tied for first in importance with 57% of individuals rating it in the top 4 in importance.  This alternative analysis again shows that the 100% satisfaction statement is material in the consumer's decision to pursue therapy with StemGenex.

9.  Research question #2 deals with the respondents' interpretation of the 100% satisfaction statement in terms of meeting or exceeding expectations.  While the statement relates specifically to patient experience and care, accommodations, staff and facilities, 62% of respondents in Cell A (without the disclaimer) and 45% of respondents in Cell B (with the disclaimer) believed that it relates to the effectiveness of the stem cell therapy in treating their disease.  Both of these percentages represent **significant confusion** for a statement shown in research Question #1 to be material in motivating patients to consider going to StemGenex for treatment. Moreover, while the disclaimer present in Cell B reduces the confusion significantly by 17 percentage points, the 45% confusion which remains is significant.

10.  Finally, the first secondary research question determined that the 100% patient satisfaction statement was interpreted by the majority of qualified respondents for each cell as involving "everyone treated by StemGenex," through the specified date in the stimulus. While the data does reveal some degree of uncertainty among the sample, this is to be expected as the

4

**EXHIBIT 1**
**PAGE 5**

company itself, StemGenex is apparently uncertain as to the time period that this material attribute represents.[3]

## III.   BACKGROUND AND QUALIFICATIONS

11.      I am presently Director of Online Programs, Full Professor and Visiting Professor of Marketing at the Peter F. Drucker Graduate School of Management at Claremont University. I presently teach Marketing Management to their EMBA program and Marketing Strategy to their CORE marketing program. In the fall of 2018, I will teach Marketing Research online and "on the ground," at Claremont. Previous to my current appointment, which began on January 1, 2018, I served as Director of Research, Full Professor and Area Head of Marketing with tenure at the Harriman School of Business at Stony Brook University-SUNY. At Stony Brook, I exclusively taught courses in marketing at the graduate level, including Marketing Research, Marketing Management, and Marketing Strategy. Prior to my position at Stony Brook, I was an Associate Professor of Marketing, with tenure, at the Marshall School of Business Administration (University of Southern California) where I taught for over 24 years. While at USC, I taught courses at the executive, doctoral, graduate, and undergraduate level in strategic marketing management and marketing research. I also taught in USC's prestigious Global Executive MBA program (GEMBA) in Shanghai, China as well as in the USC Executive MBA program.

12.      My research and teaching excellence has been recognized at the national level in the

past. For example, my paper with Valerie S. Folkes titled, "Effects of Information about Firms' Ethical and Unethical Actions on Consumers' Attitudes," was selected to represent the year "1999" in a special issue of the *Journal of Consumer Psychology* celebrating 20 years of

---

[3] Please see selected sections of the deposition of: Gibrahn Verdault (former Patient Advocate Director); Candace Henderson (former V.P of the company); Joe Perricone (former Patient Advocate Director); Jamie Schubert (Director of Marketing); and Rita Alexander (Owner/President).

EXHIBIT 1
PAGE 6

publication. I have also advised numerous companies regarding their advertising, marketing, and marketing research practices both in my capacity as Director of the IBEAR (International Business Education and Research) International Business Consulting Project at the University of Southern California, as well as in many other independent consulting assignments.

13.     Throughout my career, I have focused on how consumers interpret advertising and promotional material as related to the products they purchase through the measurement of various dependent measures such as attitude, cognition, behavioral intention and verbal protocols. I have also focused on how consumers weigh attributes in decision-making as well as how the expectations that they have of product performance on various attributes ultimately influences product evaluation after trial.

14.     I have conducted over 600 consumer surveys across various products and services in the last 40 years. This experience, derived through both theoretical development and applied primary research (*e.g.*, using both surveys and experiments), has enabled me to understand how the typical consumer would react to advertising claims and signage in relation to their product experience across a wide range of product categories. It has also enabled me to evaluate how consumers frame their expectations regarding product evaluation.

15.     One of my current academic research interests is branding and the image that certain characteristics of brands convey. I have published numerous empirically based articles on the "pioneer brand" (*e.g.*, the brand that establishes a product class, such as Amana, the first brand of microwave oven), and am considered one of the preeminent experts in the country in this area. My current research interests also include the study of strategic bidding strategy in an auction environment as well as consumer perceptions of price bundling. My article in the *Journal of Consumer Psychology* (October 2014) examines how the interest of others in a

6

**EXHIBIT 1**
**PAGE 7**

product or service is either a favorable or unfavorable factor in triggering purchase, as a function of the type of product being considered. In August of 2018, a book I authored will be published with the title, <u>Marketing Manipulation: A Consumer's Survival Guide.</u>

16.     I received the degree of Bachelors of Business Administration in 1974 from Bernard M. Baruch College in New York, with a major in Statistics. I received my M.B.A. from the same institution in 1977. In 1984, I received my Ph.D. in Marketing from New York University. Since receiving my doctoral degree, I have published over fifty articles and proceedings in major academic journals, including the *Journal of Marketing Research*, *Journal of Marketing*, *Journal of Consumer Research*, *Strategic Management Journal*, *Journal of Consumer Psychology*, *Journal of the Academy of Marketing Science*, *Journal of Interactive Marketing*, *Journal of Advertising* and the *Journal of Advertising Research*. I am or have been on the editorial board of the *Journal of Advertising*, the *Journal of Business Research*, *Marketing Letters*, *Journal of Consumer Psychology*, and the *Journal of the Academy of Marketing Science*.

17.     I have also conducted extensive survey research in both an academic and consulting environment, including surveys on the issue of confusion, secondary meaning and dilution. I have testified concerning consumer confusion in both State and Federal court, on behalf of both plaintiffs and defendants, and have also testified in front of the California Public Utilities Commission (CPUC) regarding issues of false and deceptive advertising and the consumer's interpretation of that advertising.

18.   Finally, I have consulted for such companies and individuals as American Express, AT&T, BancOne, Canon, Cingular Wireless, Con-Agra, DeadMaus5, Facebook, Hilton Hotels, LensCrafters, Munchkins, Pinkberry, Panda Express, Retired NFL Players, Samsung, Sears, Skechers, Waters, Yeti, Zillow, The State of California, The State of New York (Eliot Spitzer,

EXHIBIT 1
PAGE 8

AG), The Department of Justice, Bill Medley (Righteous Brothers), Muhammad Ali, Kareem-Abdul Jabbar, the rock group "Boston," Taylor Swift, and the Doors. I have also appeared in cases involving celebrities and politicians such as Sugar Ray Leonard, Mike Weaver, Donald Trump (Trump University), and Jay-Z. I am compensated at the rate of $695/hour for consultation, deposition, and trial time in this case. My curriculum vitae is attached as Appendix A, and a record of all cases in which I have testified at deposition or trial within the past 4 years is attached as Appendix B.

## IV.  INFORMATION CONSIDERED IN WRITING MY REPORT

19.    In coming to conclusions and arriving at my stated opinions, I reviewed the following items <u>in addition</u> to those referenced in this report:

a.  The May 10th 2017 Fourth Amended Class Action Complaint.

b.  The September 11th Order Denying Defendants' Motion to Dismiss.

c.  Academic article: Tal, Aner and Brian Wansink (2016). "Blinded by science: Trivial f. graphs and formulas Increase ad persuasiveness and belief in product efficacy," *Psychological Science*, Vol. 25(1), pp. 117-125.

d.   Parts of the depositions of Gibrahn Verdault; Rita Alexander; Jamie Schubert; Candace Henderson and Joe Perricone presented in Appendix C.

e.   StemGenex Study Methodology Report provided by Eliott Hartstone – Spectrum Associates presented in Appendix D.

f.   StemGenex Figures provided by Dorinda Richitelli – Spectrum Associates presented in Appendix E.

8

EXHIBIT 1
PAGE 9

g.      StemGenex Study Screen Shots provided by Dorinda Richitelli – Spectrum Associates presented in Appendix F.

h. Excel data file provided by Dorinda Richitellli – Spectrum Associates presented in Appendix G.

## V.  RESEARCH METHODOLOGY AND ITS TRUSTWORTHINESS

20.    The research methodology that I am about to describe in detail was conducted over the internet and was undertaken in strict adherence with the "seven-factor" framework for trustworthy survey research cited in Shari Seidman Diamond, Reference Guide on Survey Research in the Reference Manual on Scientific Evidence, Federal Judicial Center (3rd ed. 2011). Also taken into account when considering the design of my survey, was the framework of the Supreme Court's opinion in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and Tourangeau and Diamond, "Internet Surveys for Evaluating Trademark Infringement and Deceptive Advertising," in Diamond and Swann Trademark and Deceptive Advertising Surveys: Law, Science and Design (American Bar Association, 2012).

21.    The article by Tourangeau and Diamond (2012) identifies four distinct advantages that make web surveys a viable and attractive vehicle for trademark and deceptive advertising studies all of which apply to this case.  First, when the population of interest does not make up a large proportion of the general population (e.g., individuals with a chronic illness or degenerative disease), internet panels (used here) enable researchers to identify members of those populations relatively efficiently. Second, by its very nature internet surveys eliminate errors associated with interviewers since there are no interviewers. Third, respondents can be drawn from a

9

EXHIBIT 1
PAGE 10

geographically diverse population effectively and efficiently, And, finally, in many actions where trademark and deceptive advertising are involved, so are the use of visual stimuli or images. The use of the internet can easily enable the presentation of all types of images to respondents and place these images at their fingertips.

22.     These authors also reported on the quality of internet based surveys. They reported that respondents to a web as opposed to telephone survey provided answers that were more reliable and provided greater concurrent and predictive validity than those given by telephone, ultimately concluding that web surveys "seem to have good measurement properties (pp. 306)."

23.     The Manual for Complex Litigation, Federal Judicial Center (4th ed. 2004) (page 501, §23.33) details seven basic factors that must be present if the research undertaking is to be considered reliable and valid. These factors address whether: (a) The survey researcher identified the appropriate population and sample frame; (b) The sample as chosen was representative of that population; (c) That the questions asked of the sample were clear and not leading; (d) That the survey was conducted by qualified individuals following proper interviewing procedures; (e) That the data gathered were accurately reported; (f) That the data were analyzed in accordance with accepted statistical principles; and (g) That the entire research process was conducted to ensure objectivity and to minimize any noise impacting the data. I will now review each of these factors as they apply to the present research design and methodology.


## A.  FACTOR #1: POPULATION CONSIDERATIONS

24.     I conducted an empirical study to answer a set of questions designed by me using goals outlined in paragraph 3 of this report. One of the first steps in conducting a survey is the need to define the appropriate target population/universe to sample from. As Diamond (pg. 377)

EXHIBIT 1
PAGE 11

notes: "The target population consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent." It is critical to define the relevant population because the inferences drawn from the study (through use of a sample) are limited to the population considered. Indeed there may be systematic differences between members of the population and non-members. For example, those who never considered the purchase of a given product of interest may have significantly different perceptions from those who have purchased the product, and these perceptions may differ from those who are brand loyal. Surveying the former groups, may not meet survey objectives.

25.     Therefore, the present study collected a sample from a population of U.S. consumers (over the age of 21 and below the age of 80 – Screener #1) who currently (as noted in Screener #6 and Screener #7) have a chronic illness or degenerative disease inclusive of Alopecia Areata, Celiac disease, Crohn's disease, COPD, Graves' disease, Lupus, Multiple Sclerosis, Osteoarthritis, Parkinson's, Rheumatoid Arthritis, or Type I Diabetes. This demographic characteristic and set of chronic diseases were selected to be consistent with the diseases that StemGenex treats currently or has treated in the past amongst the relevant age group.

26.    In addition, it was required that upon reviewing one of the two StemGenex website homepages used as a stimulus, inclusive of access to all relevant patient satisfaction charts, each respondent to continue on to the main survey had to indicate that they were either "Very Likely," or "Somewhat Likely," to consider stem cell therapy from StemGenex on a four-point scale (Screener #9).  Those individuals who indicated that they were "Not Too Likely," "Not at all Likely," or "didn't know" were dropped from further consideration.  This requirement insured

11

EXHIBIT 1
PAGE 12

that only those respondents who showed a strong likelihood of consideration of the services of StemGenex were queried establishing a high degree of reliability and validity of the sample.

27.     The sample also excluded people living in a household where anyone works for a marketing research firm, advertising agency, or a public relations firm, or a hospital or medical office (Screener #5). This population, as defined, represents the "appropriate population" to sample from. That is, the state of mind of such individuals are relevant and probative for the issues at hand.[4]

### B. FACTOR #2: SAMPLE CONSIDERATIONS

28.  The empirical study was completed online with the assistance of Spectrum Associates, a market research supplier headquartered in Wallingford, Connecticut using Research Now, a leading on-line panel company to program the questionnaire, email invitations to members of a national panel of individuals with a chronic illness in the study's target region (United States) and host data collection by using the invitations to direct respondents to the survey's website. The study contained a sample of n=253 respondents divided into two groups. The first group (Cell "A") was exposed to the March 21st 2015 StemGenex website home page which featured four StemGenex patient satisfaction charts without the disclaimer. Those in the second group (Cell "B") were exposed to the May 16th 2016 StemGenex website home page which featured nine StemGenex patient satisfaction charts which contained the disclaimer. Overall, 21.6% of the panel members responding to the invitation qualified for the study. Data collection was conducted from June 15th 2018 through July 1st 2018 and the process began with

---

[4] Screener #2 asked about gender and the only limitation here was that the sample not exceed 70% of either gender. Screener #3, asked for the state that the respondent lived in. Screener #4 was designed to catch yea sayers by asking "which of the following do you own inclusive of: a single-family home, a vacation home, a time share and an RV. Those who answered all four were dropped from consideration and finally Screener #8 asked about the device that respondents used to take the survey.  Those who used a smartphone were dropped from consideration because it was felt that the screen was not large enough to view the stimuli.  Those who used a desk or laptop computer or a tablet were allowed to continue on with the survey contingent upon other qualifications.

invitations emailed by Research Now to panel members who had previously informed Research Now that they had a chronic illness.

29. Spectrum Associates monitored panel member "click rates" into survey invitations to ensure panel member invitation distribution accounted for variation in member open/click rates by age and gender. As a result, the percentage of survey clicks was very similar to chronic illness panel demographics for age and gender. Therefore, variations from census data in the survey respondent demographics reflect differences in study qualifying rates and not differences in panel member willingness to participate in the study.

30. Those respondents included in the sample, provided appropriate responses to the qualifying/screener questions (as indicated above) which served to qualify them for the respective main study. Hence the sample reflected the appropriate population as defined.

### C. FACTOR #3: DESIGN OF THE QUESTIONNAIRES

31. The survey instrument was developed by Dr. Kamins with assistance from Dr. Hartstone. The questionnaire was submitted to and approved by Mulligan, Banham and Findley. Once the written questionnaire was approved, Spectrum Associates supervised the programming of the questionnaire and submitted a link to Mulligan, Banham and Findley for review and approval. The program was prepared to enable respondents to easily complete the survey using a desktop computer, a laptop computer, or a tablet.

32. As noted herein, there are typically two parts to a survey questionnaire. The first part presents the qualifying/screener questions followed by the main questionnaire. A screener question is typically placed at the beginning of a survey in order to determine whether a specific

13

EXHIBIT 1
PAGE 14

respondent has certain characteristics that would make them eligible to take part in the survey. We have already discussed some of the screener questions utilized. Those deemed ineligible by these screener questions are then terminated from the survey. Those who satisfy all of the requirements in the screener questions then qualify to answer the questions in the main questionnaire which includes the questions of substantive interest which are typically the dependent variables of consideration. Screening is done to ensure that the interviewing process continues with respondents who satisfy the universe definition. Copies of the Screener and Main questionnaire for the empirical study is provided in Appendix H.

33.    The first screener question (S1) asked: "Into which of the following age ranges do you fall? Under 21 (TERMINATE); 21 – 34; 35 – 49; 50 – 64; 65 – 79; 80 or older (TERMINATE). The purpose of this question is to attempt to align the sample with those individuals who have actually undergone stem cell procedures at StemGenex.

34.    The second screener question (S2) simply asked about the respondents' gender and all respondents qualified, however the data collection was programmed so that either gender did not exceed 70% of the final sample. The third screener (S3) asked respondents: "In which state do you live?" A drop-down menu appeared which terminated any respondent not currently living in the United States.

35.    The fourth screener (S4) asked: "Which of the following do you own?: a. A single-family home; b. A vacation home; c. A time-share; and d. an RV.  The respondent was terminated from further consideration if they indicated that they owned all four types of homes. In this respect, we should note that as it is well known in the research industry that some individuals responding to panel invitations may answer screener questions in a manner to attempt to qualify. To eliminate any panel members attempting do so, we included this question on

14

EXHIBIT 1
PAGE 15

respondent ownership of four specific home/ vacation properties to weed out those panel members who say the own everything asked in order to qualify for the study. Twenty (20) panel members were screened out for having recorded they owned all four of the property types. The fifth screener (S5) asked: "Do you or a member of you household or immediate family work for: a. A travel agency; b. A manufacturer, wholesaler or retailer of sporting goods; c. A marketing research firm, advertising agency, or public relations firm; d. A hospital or medical office; and e. An airline company." The response options for this screener question are "yes no." This question serves to eliminate respondents who are likely to have special knowledge of the survey research process or work in an industry which may be more likely to be aware of the current action and case issues.

36.    The sixth screener (S6) asked: "Do you currently have any chronic illness or degenerative disease?" Those **who did not** were not allowed to continue, but those who answered in the affirmative were asked in S7, about which, if any of a list of chronic illnesses or degenerative diseases they had. The response options for this screener question are "yes no." This list was presented in paragraph 21 of this report and was made to be representative of the diseases treated by StemGenex presently and in the past, as all of these diseases listed can be found on the StemGenex website. Respondents were terminated if they indicated "no" to each and every disease listed (since they did not have a chronic illness or degenerative disease that StemGenex treats) or if they listed 4 or more degenerative diseases, since this would seem to be a suspicious response and indicative of someone who was a "yea sayer." Sixteen respondents were terminated for this reason.

EXHIBIT 1
PAGE 16

37.     The eighth screener (S8) asked about the device used to take the survey and respondents who were using a smartphone were deleted from consideration because it was felt that they could not clearly see the images shown on such a device.

38.   Finally all respondents who qualified to be in-sample at this point in the survey were randomly assigned to be shown one of two different StemGenex home pages dating from either March 21st 2015 or May 16th 2016, as discussed in detail earlier in paragraph 2 and 3 of this expert report.  Before seeing the website homepage, they were given the following directions:

> **"Following this page you will see the homepage of a website for a company called StemGenex, a company that provides stem cell therapy to individuals who suffer from specific types of chronic illness or degenerative disease. Please note that this homepage is not interactive so you will <u>not</u> be able to view the videos referred to on the top of the webpage.  We have provided the additional patient satisfaction charts that are available through the homepage for your review if you'd like to see them.**
>
> **Please read the information provided as if you were looking at the website to gather information about possible treatments for your disease.  This includes viewing any of the optional charts provided if you believe you would do so when visiting the website. After viewing the website homepage and the additional charts you selected, you will be asked several questions.**
>
> **Be sure to review each page carefully as you cannot go back to a page once you hit the continue button."**

The homepage image was then presented followed by the charts under the title of StemGenex Patient Satisfaction Ratings which appear on the bottom of the homepage of the StemGenex website.  An instructional text appeared above the homepage image written as follows:

> **"To continue with the survey, you must click on the homepage image below to enlarge it so that you can read it.-As a reminder, please read the information provided on this homepage as you would if you went to the online website to seek out information.  Please scroll up and down so you can see the entire page. After a few minutes, the "close" option will appear on the bottom right corner of the enlarged page and you will be able to close the enlarged page and continue."**

The "close" option only appeared after one-minute had elapsed from the time when the

16

**EXHIBIT 1**
**PAGE 17**

respondent first enlarged the homepage image.  Once the homepage was closed, the charts

appeared and the instructions above the charts stated:

> **"Below is a series of charts available on the StemGenex homepage. Please click on and review as many of them as you would if you were on the StemGenex online website gathering information about possible treatments for your disease."**

39.     There was no limit to how long the respondent could view either the home page or the

charts. However, to control for "speeders," (i.e., those who move quickly through the

questionnaire, respondents were eliminated if they spent less than 4 minutes on the entire

questionnaire inclusive of the screener and the main section of the instrument.  Likewise, those

respondents who spent an inordinate amount of time on the study (above 24 minutes), were also

eliminated.  Across both groups 26 respondents were eliminated. The concern here, is that

"speeders" and "slowpokes" may not be paying careful attention to the stimulus and the

questions provided.  The former may speed through the information and the latter may be

distracted from the process, hence it is typical in customary trustworthy research to eliminate

both groups.

40.     Respondents who finished reviewing the StemGenex homepage inclusive of an

opportunity to view the charts were then given a final screener (S9).  Here they were asked the

following question:

S9.     Based on the information you just reviewed on this website, how likely would you be to
<u>consider</u> stem cell therapy from StemGenex?

> Very likely ............................................. 1
> Somewhat likely .................................... 2
> Not too likely ........................................ 3 **(TERMINATE)**
> Not at all likely...................................... 4 **(TERMINATE)**
> Don't know ............................................ 5 **(TERMINATE)**

17

**EXHIBIT 1
PAGE 18**

41. Only those respondents who indicated a propensity to consider stem cell therapy from StemGenex after reviewing the material were qualified to move on to the main questionnaire and to fill out questions relating to the main dependent measures. Of those individuals shown one of the two StemGenex website homepages, a total of 63% stated that based on the information they reviewed on the website homepage they would be "very" or "somewhat" likely to consider stem cell therapy from StemGenex. Overall, 21.6% of the panel members responding to the invitation qualified for the study.

### D.   FACTOR #4: INTERVIEWING PROCEDURES

42. Since the study was conducted and administered online, there were no actual interviewers. Hence, by definition, this approach satisfies the "double blind" requirement of trustworthy research that an interviewer (of which there wasn't any) and respondent are not aware of the purpose of the study.

### E.   FACTORS #5 AND #6: ENSURING THAT THE DATA IS ACCURATELY RECORDED, ANALYZED AND REPORTED

43. The closed-ended data that was collected online are automatically transferred to an Excel sheet. At the conclusion of the study, the Excel sheet was provided to me and I reviewed it to determine if the aggregate data analysis conducted and provided by Spectrum Associates was correct.

### F.   FACTOR #7: ENSURING OBJECTIVITY THROUGHOUT THE RESEARCH PROCESS

44. Throughout the research process, every attempt has been made to reduce bias and eliminate any sources of error in population definition, questionnaire and sample design and data collection, analysis and interpretation. This has resulted in an empirical study using findings,

18

EXHIBIT 1
PAGE 19

subject to statistical error, that are both reliable and valid in terms of the conclusions derived from the observations.

## VI.   RESEARCH FINDINGS

45.   The first research question involved the determination of the relative influence that various factors/statements appearing on the StemGenex website had on the respondent's willingness to consider StemGenex stem cell therapy. All nine factors/statements were positive statements about StemGenex reflecting the website's efforts to generate interest in StemGenex. In order to determine the relative influence of these statements/factors we asked the following questions in the main questionnaire starting with Question #1 below:[5]

### *a) Respondents' Perception of the Importance of Patient Satisfaction Ratings Meeting*

### *or*

### *Exceeding Expectations (PRIMARY RESEARCH QUESTION #1).*

"Q1.        Provided below are nine statements describing StemGenex based on the StemGenex website homepage.  Please read all nine statements carefully before answering the question.

After reading all of the statements, please rank order the four statements (1st, 2nd, 3rd and 4th) that were most influential in your willingness to consider StemGenex stem cell therapy.  If fewer than four statements apply, only rank the statement or statements that apply.

**(RANDOMIZE ORDER DISPLAYED)**

a. StemGenex offers patients "cutting-edge adipose stem cell therapy" for each degenerative disease.

---

[5] Note that the wording of the statements appearing on each website may have differed slightly in miniscule terms between websites.  In other instances, we replaced pronouns such as "our," with the name of the company "StemGenex," so as to reduce potential confusion in understanding the meaning and context of the statement.

EXHIBIT 1
PAGE 20

b. "By exclusively utilizing Stem Cell Centers of Excellence, StemGenex offers patients access to stem cell treatment with a level of quality and patient care that simply cannot be found elsewhere."

c. StemGenex clinics and treatment centers "utilize board-certified surgeons."

d. Individual patient testimonials/success stories referred to at the top of the homepage.

> e. (USE FOR 3/21/15 VERSION) Patient satisfaction research revealed 100% of StemGenex patients described their "overall experience" with StemGenex as having "exceeded" (73%) or "met" (27%) their expectations.
>
> e (USE FOR 5/16/16 VERSION) Patient satisfaction research revealed 100% of StemGenex patients described their "overall experience" with StemGenex as having "exceeded" (88%) or "met" (12%) their expectations.

f. StemGenex protocols "utilize targeted administration methods and the latest activation methods to ensure the safest most effective stem cell treatments possible."

g. StemGenex "believes in providing patients with the IRB approved studies for stem cell treatments registered through the National Institutes of Health."

h. StemGenex "offers access to individualized stem cell treatment plans."

i. "Through its stem cell therapy studies, StemGenex hopes to provide patients with options that may change the course of their lives as well as the course of their disease."

> **IF TAKING SURVEY ON DESKTOP/LAPTOP, S8 = 1 or 2:**  Please indicate which statement most generated your interest in StemGenex stem cell therapy by dragging the statement to the "rank 1st/most caused me to be interested in StemGenex" box. Please then indicate the 2nd, 3rd and 4th most influential statements by dragging them to the appropriate boxes if they apply.
>
> **IF TAKING SURVEY ON TABLET, S8 = 3:**  Please indicate which statement most generated your interest in StemGenex stem cell therapy by selecting that statement (#1 will appear next to the statement). Please continue your ranking by selecting in order the 2nd, 3rd and 4th most influential statements if they apply.

If none of the statements influenced you, please click on the box that says "no statement influenced me." **(ALLOW RESPONDENT TO CHOOSE ONE STATEMENT. DO NOT ALLOW RESPONDENT TO SELECT "NO STATEMENT INFLUENCED ME" AND ANOTHER STATEMENT)**

_____ statement that most (1st) caused me to be interested in StemGenex

_____ statement that was 2nd most influential

_____ statement that was 3rd most influential

_____ statement that was 4th most influential

_____ no statement influenced me

46. Question #1 presented respondents with 9 statements/factors, and after reading and

EXHIBIT 1
PAGE 21

processing them, they were then asked to rank order the four statements (1st, 2nd, 3rd and 4th) that were most influential in their willingness to consider StemGenex stem cell therapy.  If the respondent felt that fewer than four statements were evident, then they were asked to only rank the statement or statements that applied.  They were also encouraged to indicate that no statement influenced them, if that was the true state of nature.  The statements/factors were randomized to avoid order bias.[6] The findings for each of the two StemGenex websites are presented below in Figures 1a and 1b.

---

[6] The questionnaire also provided instructions to respondents that: "there are no right or wrong answers to this survey, just your opinions.  If you have no opinion for a specific question, please do not hesitate to record no opinion or don't know."

**EXHIBIT 1
PAGE 22**

**Figure 1a**
**Importance of Different Factors in Being Willing to Consider**
**Stem Cell Therapy from StemGenex**
**(3/21/2015, no disclaimer)**
**(Percentage Ranked Statement 1st, Base=126)**

| | |
|---|---|
| Patient satisfaction research revealed 100% of StemGenex patients described their overall experience with StemGenex as having exceeded or met their expectations | 20% |
| Through its stem cell therapy studies, StemGenex hopes to provide patients with options that may change the course of their lives as well as the course of their disease | 14% |
| Offers cutting-edge adipose stem cell therapy | 14% |
| Offers access to individualized stem cell treatment plans | 14% |
| Utilize board-certified surgeons | 11% |
| Protocols utilize targeted administration methods and the latest activation methods to ensure the safest most effective stem cell treatments possible | 8% |
| Stem Cell Centers of Excellence offer stem cell treatment with a level of quality and patient care not found elsewhere | 7% |
| Believes in providing patients with the IRB approved studies for stem cell treatments registered through NIH | 6% |
| Individual patient testimonials/success stories | 4% |

Note: 3 respondents indicated that none of the statements influenced them.

22

**EXHIBIT 1**
**PAGE 23**

**Figure 1b**
**Importance of Different Factors in Being Willing to Consider**
**Stem Cell Therapy from StemGenex**
**(5/16/2016, with disclaimer\*)**
**(Percentage Ranked Statement 1st, Base=127)**

| | |
|---|---|
| Through its stem cell therapy studies, StemGenex hopes to provide patients with options that may change the course of their lives as well as the course of their disease | 21% |
| Patient satisfaction research revealed 100% of StemGenex patients described their overall experience with StemGenex as having exceeded or met their expectations | 19% |
| Offers cutting-edge adipose stem cell therapy | 15% |
| Protocols utilize targeted administration methods and the latest activation methods to ensure the safest most effective stem cell treatments possible | 10% |
| Utilize board-certified surgeons | 9% |
| Believes in providing patients with the IRB approved studies for stem cell treatments registered through NIH | 9% |
| Offers access to individualized stem cell treatment plans | 6% |
| Stem Cell Centers of Excellence offer stem cell treatment with a level of quality and patient care not found elsewhere | 5% |
| Individual patient testimonials/success stories | 3% |

\* The disclaimer provided under the chart on the homepage reads: "The patient satisfaction ratings above represent data received from patient exit surveys evaluating patient experience and care, accommodations, staff and facilities."

Note: 4 respondents indicated that none of the statements influenced them.

47. The most highly ranked statement in terms of the percentage of time (20%) that it was ranked as the #1 statement for the cell without the disclaimer cell "A" (i.e., 3/21/15) was: "Patient satisfaction research revealed 100% of StemGenex patients described their "overall experience" with Stem Genex as having "exceeded" (73%) or "met" (27%) their expectations. This was followed by three other statements tied at 14%... a) "Through its stem cell therapy studies, StemGenex hopes to provide patients with options that may change the course of their lives as well as the course of their disease; b) "offers cutting edge adipose stem-cell therapy," and finally, c) "offers access to individualized stem cell therapy treatment plans." As there are

**EXHIBIT 1**
**PAGE 24**

nine statements that were tested, if the most influential statement were chosen randomly, one would expect that on average each statement would appear in the highest ranked position 11.11% of the time (100%/9 = 11.11%). Therefore, it is of interest to determine if the statement linked to patient satisfaction that was ranked as the most influential statement (20% of the time) more than any other individual statement, could be determined to have a degree of influence significantly greater than chance. To accomplish this objective, a Student's t-test was applied to the data in Cell A. Results revealed a t-test value of equal to 3.18, p<.001 indicative of significantly greater influence than simply due to chance. None of the other statements as studied could be so characterized. This result shows that on the StemGenex webpage, when the disclaimer was not present, the **patient satisfaction data as well as the claims** presented in the chart on the bottom of the page **were material in motivating qualified respondents to consider StemGenex stem cell therapy**.

48.    Results presented in Figure 1b (Cell B), relating to statements appearing on the 5/16/16 StemGenex website which included the disclaimer revealed a similar story. Here the patient satisfaction statement appeared second in frequency as the most important statement (19% of the time as the most important statement) below the statement relating to StemGenex providing options that may change the course of the patient's disease and course of their life (noted 21% of the time as the most important statement). Results reveal that these were the ONLY two statements that appeared in the most influential position whose presence occurred with a frequency greater than chance (t = 3.55, p<.001) for the statement regarding changing the course of the patient's life and disease; (t = 2.83, p<.001) for the statement related to patient satisfaction). Moreover, the presence of the disclaimer in the 5/16/16 only reduced the importance of the patient satisfaction statement in terms of influence by 1 non-significant percentage point (i.e., from 20% to 19% - $t_{251}$ = .19, p = n.s.).

49.    Thus Figures 1a and 1b allow for the conclusion that the 100% patient satisfaction data found in chart form on the bottom of the StemGenex home-page remain a key factor in motivating a patient's willingness to consider StemGenex stem cell therapy. That is, these data **are material** in the patient's decision to consider the company's offering for treatment of their disease.

24

EXHIBIT 1
PAGE 25

50.     The relative influence of 9 different statements in motivating the patient's willingness to consider StemGenex stem cell therapy for treatment in Question #1 could be alternatively analyzed by focusing on the percentage of time a given statement is ranked within the top 4 influential statements as noted by each respondent.  As there are 9 statements, the fifth most important statement, represents the statement that is in the median position of importance, hence by definition any statement ranked above the 5th ordered position for a given person is important. The data representative of the percentage of time each statement is within a "top 4" ranking is presented below in Figures 2a and 2b respectively for the case where the disclaimer is missing in the chart on the bottom of the StemGenex web-page – Cell A (i.e., 3/21/15) and again where it is present – Cell B (i.e., 5/16/16).

**Figure 2a**
**Importance of Different Factors in Being Willing to Consider**
**Stem Cell Therapy from StemGenex**
**(3/21/2015, no disclaimer)**
**(Percentage Ranked Statement in Top 4, Base=126)**

| | |
|---|---|
| Patient satisfaction research revealed 100% of StemGenex patients described their overall experience with StemGenex as having exceeded or met their expectations | 65% |
| Offers access to individualized stem cell treatment plans | 49% |
| Utilize board-certified surgeons | 46% |
| Through its stem cell therapy studies, StemGenex hopes to provide patients with options that may change the course of their lives as well as the course of their disease | 46% |
| Protocols utilize targeted administration methods and the latest activation methods to ensure the safest most effective stem cell treatments possible | 44% |
| Offers cutting-edge adipose stem cell therapy | 42% |
| Stem Cell Centers of Excellence offer stem cell treatment with a level of quality and patient care not found elsewhere | 31% |
| Believes in providing patients with the IRB approved studies for stem cell treatments registered through NIH | 28% |
| Individual patient testimonials/success stories | 20% |

Note: 3 respondents indicated that none of the statements influenced them.

25

**EXHIBIT 1**
**PAGE 26**

**Figure 2b**
**Importance of Different Factors in Being Willing to Consider**
**Stem Cell Therapy from StemGenex**
**(5/16/2016, with disclaimer\*)**
**(Percentage Ranked Statement in Top 4, Base=127)**

| | |
|---|---|
| Through its stem cell therapy studies, StemGenex hopes to provide patients with options that may change the course of their lives as well as the course of their disease | 57% |
| Patient satisfaction research revealed 100% of StemGenex patients described their overall experience with StemGenex as having exceeded or met their expectations | 57% |
| Offers cutting-edge adipose stem cell therapy | 46% |
| Protocols utilize targeted administration methods and the latest activation methods to ensure the safest most effective stem cell treatments possible | 45% |
| Offers access to individualized stem cell treatment plans | 40% |
| Believes in providing patients with the IRB approved studies for stem cell treatments registered through NIH | 39% |
| Utilize board-certified surgeons | 38% |
| Stem Cell Centers of Excellence offer stem cell treatment with a level of quality and patient care not found elsewhere | 35% |
| Individual patient testimonials/success stories | 21% |

\* The disclaimer provided under the chart on the homepage reads: "The patient satisfaction ratings above represent data received from patient exit surveys evaluating patient experience and care, accommodations, staff and facilities."

Note: 4 respondents indicated that none of the statements influenced them.

51.    If statements were randomly ranked, then one would expect that each statement would appear in a given individual's top 4 of importance approximately 44.44% of the time (i.e., 4/9).[8] Therefore the extent to which a given statement exceeds a value of 44.44%, the more important it is in motivating a consideration of StemGenex for stem cell therapy. A review of Figure 2a shows that there is only ONE statement which is statistically higher in magnitude than the random default percentage of 44.44%, that is yet again, the statement relating to 100% patient satisfaction with their overall experience as meeting or exceeding their expectations (65%; t =

26

**EXHIBIT 1**
**PAGE 27**

4.654, p<.001). That is, significantly more respondents than would be expected by chance, believed that the statement which characterized 100% patient satisfaction with their overall experience at StemGenex as either meeting or exceeding their expectations, was rated as important from the perspective of being ranked in the top half of all statements considered.

52.  When the data is then analyzed in Figure 2b using a StemGenex website which included a disclaimer in their patient satisfaction chart, the results are similar (Cell B).  Here, the patient satisfaction statement appeared tied in frequency in terms of appearance in the top 4 statements (57% of the time as the most important statement) with the statement relating to StemGenex providing options that may change the course of the patient's disease and course of their life (57%). Both of these statements were found to statistically exceed the notion that this event occurred by chance (t = 2.85, p<.001) and no other statements considered even approached significance. Finally, the decline in percentage of the 100% expectation statement from a frequency of 65% in Cell A, versus 57% in Cell B was not determined to be significant ($t_{251} =$ 1.30, p = n.s.).

53.  These findings regarding the respondent's evaluation of the top 4 statements appearing on the StemGenex website that were seen to be influential in the respondent's willingness to consider StemGenex for stem cell therapy mimic that found for the most important reason. Basically, two factors stand out as material, and seem to be heavily weighted by prospective customers of StemGenex in their decision process related to whether or not they would consider undertaking StemGenex stem cell therapy.  They are: a) Patient satisfaction research revealed 100% of Stem Genex patients described their "overall experience" with Stem Genex as having "exceeded" (x%) or "met" (x%) their expectations," and b) "Through its stem cell therapy studies, Stem Genex hopes to provide patients with options that may change the course of their lives as well as the course of their disease."

---

8 Note that in Figure 2a, 108 individuals selected 4 most "important" statements, nine individuals selected 3 statements, 2 individuals selected two statements and 4 individuals selected one statement.  For Figure 2b, 114 individuals selected 4 most "important" statements, five individuals selected 3, three individuals selected 2 and one individual selected one statement.

**EXHIBIT 1**
**PAGE 28**

### *b) Interpretation of Qualified Respondents' Understanding as to the Meaning of the Patient Satisfaction Chart (PRIMARY RESEARCH QUESTION #2)*

54. In order to answer research question #2, the following question was asked in the main study:

Q2.     As you may recall, the homepage displayed a chart that showed responses to the question: "How would you describe your overall experience with StemGenex, in terms of meeting your expectations?" This chart is displayed below. Please take another look at this chart and then answer the question that follows.

**(DISPLAY CHART ABOVE THE QUESTION, KEEP ON THE SCREEN)**

In your opinion, when the patients provided an "overall experience" rating of StemGenex in the above chart what were they referring to?  Please select <u>all that apply</u>.

If you feel the chart does not reflect any of the statement options listed, you can check "none of the above."  If you have no opinion, you can select "no opinion/don't know."

**DO NOT ALLOW RESPONDENT TO CHOOSE "NONE OF THE ABOVE" OR "NO OPINION" WITH ANY OTHER RESPONSE.  RANDOMIZE ORDER (1/2 SEE A, B, C ORDER AND 1/2 SEE C, A, B ORDER).**

> a.   The chart reflects the patients' ratings of their experience with care, accommodations, staff and facilities up through the day after treatment          _____
>
> b.   The chart reflects the patients' ratings of their experience with care, accommodations, staff and facilities through a longer period time after treatment          _____
>
> c.   The chart reflects the patients' ratings of the effectiveness of the stem cell therapy in treating their disease          _____

28

**EXHIBIT 1**
**PAGE 29**

d.  None of the above        _____

e.  No opinion/Don't know        _____

55.  The purpose of this question, was to determine if qualified respondents correctly understood what the data presented in the chart at the bottom of the StemGenex website actually represented, and to see if the use of the disclaimer included at the bottom of the chart for the 5/16/16 condition, had any impact on a reasonable consumer's understanding of the patient satisfaction claims.  The correct interpretation of the data presented in the chart relates to patients' ratings of their experience with care, accommodations, staff and facilities up through the day after treatment as noted in part by the disclaimer.[9] It is important to note that respondents to this question could provide multiple responses aside from providing "no opinion/don't know," (choice e) coupled with any other choice.

56. The data presented in Figure 3a and 3b below enable the researcher to examine the degree of confusion that qualified respondents have in relation to either the time frame related to care provided after treatment (i.e., choice "b" which states: "The chart reflects the patients' ratings of their experience with care, accommodations, staff and facilities through a longer period time after treatment,") or the misperception that the patient satisfaction chart is linked to the effectiveness of the stem cell treatment in addressing their underlying disease (i.e., choice "c" which states:  "The chart reflects the patients' ratings of the effectiveness of the stem cell therapy in treating their disease.").  Effectively, only choice "a" in Question #2 is a correct interpretation of the StemGenex chart… "a" ("The chart reflects the patients' ratings of their experience with care, accommodations, staff and facilities up through the day after treatment.").  The results for Question #2 appear below:

---

9 The disclaimer reveals that the patient satisfaction ratings presented in the chart represent evaluations of their experience with care, accommodations, staff and facilities.  As to whether this evaluation extends to the "day after treatment," or "through a longer period of time after treatment," is indeterminate from the disclaimer.  However, I was informed by counsel that the time frame is actually up through the day after treatment and I made that assumption in my analysis.

29

EXHIBIT 1
PAGE 30

57. The data as collected for both experimental cells appear below in Figures 3a and 3b.

**Figure 3a**
**What Respondents Believe the Chart Was Referring to by**
**"Overall Experience" Rating of StemGenex**
**(3/21/2015, no disclaimer)**
**(Base=111*)**

| | |
|---|---|
| None of the statements offered | 3% |
| Only selected "experience with care, accommodations, staff and facilities up through the day after treatment" | 17% |
| Only selected "experience with care, accommodations, staff and facilities for a longer period of time after treatment" ** | 18% |
| Selected "experience with care, accommodations, staff and facilities up through the day after treatment" and "effectiveness of the stem cell therapy in treating their disease" | 5% |
| Selected "experience with care, accommodations, staff and facilities for a longer period of time after treatment" and "effectiveness of the stem cell therapy in treating their disease"** | 19% |
| Only selected effectiveness of the stem cell therapy in treating their disease" | 38% |

\* Excludes 15 respondents who selected "no opinion/don't know."

\*\* Incudes those who also said up through the day after treatment.

30

EXHIBIT 1
PAGE 31

**Figure 3b**
**What Respondents Believe the Chart Was Referring to by**
**"Overall Experience" Rating of StemGenex**
**(5/16/2016, with disclaimer\*)**
**(Base=120\*\*)**

| | |
|---|---|
| None of the statements offered | 8% |
| Only selected "experience with care, accommodations, staff and facilities up through the day after treatment" | 23% |
| Only selected "experience with care, accommodations, staff and facilities for a longer period of time after treatment"\*\*\* | 25% |
| Selected "experience with care, accommodations, staff and facilities up through the day after treatment" and "effectiveness of the stem cell therapy in treating their disease" | 11% |
| Selected "experience with care, accommodations, staff and facilities for a longer period of time after treatment" and "effectiveness of the stem cell therapy in treating their disease"\*\*\* | 16% |
| Only selected effectiveness of the stem cell therapy in treating their disease" | 18% |

\* The disclaimer provided under the chart on the homepage reads: "The patient satisfaction ratings above represent data received from patient exit surveys evaluating patient experience and care, accommodations, staff and facilities."

\*\* Excludes 7 respondents who selected "no opinion/don't know."

\*\*\* Incudes those who also said up through the day after treatment.

58.     From the data presented in Figure 3a and 3b above, one can construct Table 1 which represents respondent confusion regarding both time frame and source of satisfaction across both cells examined (i.e., with and without disclaimer). Table 1 now appears below:

**TABLE 1**

**CONFUSION RELATING TO LENGTH OF CARE & TREATMENT EFFECTIVENESS**

| **Source of Confusion:** | Perception of Length of Care\* | MisPerception that Satisfaction Data Relates to Treatment Effectiveness\*\* |
|---|---|---|
| Cell "A" Without Disclaimer | 37% | 62% |
| Cell "B" With Disclaimer | 41% | 45% |

\*Includes a summation of the data for rows 3 and 5 respectively of Figure 3a and 3b.
\*\*Includes a summation of the data for rows 4, 5 and 6 respectively of Figure 3a and 3b.
The sample base is n=111 in Cell A and n=120 in Cell B.

31

**EXHIBIT 1**
**PAGE 32**

59.      The data in Table 1 above shows a significant degree of confusion on behalf of qualified respondents irrespective of whether or not a disclaimer is included in the chart regarding the perception of length of care. When the disclaimer is absent in Cell A, the confusion level is measured at 41% and in Cell B, when the disclaimer is present, it falls to 37%. However, there is no significant statistical difference between the two cells ($t_{229}$ = .62, p = n.s.). In terms of the percentage of respondents who believe that the data regarding patient satisfaction relates to the effectiveness of the StemGenex treatment effectiveness, in Cell A, without a disclaimer the percentage who are confused is 62%, while that percentage significantly drops to 45% when a disclaimer is utilized ($t_{229}$ = -2.59, p<.025). A level of 45% confusion measured in the presence of a disclaimer is still representative of a significant magnitude when tested against the absence of confusion. This is particularly the case since the findings for Research Question #1 revealed that the 100% satisfaction claim is a **material claim** on the StemGenex homepage.

c) *Respondents' Understanding of the StemGenex Charts in Terms of the Time Period Represented for Treatment (SECONDARY RESEARCH QUESTION #3).*

60.      In order to understand how qualified respondents interpreted the StemGenex series of charts displayed at the bottom of their website homepage, the following secondary research question was asked with the charts displayed above the question when presented to the respondent.  Note that different dates were inserted respectively for Cell A and Cell B and the choices orders were appropriately randomized:

Q3. In your opinion, does the chart above include:

**(DATE BELOW VARIES FOR 3/21/15 *CELL [3/1/15] AND 5/16/16 CELL [4/14/16]*).**

**(RANDOMIZE ORDER 2 OPTIONS:  1/2 SEE ORDER 1, 2, 3, 4  AND 1/2 SEE ORDER 3, 2, 1, 4)**

Everyone treated by StemGenex through (March 1, 2015) (April 14, 2016) .................. 1

All patients treated in the calendar year through (March 1, 2015) (April 14, 2016) ....... 2

32

**EXHIBIT 1
PAGE 33**

All patients treated in the <u>30 days</u> through (March 1, 2015) (April 14, 2016)................. 3

No opinion/Don't know ........................................................................................ 4

61.    The findings for this question appear in Figure 4a and 4b below:

**Figure 4a**
**Respondents Perception of Time Period Included in the Chart**
**(3/21/2015, no disclaimer)**
**(Base=126)**

| | |
|---|---|
| Everyone treated by StemGenex through March 1, 2015 | 67% |
| All patients treated in the calendar year through March 1, 2015 | 12% |
| All patients treated in the 30 days through March 1, 2015 | 5% |
| No opinion/ don't know | 17% |
| Total | 100% |

**Figure 4b**
**Respondents Perception of Time Period Included in the Chart**
**(5/16/2016, with disclaimer\*)**
**(Base=127)**

| | |
|---|---|
| Everyone treated by StemGenex through April 14, 2016 | 59% |
| All patients treated in the calendar year through April 14, 2016 | 18% |
| All patients treated in the 30 days through April 14, 2016 | 3% |
| No opinion/ don't know | 20% |
| Total | 100% |

\* The disclaimer provided under the chart on the homepage reads: "The patient satisfaction ratings above represent data received from patient exit surveys evaluating patient experience and care, accommodations, staff and facilities."

33

**EXHIBIT 1**
**PAGE 34**

62.     I have been informed by counsel, that the "correct" answer to this question is uncertain as representatives of StemGenex, were unclear as to the exact timeframe of care the data presented on their website represented.  This uncertainty is also reflected in the understanding of qualified respondents.  That is 5% of qualified respondents in Cell a believe that the data relates to all individuals treated in the 30 days prior to the indicated date (i.e., March 1st for Cell A and April 14th for Cell B).  Twelve percent of respondents in Cell A and 18% in Cell B believed that the data represented all patients treated in the respective calendar year. Finally, 67% in Cell A and 59% in Cell B believed that the data represented everyone treated by StemGenex up to the respective specified date.    In addition, as the disclaimer appearing below each and every chart in Cell B had nothing to do with the dates that individuals received service, one would expect no effect between cells in regard to this measure, and that is what was observed for each and every category.

### d) *Respondents' Understanding of the number of StemGenex Patients the Charts are Based On (SECONDARY RESEARCH QUESTION #4).*

63.     In order to investigate this secondary issue, the following question was asked of qualified respondents again with the series of charts visible above the question:

Q4.  In your opinion, do you think that the chart above is based on:

        Fewer than 10 StemGenex patients ...........................1

        10 – 20 StemGenex patients .....................................2

        21 – 50 StemGenex patients .......................................3

        51 – 100 StemGenex patients .....................................4

        More than 100 StemGenex patients ...........................5

        No opinion/Don't know ..............................................6

64.     The data collected for this question representative of Cells A and B appear below as follows in Figures 5a and 5b:

34

**EXHIBIT 1
PAGE 35**

**Figure 5a**
**Respondents Perception of Number of Patients Included in the Chart**
**(3/21/2015, no disclaimer)**
**(Base=126)**

| | |
|---|---|
| Fewer than 10 StemGenex patients | 2% |
| 10 - 20 StemGenex patients | 2% |
| 21 - 50 StemGenex patients | 5% |
| 51 - 100 StemGenex patients | 7% |
| More than 100 StemGenex patients | 21% |
| No opinion/ don't know | 62% |
| Total | 100% |

**Figure 5b**
**Respondents Perception of Number of Patients Included in the Chart**
**(5/16/2016, with disclaimer*)**
**(Base=127)**

| | |
|---|---|
| Fewer than 10 StemGenex patients | 2% |
| 10 - 20 StemGenex patients | 4% |
| 21 - 50 StemGenex patients | 6% |
| 51 - 100 StemGenex patients | 11% |
| More than 100 StemGenex patients | 19% |
| No opinion/ don't know | 58% |
| Total | 100% |

* The disclaimer provided under the chart on the homepage reads: "The patient satisfaction ratings above represent data received from patient exit surveys evaluating patient experience and care, accommodations, staff and facilities."

35

EXHIBIT 1
PAGE 36

65.     By far the #1 response to this question for each Cell is "No Opinion/Don't Know). This result represents 62% of the respondents for Cell A, and is similarly repeated in Cell B with 58% giving the same response.  Of the 53 individuals in Cell A who gave an actual response to the question, 38 (or 71.7%) believed that the chart is using data from more than 50 individuals treated by StemGenex, whereas in Cell B 35 or 47 (74.5%) made the same false inference.  A difference between Cells ($t_{98}$ = .31, p= n.s.) should not be expected, and was not found, because the disclaimer does not inform about the number of individuals treated by StemGenex during their time in business. Again, the uncertainty reflected by the qualified respondents for this issue, reflects the uncertainty previously expressed by StemGenex regarding the basis for their claim of 100% patient satisfaction.

66.     It is amazing, that the company would advertise such a claim without an understanding of what underlies the basis for such a claim.  Doing this is particularly egregious in this case because the claim of 100% patient satisfaction is valued as material by qualified consumers in terms of motivating their consideration of StemGenex for treatment, and the claim as presented serves to confuse consumers into believing that the StemGenex treatment is effective in treating their disease (See Figure 3a and 3b).

67.  Finally, the demographic data collected for each cell is presented below in Figures 6a and 6b.

EXHIBIT 1
PAGE 37

**Figure 6a**
**Respondent Demographics**
**(3/21/2015, no disclaimer)**
**(Base=126)**

| Gender | | |
|---|---|---|
| Female | | 69% |
| Male | | 31% |
| | Total | 100% |
| **Age** | | |
| 21-34 | | 6% |
| 35-49 | | 29% |
| 50-64 | | 41% |
| 65-79 | | 23% |
| | Total | 100% |
| **Illness/Disease** | | |
| Osteoarthritis | | 60% |
| COPD | | 15% |
| Rheumatoid Arthritis | | 15% |
| Multiple Sclerosis | | 10% |
| Type 1 Diabetes | | 10% |
| Crohn's disease | | 5% |
| Graves' disease | | 3% |
| Lupus | | 3% |
| Alopecia Areata | | 2% |
| Parkinson's | | 1% |
| Celiac disease | | 0% |

37

EXHIBIT 1
PAGE 38

**Figure 6b**
**Respondent Demographics**
**(5/16/2016, with disclaimer\*)**
**(Base=127)**

| Gender | |
|---|---|
| Female | 69% |
| Male | 31% |
| Total | 100% |
| **Age** | |
| 21-34 | 6% |
| 35-49 | 21% |
| 50-64 | 43% |
| 65-79 | 31% |
| Total | 100% |
| **Illness/Disease** | |
| Osteoarthritis | 63% |
| Rheumatoid Arthritis | 24% |
| COPD | 14% |
| Lupus | 9% |
| Type 1 Diabetes | 6% |
| Multiple Sclerosis | 6% |
| Celiac disease | 2% |
| Crohn's disease | 2% |
| Graves' disease | 2% |
| Parkinson's | 2% |
| Alopecia Areata | 1% |

## VII.   CONCLUSIONS

68.       StemGenex advertises that their patient satisfaction ratings in terms of their overall experience with StemGenex either met or exceeded their expectations, with the emphasis on the latter.  The present research study shows that this claim **is material** in motivating the reasonable

**EXHIBIT 1
PAGE 39**

qualified consumer to consider getting StemGenex stem cell therapy to treat their disease, and that as presented, the claim **is confusing** to a significant percentage of consumers and is misinterpreted as meaning that the treatment is effective in treating their disease. In reality, the claim simply represents patient satisfaction in terms of their experience with care, accommodations, staff and facilities up until the day after treatment. To add insult to injury, two factors should be discussed.   First, deposition testimony, as referenced in this expert report shows that leading executives of the company inclusive of the company's owner and President (Rita Alexander) are not clear about the basis for the claim both in terms of how many patients it represents and the length of time over which it purportedly extends.   In a high involvement product category where the correct treatment can literally mean life or death for some individuals, it is imperative for a company to make sure that their claims are clear and easily understood so that the target market can make an informed decision as to whether or not they want to adopt the therapy.   This was clearly NOT the case for StemGenex.

69. I reserve the right to amend this report should I be furnished with additional pertinent materials or information.

## REFERENCES

Diamond, Shari Seidman (2000). "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, Second Edition, Federal Judicial Center, p. 235, available at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf.

Manual for Complex Litigation, (2004) Federal Judicial Center (4th ed.) (page 501, §23.33).

Supreme Court's opinion in Daubert v. Merrell Dow Pharmaceuticals, Inc., (1993). 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469.

EXHIBIT 1
PAGE 40

Tourangeau Roger., and Shari Seidman Diamond, (2012). "Internet Surveys for Evaluating Trademark Infringement and Deceptive Advertising," in Diamond and Swann Trademark and Deceptive Advertising Surveys: Law, Science and Design (American Bar Association).

Dated: Claremont, California
        July 14th, 2018

Dr. Michael A. Kamins

40

EXHIBIT 1
PAGE 41

**DECLARATION OF MICHAEL A. KAMINS, PH.D.**

Re: Moorer, et. al. v. Stemgenex Medical Group,Inc., et. al.
Case No.: 3:16-cv-02816-AJB-NLS

# EXHIBIT 2

**EXHIBIT 2
PAGE 1**

**FROM DEPOSITION OF GIBRAHN VERDAULT, Former Patient Advocate Director:**

Q. These are items from -- I had an extra somewhere here. Hold on.
They are identified down at the bottom by
"Clique" and a number -- page number.
What is Clique, to your knowledge?
A. One of the services that Rita hired.
Q. And what does that service do?
A. I'm not sure if they were their web master or designer or if they did their social media. Rita hired a number of services to manage that.
Q. Okay. I'll have you turn to -- hang on just a second -- page Clique 1755. I hope that they are in numerical order. I tried to get them in numerical order.
A. Okay.
Q. And that's an e-mail from you to Jeff Molitor and Cece -- is that right -- dated October 13th, 2015?
A. Can I have a minute to review this?
Q. Oh, yes.
A. Okay. What was the question?
Q. Yes. That's an e-mail from you to Jeff Molitor
SAN DIEGO COURT REPORTING SERVICE
112
and Cece; is that right?
A. Correct.
Q. October 13, 2015?
A. Correct.
Q. And could you read that to us, please?
A. "Tommy, we were told to simply send the Excel spreadsheet every month with updated results for you to post and update results and month of results. Not familiar with an easy to use support platform. Is this something you can walk Cece and I through? Thanks."
Q. Does that refresh your recollection with regard to getting the patient satisfaction ratings updated each month?
A. Yes.
Q. And were you attempting to have those updated on the StemGenex.com website with this e-mail?
A. I was attempting to figure out what the process was in doing so, because Cece, the office manager, was taking that over.
Q. Okay. Was it your understanding that each month the patient satisfaction ratings began anew as far as what they were reporting in the graph?
MR. FARNAES: Objection. Vague.

EXHIBIT 2
PAGE 2

MS. MELVANI: Join.

THE WITNESS: I presume they accumulated.

SAN DIEGO COURT REPORTING SERVICE

113

BY MS. BANHAM:

Q. And by presume, do you know?

A. I don't know, no. I just presumed that it was
an ongoing statistic, because the other one said by -- as
of 6/1, so that was my presumption.

Q. Okay. But you have no independent knowledge of
whether it was month by month or cumulative?

A. I do not, no.

---

**TESTIMONY OF RITA ALEXANDER, Owner/President   p. 229**

BY MS. BANHAM:

Q. I just would like to cover something that I
think we did not cover earlier when we were talking about
the -- the client satisfaction surveys.

Was it your intention or the intention of
StemGenex as a business that these surveys were started
anew every month so that the reporting of each month's
update only covered the patients treated within that
last, past month?

A. I don't recall how Joe set those up, so I don't
know the answer to that. But I know they were to be
defined for a certain time period. I just don't know
what that was.

Q. So in your understanding of what you were
publishing on the web and in these mailers, did you
understand that these patient satisfaction ratings were
from the beginning of the business until that month, or
did you understand them to be just the reporting of one
month's data?

A   I thought they were cumulative, but I'm not
sure.

MS. BANHAM: Okay. Could you remove your elbow,
Mr. Rosenberg, from that No. 40.

Oh, that's your No. 40.

MR. ROSENBERG: Yeah, that's my No. 40. You
want something to look at?

MS. BANHAM: A No. 40, yes. Thanks.

Q. We are just showing you the exemplar that we had
marked as Exhibit 40 with the question -- this one is the
question: How would you describe your overall experience
with StemGenex in terms of meeting your expectations.

You -- are you telling us that you understood

**EXHIBIT 2
PAGE 3**

this to be a cumulative over time with just an adjustment
each month for that month's group of patients?
A. I believe that's the case. It says through
August 2016 on here. But I don't know for sure.
Q. Have you ever had a discussion with Joe
Perricone or Gibrahn Verdault about -- about that fact,
whether this is cumulative or just month by month?
A. I don't recall a conversation.
Q. Okay. So is this an assumption you were making,
or is it based on some actual data or knowledge that you
have?
A. The answer I'm providing you?
Q. Yeah, that you thought it was cumulative.
A. It's an assumption.
Q. Okay. Would you be surprised if we learn that
that is not the case, and it's only based on -- if we
learn that it's only based on a month at a time?
MR. ROSENBERG: Objection. Calls for
speculation; incomplete hypothetical; assumes facts not
in evidence.
BY MS. BANHAM:
Q. You are allowed to answer.
What would be your reaction if we were to find
out that this is only month over month --
MR. ROSENBERG: Same objection.
BY MS. BANHAM:
Q. -- each month changing?
A. Well, I think the data is still valuable.
MR. ROSENBERG: No. The question is would you
be -- I think the question is, if you -- wait. If you
found out that it's only month to month and not
cumulative, would you then be surprised if that in fact
was true, which you don't know.
THE WITNESS: No.

---

**TESTIMONY OF CANDACE HENDERSON, Former Vice President   p. 184=**

Q. Okay. Thank you. So, I'd like you to go back
12 to Exhibit 13 and 12. You will see that there is a
13 notation there bolded that this is updated through
14 6/1/15.
02:20:13PM 15 A. Here?
16 Q. Yes. Was it your understanding that those
17 mailed StemGenex Patient Satisfaction Ratings were being
18 updated on a regular basis?
19 A. Yes.
02:20:26PM 20 Q. Okay. And what basis were they being upgraded

**EXHIBIT 2
PAGE 4**

**21** on?

**22 A.** It's my understanding they were being up updated

**23** every time somebody fills one out, fills them out.

**24 Q.** Oh, okay. Is there a computer system that

02:20:40PM **25** updated that StemGenex Patient Satisfaction Rating?

**A.** It was tallied, I believe, through Excel and

**2** then given to the website people for tallying and

**3** presentation, from my understanding.

**4 Q.** Okay. The website people being Clique Studios?

02:21:00PM **5 A.** That's my -- that's what I believe, yes.

**6 Q.** How often was Clique Studios, in your custom and

**7** practice, updated with new information?

**8 A.** Monthly, I believe.

**9 Q.** And was that at the beginning the month, the end

02:21:16PM **10** of the month, middle?

**11 A.** I think the end of the month.

**12 Q.** Okay. And that was done each month?

**13 A.** My understanding is that was done monthly, yes.

**14 Q.** And this was based solely on the patient

02:21:35PM **15** questionnaire given to patients the day after their

**16** surgery; is that correct?

**17 A.** Yes, ma'am.

**18 Q.** But you will notice this doesn't have any

**19** disclaimer about that at the bottom; is that correct?

02:21:50PM **20 A.** That is correct.

**Q.** If we have records of complaint1s by people

**7** prior to 6/1/2015 of that their experience was not

**8** satisfactory and those came in the form other than the

**9** exit interviews the day after surgery, that would not

02:23:03PM **10** appear in this graph; is that correct?

**11 A.** That's correct

---

**TESTIMONY OF JOE PERRICONE, Former Patient Advocate Director, p.44 - __:**

I'm going to show you what we will collectively
mark was Exhibit 141. I have copies for everybody.
And I may need to share this with you.
(Exhibit 141 marked for identification.)
BY MS. BANHAM:
Q. These are two documents which both have two
pages each. The first one is March 2014 Client
Satisfaction Survey. Second one is January 2015 Client
Satisfaction Survey. The second pages of each of those
documents are a hand tally. The top pages are a
typewritten tally.
Is that your -- is that what you have in front
of you?
A. Yes.
Q. And were those time periods times when you were
SAN DIEGO COURT REPORTING SERVICE

**EXHIBIT 2**
**PAGE 5**

44

working at StemGenex?

A. Yes.

Q. And I'll point your attention to the bottom of
the top -- of the page marked March 2014 Client
Satisfaction Survey, the typewritten one.

A. Okay.

Q. Can we share that for a moment?

A. Uh-huh.

Q. There have been some redactions made to take out
the names of patients. And we are looking at the bottom
where it says notes. A patient whose name has been
redacted did not answer Questions 1 and 2, marked as
missing; stated too soon to know, pending. And -- No. 1.
And not yet pending for Question No. 4.
Do you see that at the bottom?

A. 1 and 4, yes.

Q. Yes.
So is it your understanding that these numbers 1
and 4 comport with, on Exhibit 140, questions that were
asked about expectations and considering a trusted
partner, et cetera?

MR. FARNAES: Objection. Calls for speculation;
lacks foundation.

MS. MELVANI: Join.

SAN DIEGO COURT REPORTING SERVICE

45

BY MS. BANHAM:

Q. If you know.

A. I think so.

Q. Okay. And you'll see at the very top there
there is a number in the rating: Exceeded, meet, failed,
missing or not applicable; is that right?

A. Yes.

Q. Okay. So for this particular month you had some
missing information; is that right?

A. It looks like there is two, yes.

Q. And if you take the time to read the bottom
notes on that March 2014 client satisfaction survey --
could you read those again? Because it's upsidedown for
me.

A. "Did not answer Questions 1 and 4. Marked as
missing. She stated too soon to know, pending for No. 1
and not yet, pending, for Question No. 4."

Q. Okay.

A. "Did not complete survey; included in tally and
marked as missing or NA."

EXHIBIT 2
PAGE 6

Q. Okay. And I'm going to also point your
attention to January 2015 client survey in that same
Exhibit 141.
Do you see down at the notes -- can you please
read it for me because it's upsidedown.
SAN DIEGO COURT REPORTING SERVICE
46
A. Sure.
"Left Questions No. 2, 3 and 4 blank and marked
B/C for offsite staff. Marked as missing or NA. She
wrote: Frank was great; Dr. Singer was heavy handed for
Question No. 2. Wrote: Time will tell for Questions 3
and 4. Left 3 and 4 blank. Marked as missing. Wrote:
Hope so; so far, so good for No. 3 and not now for
No. 4."
Q. Okay.
A. "Is daughter of" -- it's redacted.
Q. Thank you.
And apparently there was some Dr. Singer
affiliated with StemGenex at that time?
A. Okay.
Q. Who was that?
A. I don't --
Q. You don't --
A. It sounds familiar. I just don't know exactly
if he was there when I was there. I guess he was. Maybe
he was an anesthesiologist or something.
Q. Is it your understanding that from this -- what
do you understand when the person has left something
blank or said time will tell?
A. I understand that they didn't know.
Q. And what did you think they were meaning by time
SAN DIEGO COURT REPORTING SERVICE
47
will tell?
MS. MELVANI: Calls for speculation.
THE WITNESS: I assume that --
MS. FARNAES: Objection. Seeks the state of
mind of a nondeclarant.
MS. MELVANI: Join.
BY MS. BANHAM:
Q. But while you may not be sure what that means,
the person has said time will tell and some of the
answers are not filled in. Is that your understanding of
what this tally means?
A. Yes.
Q. And same with March 2014, a person answering too

**EXHIBIT 2
PAGE 7**

soon to know, pending, in response to Question 1 and 4.
Question 1 on our client satisfaction survey that I'll
represent to you was used through a large part of the
time is: How would you describe your overall experience
with StemGenex in terms of meeting your expectations.
And Question 4: Based on your experience, would you feel
comfortable recommending StemGenex to a friend or family
member for stem cell therapy.
To those questions this -- one of the
respondents has answered: Too soon to know, pending, did
not answer those questions.
A. Uh-huh.
SAN DIEGO COURT REPORTING SERVICE
48
Q. Do these documents refresh your memory in any
way as to whether some people left certain blanks on
these questionnaires while you were working at StemGenex?
MR. FARNAES: Objection. Lacks foundation;
calls for speculation.
MS. MELVANI: Misstates testimony.
MR. FARNAES: I'll join in that objection.
THE WITNESS: I -- I believe some people -- I do
recall people answering like that.
BY MS. BANHAM:
Q. So you recall people answering like that, saying
it's too soon to tell?
MR. FARNAES: Same objections.
THE WITNESS: Yeah, I think so.
MS. MELVANI: Join.
THE WITNESS: It's not clear. It's been awhile.
BY MS. BANHAM:
Q. Do you remember some people not answering
particular questions during the time you were working at
StemGenex?
MR. FARNAES: Same objections.
MS. FARNAES: Asked and answered.
THE WITNESS: Not that I'm aware of. Yeah, I
don't recall. Sorry.
SAN DIEGO COURT REPORTING SERVICE
49
BY MS. BANHAM:
Q. That's okay. Did you -- you said someone else
gave you totals and then you gave them to the Clique
Studios, the website company; is that right?
A. Yes. Uh-huh.
Q. So did the people give you the totals in this
handwritten manner --

EXHIBIT 2
PAGE 8

A. Uh-huh.
Q. -- which is the second page of each of these two
on Exhibit 141?
A. Uh-huh.
Q. And we need a yes or no.
A. Oh, I -- no, I think.
Q. Oh, okay.
A. Yeah. I don't think I received this. If I
recall correctly -- it's been years -- but it was just
more of a tally total. Not on this. It was different
most times too, but --
Q. Okay.
A. -- I don't remember these sheets.
Q. Okay. Do you -- how did the tally total come to
you?
A. In -- it was handwritten on like a Post-It note.
Q. Okay. And did it just say a number?
A. It was just numbers, yeah. And I added those
SAN DIEGO COURT REPORTING SERVICE
50
numbers to the old ones really.
Q. Okay. So if we turn back to Exhibit 139 --
A. Uh-huh.
Q. -- and look at these -- like Page 7, would the
Post-It note typically say a percentage, or would it say
a number?
A. It would say a number.
Q. Okay. And can you give us an example of like
what that number --
A. It was -- for that question there could have
been like -- well, it was a month's worth, right? So it
could have been 10.
Q. Okay.
A. You know. And 10 of them -- this is how 10 of
them answered. This one is how 10 answered, and it was
added to all of the previous months to determine the
percentage.
Q. So while you were working there the results were
posted in a cumulative manner; is that correct?
A. Correct.
MR. FARNAES: Objection. Lacks foundation.
BY MS. BANHAM:
Q. Okay. And you understand what I mean by
cumulative?
A Yes.

Q. Can you tell me what you think I mean by that.

EXHIBIT 2
PAGE 9

A. You total the sum of all of the surveys.

Q. Okay. So while you were working there, it was your understanding that the sum of all surveys was people who had been treated, for instance, in August -- I'm sorry. It began in December of 2013. Is that your memory? That the patient satisfaction ratings began --

A. I don't recall the exact date that it started --

Q. Okay.

A. -- but possibly, yeah.

Q. So just for example's sake and so we understand what your cumulative answer means --

A. Yes.

Q. -- if we had patients in January and then patients in the succeeding months and we are in June of that same year, these graphs on the website, at least in your understanding while you were working there, represented all patients from January to June?

A. Correct.

Q. And not just a particular month?

A. Not just June or -- yes.

Q. Did you ever receive on your Post-It note numbers, if you remember, that said certain people didn't answer the question at all?

A. I don't recall.

SAN DIEGO COURT REPORTING SERVICE

52

Q. Okay. Do you recall ever having any publication on the website showing that there was no answer? Do you understand what I mean?

A. Yes.

I don't believe there was an option for no answer.

Q. So from these sheets, which are Exhibit 141, we do see that some patients failed to answer or didn't fail necessarily, but just didn't answer --

A. Uh-huh.

Q. -- the question. Yes?

A. Yes.

Q. And those people are not reflected on the graphs that were published during the time that you worked at StemGenex; is that right?

MR. FARNAES: Objection. Lacks foundation; calls for speculation.

THE WITNESS: Correct.

EXHIBIT 2
PAGE 10

**TESTIMONY OF JAMIE SCHUBERT**, Director of Marketing (Present):

Q. Okay. And while the information may not have
been consistently updated monthly, are you able to tell
SAN DIEGO COURT REPORTING SERVICE
156
us whether the representation that viewers see on the
screen is a representation of all patients throughout
time or just patients that treated during that period,
that month period?
A. Are you talking cumulatively?
Q. Yes.
A. From my understanding, at the beginning it was
cumulative.
Q. At the beginning of your employment? Or at the
beginning of what?
A. I don't know. I recall hearing it was
cumulative, and then it went month to month or whenever
it was updated.
Q. Okay. So let's break that down.
Do you know when it went month to month?
A. I don't know.
Q. Was it during your time there, or was it prior
to your time there?
A. I don't know.
Q. Did you have any involvement in the change from
cumulative to month to month?
A. No.
Q. Are you aware of anything that let the public
know -- any published posting on the internet, in a
mailer or anywhere else -- that let the public know there
SAN DIEGO COURT REPORTING SERVICE
157
had been a change in the method of reporting from
cumulative to month to month?
A. I don't know.
Q. Who would be the person most knowledgeable about
this subject?
A. Cece, Centrila.
Q. How would the public understand the chart --
yeah.
MR. ROSENBERG: I'm just pausing because I want
to hear the end of the question before I object. I think
it's going to call for speculation.
MS. BANHAM: If you have a better suggestion,

**EXHIBIT 2**
**PAGE 11**

let me know. You know where I'm going.
MR. ROSENBERG: I'm not sure. So ask the
question.
BY MS. BANHAM:
Q. So you're not aware of anything in writing to
the public that told them that this information was
cumulative at any time, right?
A. I don't know.
Q. And you are not -- are you aware of any
information at any time that told the patient or
public -- anyone seeing these graphs -- that the
reporting was only showing a month's worth of clients?
A. What was the question?
SAN DIEGO COURT REPORTING SERVICE
158
Q. Are you aware of anything in writing that
would -- published -- to tell -- that was with the intent
to tell prospective clients that the information they
were viewing in the graphs was only a reporting of a
month's worth of patients?
MR. ROSENBERG: Before you answer -- I was out
of the room, so if this sounds foolish, I apologize. But
has it been established that this witness knows that it
was only monthly and not cumulative?
MS. BANHAM: You were just here.
MR. ROSENBERG: I didn't catch that.
MS. BANHAM: Okay. So I'm going to summarize
what I believe I heard you say, and correct me if I'm
wrong.
I asked about this information that was in the
graphs on the website -- we are talking specifically on
the website -- and I asked her was she familiar with
these and did she need to see an exemplar and she said
no. And I said we are talking only about the pie charts.
Are you aware of whether or not this information that is
shown is cumulative over time or is a visual of only the
month to month -- month over month, and she responded
that at the beginning it was cumulative, and then at a
certain time it went to a depiction of month over month.
THE WITNESS: However --
SAN DIEGO COURT REPORTING SERVICE
159
BY MS. BANHAM:
Q. Okay. But up to that point had I described your
testimony correctly, or are you --
A. I would like add -- I would like to clarify.
However, this is hearsay; it's what I was told.

EXHIBIT 2
PAGE 12

Q. Okay. What is your understanding of -- so we
are going to talk about the month that you were told to
take the ratings -- the patient satisfaction ratings off
the website, just prior to you being told to take those
off.
What was your understanding of what that
depicted? A cumulative assessment of all patients over
time or only a depiction of the previous month since the
last update?
A. I don't know.
Q. Okay. So you don't know whether it was -- at
the time right before it was taken off, you don't know
whether it showed 100 percent of the people described
their overall experience with StemGenex in terms of
meeting their expectations, whether that was like all the
patients of StemGenex over time or -- you don't know
that?
A. I don't know.
Q. Okay. And you don't know whether it was within
a two-year period, for instance, right?
SAN DIEGO COURT REPORTING SERVICE
160
A. I don't know. Again, I was handed the numbers.
Q. Okay. And you don't know whether it was in a
one-year period, correct?
A. I don't know.
Q. And you don't know whether it was as to showing
just the last month's worth of patients, how they felt
about the experience with StemGenex; is that correct?
A. I don't know.
Q. And is it -- do you know whether this described
an experience -- when patients were asked how would you
describe your overall experience with StemGenex in terms
of meeting your expectations, and that showed on the
website in a pie chart, whether that described the
experience while they were at the StemGenex facility
until the day after treatment, or did that describe their
long-term experience with StemGenex?
MR. FARNAES: Objection. I think that question
calls for the state of mind of all of the patients who
answered the question as to what exactly they were
answering. So I think it calls for speculation.
MR. ROSENBERG: Join.
MS. MELVANI: Join.
MR. ROSENBERG: Also, beyond speculation, calls
for the state of mind of a nondeclarant.
SAN DIEGO COURT REPORTING SERVICE

EXHIBIT 2
PAGE 13

161
BY MS. BANHAM:
Q. I'm asking you, Jamie Schubert, director of
media and community relations, in the month prior to
your -- your taking these off the internet. Did you --
what did you understand that internet posting in the form
of a pie chart as to how would you describe your overall
experience with StemGenex in terms of meeting your
expectations.
Did you understand that to be a visual depiction
of the answers for people who had just left the StemGenex
facility and just had the treatment the day before, or
did you understand that to be a depiction of a long-term
satisfaction?
MR. FARNAES: Objection. Compound.
MR. ROSENBERG: Yeah. Incredibly compound.
MS. MELVANI: Join.
BY MS. BANHAM:
Q. Can you please answer the question?
MR. ROSENBERG: If you can.
THE WITNESS: Of patients that were treated the
day before.
BY MS. BANHAM:
Q. And did that answer you just gave apply to your
understanding of this depiction on the website
throughout -- throughout your time working there?
SAN DIEGO COURT REPORTING SERVICE
162
A. Yes.
Q. Okay. And you have previously testified that
you were unaware of the mailed version of that pie chart;
is that right?
A. Correct.
Q. So let's go back to the change from cumulative
to month to month, and forgive me if I'm going where we
went before, but I want to be sure.
You are not sure when that depiction in the
graph changed from depicting a cumulative over time
result of the patient satisfaction surveys versus just
the month prior to the update?
A. Again, this is something I was told, so I don't
feel comfortable even saying I know for sure.
Q. Who told you about the change?
A. I don't know.
Q. And do you remember in what context you were
told about a change?
A. I don't know -- somebody just happened to

EXHIBIT 2
PAGE 14

mention it. It was awhile ago. I don't know.
Q. How long was your discussion about that?
A. I don't know.
Q. Okay.
A. It was very brief.
Q. What was your reaction, if any, to that?
SAN DIEGO COURT REPORTING SERVICE
163
A. None.
Q. Did you have any concern as the director of
media and community relations of potential lack of
understanding by the public of that -- of the graph or
graphs?
A. From my understanding, this conversation
happened after the fact and they were removed.
Q. Okay. That's enlightening. Thanks.
So prior to the removal in early 2017, you did
not know -- did you know whether it was cumulative or
month to month?
A. I don't know.
Q. You mean you didn't know, or you don't know now?
A. I didn't know then and I don't know now.
Q. Okay.
A. Sorry.
Q. So at the time of removal, you didn't know
whether it was a cumulative or a month-to-month depiction
of the information?
A. Again, I didn't know then and I don't know now.
Q. Okay. Thanks.
SAN DIEGO COURT REPORTING SERVICE
164
you, and I just want to know where things fell. If you
have no knowledge of these things, tell me. And, again,
if it's like speculation -- the dining room table -- I
don't want to know things that you have just heard, you
know, from somebody else and it's not within your own
knowledge. I don't want to ask you about anything that
happened before you got there.
You did not have anything to do with adding the
Better Business Bureau logo to the website, did you? Do
you know?
A. I don't remember.
Q. At some point, if at all, did you learn that a
patient named Selena Moorer was unhappy with the service
of StemGenex?
A. Yes.
Q. And when was that time?

**EXHIBIT 2
PAGE 15**

A. When I learned about a proposed class action
lawsuit.
Q. Okay. Do you remember the general season or
time?
A. No.
Q. I'll represent to you that on May 5th of 2016, a
representative of StemGenex asked that this wording be
added to the website -- asked Clique Studios to add this
wording: "The patient satisfaction ratings above
SAN DIEGO COURT REPORTING SERVICE
165
represent data received from patient exit surveys
evaluating patient experience and care, accommodations,
staff of facilities." And this request asked that that
be placed under the patient satisfaction ratings on the
homepage.
Were you involved in any way in the addition of
that information on the -- under the patient satisfaction
ratings on the homepage?
A. Yes.
Q. Okay. And do you remember whether that was in
response to any particular event or discussion?
A. I don't remember that being in any particular
event.
Q. Do you remember whether you were aware of
Mrs. Moorer's complaints at the time you added that to
the website?
A. I don't remember.
Q. Do you remember someone else ordering you to add
that to the website?
A. Yes.
Q. Who was that person?
A. It was Candace and Rita or Candace and Rita.
Sorry. Let me rephrase that.
Candace or Rita or both of them.
Q. Okay. And did you ask them why you were adding
SAN DIEGO COURT REPORTING SERVICE
166
that to the website?
A. No.
Q. In July of 2016 there was a request to Clique
Studios to add "Stem cell therapy is not FDA approved and
is not a cure for any medical condition, read more," and
then that's added to the footer on the pages of
StemGenex.com website.
Did you have anything to do with that -- adding
of that information, if you remember?

EXHIBIT 2
PAGE 16

A. Yes.
Q. And what was your involvement in the adding of that information?
A. I submitted a request to Clique Studios to add the information.
Q. Do you remember why you did that?
A. No.
Q. Okay. Do you remember if you did that at the direction of some other person?
A. I remember it was discussed.
Q. Who was it discussed with?
A. Candace and Rita.
Q. Okay. And you don't have a recollection of why this was going to be added?
A. I don't remember.
Q. Do you remember where that was going to be added
SAN DIEGO COURT REPORTING SERVICE
167
on the website?
MR. FARNAES: Objection. Assumes facts not in evidence.
THE WITNESS: If I recall, it was on the footer under a specific section.
BY MS. BANHAM:
Q. Okay. I'll represent to you that on August 11, 2016 StemGenex ordered that the slides about trusted partner and recommending to a friend be removed from the website immediately.
Did you have anything to do with that request to remove those slides?
A. I'm sorry. Can you repeat the beginning?
Q. Sure.
The slides about trusted partner and recommending to a friend were -- Clique Studios was asked to remove those from the website immediately on August 11, 2016.
Do you have any idea why that was done?
A. No.
Q. Did you have any involvement in that happening?
A. Yes.
Q. And what was your involvement?
A. I put in the request, if I recall, to Clique

EXHIBIT 2
PAGE 17

# APPENDIX A

**EXHIBIT 2**
**PAGE 18**

# CURRICULUM VITAE

Michael A. Kamins
Visiting Professor of Marketing
Director of Internet Programs
Peter F. Drucker Graduate School
of Management Claremont University

6401 Warner Drive
Los Angeles, California 90048
email: michael.kamins@cgu.edu
(323) 868-9507

## EDUCATION:

Graduate:          Ph.D., New York University; February 1984
Major:  Marketing
Minor:  Quantitative Methods

Dissertation:      "The Impact of Involvement, Advertising Type, and
Expectation Level on Product Evaluation"
Chairman:  Henry Assael

M.B.A., Bernard M. Baruch College; June 1977
Major: Statistics

Thesis:           "Multiple Comparison Procedures"
Chairman:  Mark Berenson

Undergraduate:    B.B.A., Bernard M. Baruch College; January 1974
Major:  Statistics

## TEACHING EXPERIENCE

**Peter F. Drucker Graduate School of Management at Claremont Unniversity
Director of Online Programs, Visiting Professor of Marketing. January 2018-
Present. Courses taught: Marketing Management, Marketing Strategy &
Marketing Research to the MBA and EMBA program.**

Stony Brook University (SUNY): Director of Research. September 2010-2017.

Stony Brook University (SUNY): Full Professor of Marketing and Area
Head: December 2007-2017.  Courses Taught: Graduate Level Marketing
Management, Marketing Strategy and Marketing Research. Undergraduate Level:
Honors program on Leadership in the area of Data Analysis.

1

**EXHIBIT 2
PAGE 19**

<u>University of Southern California</u>:  Associate Professor of Marketing 9/90-12/07. Assistant  Professor of Marketing 1/84- 9/90.  Acting Chairperson of Marketing – Spring 1994.  Courses taught at <u>Undergraduate Level</u>:  Marketing Management, Marketing Research; at <u>Graduate Level</u>:  Marketing Management (IBEAR and CORE); Marketing Research, Ph.D. Seminar in Research Design; CORE Research Methods and Design; IBEAR Consulting Projects; Executive MBA Program (Theme 3 – Marketing). Global Executive MBA (GEMBA). Shanghai, China, 2005-6.

Visiting Professor of Marketing, <u>Stony Brook University</u>, Stony Brook New York, Fall 2006.

Visiting Professor of Marketing, <u>Griffiths University</u>-Brisbane Australia Fall 2003

<u>New York University</u>:  Instructor in Marketing 9/80 – 1/84.  Courses taught include Marketing Management, Marketing Research (Graduate and Undergraduate).

<u>Bernard M. Baruch College</u>:  Adjunct Lecturer in Statistics 6/77 – 7/80.  Courses taught, Statistics for both Accounting and non-Accounting majors.

## PUBLICATIONS IN JOURNALS:

"Effects of Product Type and Contextual Cues on Eliciting Naïve Theories of Popularity and Exclusivity," *Journal of Consumer Psychology*, (2015), Vol. 24(4), pp. 472-83, with Yael Steinhart, David Mazursky and Avi Noy.

"The Process by Which Product Availability Triggers Purchase," *Marketing Letters* (2013) Vol. 24(3), pp. 217-228, with Yael Steinhart and David Mazursky.

"The Temporal Processing Fit Effect: The Interplay between Regulatory State, Temporal Distance and Construal Levels," <u>Social Cognition</u> (2013), Vol. 31. (June), pp. 315-335. **Lead Article**.

"Thinking or Feeling the Risk in Online Auctions: The Effects of Priming Auction Outcomes and the Dual System on Risk Perception and Amount Bid," *<u>Journal of Interactive Marketing,</u>* (2013) Vol. 27 (February), pp. 47-61 with Yael Steinhart, David Mazursky and Avi Noy.

"On the Road to Addiction: The Facilitative and Preventive Roles of Marketing Cues," *<u>Journal of Business Research</u>*, (2012), Forthcoming with Ingrid Martin, Dante Pirouz, Aditi Grover, Scott Davis, Kelly Haws, Ann Mirabito, Sayantani Mukherjee and Justine Rapp.

**EXHIBIT 2**
**PAGE 20**

**PUBLICATIONS IN JOURNALS:  (continued)**

"From Use to Abuse: When Everyday Consumption Behaviors Morph Into Addictive Behaviors," *Journal of Research For Consumers*," (2011) Vol. 19, pp. 1-8, with Aditi Grover, Ingrid Martin, Scott Davis, Kelly Haws, Ann Mirabito, Sayantanee Mukherjee, Dante Pirouz and Justine Rapp. Lead Article.

"The Effect of Social Cues on Sniping Behavior in Internet Auctions: Field Evidence and a Simulation." (2011) *Journal of Interactive Marketing*, 25 (August), pp. 241-250. With David Mazursky, Avi Noy and Yael Steinhart.

"Reputation Gaps and the Performance of Service Organizations," 2010 Strategic Management Journal, Vol. 31(5), pp. 530-546, with Gary Davies and  Rosa Chun.

"An Application of Terror-management Theory in the Design of Social and Health-Related Anti-Smoking Appeals," 2010.   Journal of Consumer Behavior, V. 9(3), 172-190 with Ingrid Martin.

"Promotional Bundles and Consumers' Price Judgments: When the Best Things in Life Aren't Free," 2009.   Journal of Consumer Research, Vol. 36 (December), with Valerie S. Folkes and Alexander Fedorikhin, pp.660-670.

"Rumor Has It: The Moderating Effect of Identification  on Rumor Impact and the Effectiveness of Rumor-Refutation" 2008. Journal of Applied Social Psychology," with Sabine Einwiller. Vol. 38(September), pp. 2248-72.

"How Do Customers Know Which Brand is the Market Leader or Market Pioneer?: Customers Inferential Processes, Confidence and Accuracy," 2007 Journal of Marketing Management, Vol 23 (September), pp. 590-611. with Frank H. Alpert and Lars Perner (**Lead article**).

"Enough is Enough! When Identification no Longer Prevents Negative Corporate Associations" 2006, Journal of the Academy of Marketing Science, Vol. 34(2), with Sabine Einwiller, Alexander Fedorikhin and Allison Johnson, pp. 185-194.

"Corporate Claims as Innovator or Market Leader: Impact on Overall Attitude and Quality Perceptions, and Transfer to Company Brands," 2004 Corporate Reputation Review 7(2), with Frank H. Alpert, pp. 147-159.

"Doctoral Coursework for Australasia" 2004 with Frank H. Alpert.  Invited Commentary for the Australasian Journal of Marketing, Vol. 12 (1), pp. 66-72.

**EXHIBIT 2**
**PAGE 21**

**PUBLICATIONS IN JOURNALS:   (continued)**

"Effects of Seller-Supplied Prices on Buyers' Product Evaluations:
Reference Prices in an Internet Auction Context," 2004, with Valerie Folkes
and Xavier Dreze. Forthcoming, <u>Journal of Consumer Research,</u> 30(March)
pp. 622-628.

"Consumers' Perception and Misperception of Market Leadership and Market
Pioneership," 2003, with Frank H. Alpert and Lars Perner.  <u>Journal of Marketing
Management</u>, Vol. 19 (August), pp. 807-834.

"Retail Buyer Beliefs, Attitude and Behavior Toward Pioneer and Me-too
Follower Brands: A Comparative Study of Japan and the United States
2001 <u>International Marketing Review</u>  18(2) with Frank H. Alpert
Tomoaki Sakano and Naoto Onzo, pp. 160-187.

"Impact of Trial, Product Information and Pioneership Awareness on the
Evaluation of the Pioneer Brand," 2000  <u>Journal of Consumer Psychology,</u>
Vol. 9 (4) with Frank H. Alpert and Michael Elliott, pp. 223-230.

"Effect of Information About Firms' Ethical and Unethical Actions on
Consumers' Attitudes," 1999 <u>Journal of Consumer Psychology,</u> Vol. 8 (3) with
Valerie S. Folkes, pp. 243-259.

"Consumer Responses To Rumors:  Good News, Bad News," 1997 <u>Journal of
Consumer Psychology</u>, Vol. 6 (2) with Valerie S. Folkes and Lars Perner, pp.
165-187.

"A Multimethod Examination of Buyer-Seller Interactions Among Japanese and
American Business-people," 1997, <u>Journal of International Marketing</u>, with John
L. Graham and Wes Johnston.

"Retail Buyer Decision Making in Japan:  What U.S. Sellers Need to Know,"
1997, <u>International Business Review</u>, Vol. 6 (2) with John L. Graham, Naoto
Onzo and Tomoaki Sakano, pp. 91-112.

"U.S. Suppliers in Japan:  Overcoming Obstacles to Trade," 1996, <u>Harvard
Business Review</u>, (Editors Brief), with Frank Alpert, John L. Graham, Naoto
Onzo and Tomoaki Sakano, pp. 14-15.

"Pioneer Brand Advantage in Japan and the United States," 1996, <u>Marketing
Science Institute Working Paper</u>.  Report No. 96-101, (March) with Frank Alpert,
John Graham, Tomoaki Sakano, and Naoto Onzo.

**EXHIBIT 2
PAGE 22**

**PUBLICATIONS IN JOURNALS:  (continued)**

"Retail Buyer Decision Making in Japan:  What U.S. Sellers Need to Know,"
1995 Marketing Science Institute Working Paper.  Report No. 95-108, August
with Frank Alpert, Tomoaki Sakano, Naoto Onzo and John Graham.

"An Empirical Investigation of Consumer Memory, Attitude, and Perceptions
Toward Pioneer and Follower Brands, 1995, Journal of Marketing, Vol. 59
(October), pp. 35 – 46, with Frank Alpert.

"The Challenge of Obtaining Distribution for Me-Too Follower Brands," 1995,
International Review of Retail, Distribution and Consumer Research, Vol. 5
(April), pp. 203-217, with Frank Alpert.

"Perceptions of Products Made in Japan Versus Made in the U.S.  Among
Japanese and U.S. Executives:  A Longitudinal Perspective," 1995, Asia Pacific
Journal of Management, Vol. 12 (1), pp. 49-68 with Akira Nagashima.

"Congruence Between Spokesperson Image and Product Type:  A 'Match-Up'
Hypothesis Perspective," 1994, Psychology and Marketing, Vol. 11 (6), pp. 569
–588 with Kamal Gupta.

"Consumer Behavior and Pioneer Brand Advantage:  Conceptual Framework and
Propositional Inventory," with Frank Alpert, 1994, Journal of the Academy of
Marketing Science, Vol. 22 (Summer), pp. 244-253.

"Content Analysis of German and Japanese Advertising in Print Media for
Indonesia, Spain and the United States," with John L. Graham and Djoko
Oetomo, 1993, Journal of Advertising, Vol. 22 (2), pp. 5-15 (**lead article**).

"An Examination of Reseller Buyer Attitudes Toward Order of Brand Entry,"
1992, Journal of Marketing, Vol. 56 (July), pp. 25-37, with Frank H. Alpert and
John L. Graham.

 "Television Commercial Evaluation in the Context of Program Induced Mood:
Congruency Versus Consistency Effects," 1991, Journal of Advertising, Vol. 20
(2), pp. 1-14, with Lawrence J. Marks and Deborah Skinner (**lead article**).

"The Perception of Kosher as a Third Party Certification Claim in Advertising for
Familiar and Unfamiliar Brands," 1991, Journal of the Academy of Marketing
Science, Vol. 19 (3), pp. 177-85 with Lawrence J. Marks.

"An Investigation into the 'Match-up' Hypothesis in Celebrity Advertising:
When Beauty May Be Only Skin Deep," 1990, Journal of Advertising, Vol. 19
(1), pp. 4-13 (**lead article**).

**EXHIBIT 2
PAGE 23**

**PUBLICATIONS IN JOURNALS:  (continued)**

"A Cognitive Response Involvement Model of the Process of Product Evaluation Through Advertising Exposure and Trial," 1990, Journal of Business Research, Vol. 20 (May), pp. 191-215, with Henry Assael and John Graham (**lead article**).
**PUBLICATIONS IN JOURNALS:  (continued)**

"Effects of Appeal Type and Involvement on Product Disconfirmation:  A Cognitive Response Approach Through Product Trial," 1989, Journal of the Academy of Marketing Science, Vol. 17 (Summer), pp. 197-207, with Henry Assael (**lead article**).

"The Enhancement of Response Rates to a Mail Survey Through a Labeled Probe Foot in the Door Approach," 1989, Journal of the Marketing Research Society, Vol. 31 (April), pp. 273-84.

"Two-Sided Versus One-Sided Celebrity Advertising:  The Impact on Advertising Effectiveness and Credibility," 1989, Journal of Advertising, Vol. 18 (2), pp. 4-10, with Meribeth J. Brand, Stuart A. Hoeke, and John C. Moe (**lead article**).

"Celebrity and Non-Celebrity Advertising in a Two-Sided Context," 1989, Journal of Advertising Research, Vol. 29 (June/July), pp. 34-42.

"An Investigation into the Use of Product Sampling and Advertising:  The Effect of Sequence of Exposure and Degree of Advertising Claim Exaggeration on Consumers' Belief Strength, Belief Confidence and Attitudes," 1988, Journal of Marketing Research, Vol. 25 (August), with Lawrence J. Marks, pp. 266-81.

"An Examination into the Effectiveness of Two-sided Comparative Price Appeals," 1988, Journal of the Academy of Marketing Science, Vol. 16 (Summer), with Larry J. Marks, pp. 74-81.

"Two-sided versus One-sided Appeals:  A Cognitive Perspective on the Effect of Trial upon Belief Change," 1987, Journal of Marketing Research, Vol. 24 (February), with Henry Assael, pp. 29-39.

"Moderating Disconfirmation of Expectations Through the Use of Two-sided Appeals:  A Longitudinal Approach," 1987, Journal of Economic Psychology, Vol. 8 (June), with Henry Assael, pp. 237-53.

"Cognitive and Affective Dimensions of Educational Objectives:  Scale Development and Measurement," 1987, Journal of Marketing Education, Vol. 9 (Fall), with Dennis Sandler, pp. 52-7.

6

**EXHIBIT 2
PAGE 24**

**PUBLICATIONS IN JOURNALS:  (continued)**

"Advertising Puffery:  The Impact of Using Two-sided Claims on Product Attitude and Purchase," 1987, <u>Journal of Advertising</u>, Vol. 16 (December), with Lawrence J. Marks, pp. 6-15 (**lead article**).

<u>**Publications in Refereed Conference Proceedings**</u>

"Whether you Win or Whether You Lose: The Differential Risk of Priming the Cognitive and Affective Systems in On-line Auctions," (2010) with Yael Steinhart,  David Mazursky and Avi Noy.  Association for Consumer Research, Jacksonville, Florida.

"Fantasies Come true and Soon: Mental Construal as a Function of Regulatory State and Time Horizon," (2009) Association for Consumer Research Proceedings, with Yael Steinhart and David Mazursky. Pittsburgh, Pennsylvania.

"Promotional Bundles and Consumers' Price Judgments: When the Best Things In Life Aren't Free," (2009) Association for Consumer Research Proceedings, with Alexander Fedorikhin and Valerie Folkes. Pittsburgh, Pennsylvania.

"The Interpersonal determinants of Sniping in internet Auctions," (2008). Association for Consumer Research Proceedings, with David Mazursky, Avi Noy and Yael Steinhart.  San Francisco, California.

"When the Loss of Free-Will Can Be Costly: A Novel Approach to an Anti-Smoking Campaign," (2007). Association for Consumer Research Proceedings, with Aditi Grover. Memphis, Tennessee.

"Relationships Can Disappear in a Puff of Smoke: A Test of Terror Management Theory and Risk perceptions on Smoking Behavior," (2006). Association for Consumer Research Proceedings, with Ingrid Martin.  Orlando, Florida.

"Pioneer Brand Advantage with retail Buyers in Japan, A Comparison with U.S. Data." (2000), 29th European Marketing Academy Conference Proceedings (Amsterdam, Erasmus university) with John L. Graham, Frank H. Alpert, Tomoaki Sakano and Naoto Onzo.

"Content Analysis of German and Japanese Advertising (1993) <u>Proceedings of the Fourth Symposium on Cross Cultural Research</u>, 171-175.  Kahuku, Hawaii: Gerald Aldaum, Editor.

"Message and Non-message Elements in Advertising:  Does Involvement Matter?" (1988), <u>Academy of Marketing Science Proceedings</u> with Dennis Sandler and Henry Assael.

**EXHIBIT 2
PAGE 25**

"Investigating the Experiential Dimensions of Product Evaluations" (1987), Advances in Consumer Research, Vol. 14.  Association for Consumer Research with Larry J. Marks and Susan Higgins, pp. 114-121.

"The Effect of Framing and Advertising Sequencing on Attitude Consistency and Behavioral Intentions" (1986), Advances in Consumer Research, Association for Consumer Research with Larry J. Marks, pp. 168-72.

"The Effects of Level of Expertise on the Processing of Framed and Unframed Pictorial Print Advertisements" (1986) AMA Educators' Proceedings, Terence A. Shimp, Subhash Sharma, et al. (eds.) with Larry J. Marks and Donna Murphy, pp. 57-61.

"The Effect of Cognitions Upon Post-trial Evaluation and Purchase Intention Measures and the Advertiser's Choice of Appeal Type" (1986), with Henry Assael, Researches on Communication Promotion, Aix-en-Provence, France, pp. 275-301.

"The Effect of Commitment and Product Performance Disconfirmation on Consumer Evaluations" (1985) with John W. Keon, AMA Educators Proceedings, pp. 86-92.

"The Effect of Two-sided Appeals upon Post-trial Performance Evaluation, Advertiser Credibility, and the Disconfirmation Level" (1985), Researches on Communication/Promotion, Aix-en-Provence, France, pp. 86-108.

"What Are the Causes and How Can One Control for Television Advertising Wearout?" (1981), ORSA/TIMS Market Measurement Conference, pp. 67-77.

## Books and Chapters

Marketing Manipulation: A Consumer's Survival Guidel (2018), Now Publishing.

Handbook of Persuasion and Social Marketing (2015) (Three Volume set Praeger).  Published Chapter 7 of the first volume on "Rumors, Word-of-Mouth, and Social Media," Editor: David W. Stewart.

"Price Bundling" (2010)  A Chapter in the Wiley International Encyclopedia of Marketing, Jagdish N. Sheth; Naresh K. Malhotra (Editors in Chief).

"Marketing Communications" (2002) A Chapter in the Handbook of Marketing, Barton Weitz, Editor. with David W. Stewart (Lead author).

**EXHIBIT 2**
**PAGE 26**

Sales & Marketing: 25 Keys to Selling Your Products. (1999) The <u>New York Times</u> Pocket MBA Series, Volume (8).  Lebhar-Friedman Books, New York, New York. <u>Secondary Research:  Information Sources and Methods</u> (second edition) with David W. Stewart (lead author), Sage Publications:  New York 1993.

## BOOK REVIEWS

"A Brand New Language," <u>Journal of Marketing</u>, 1994, 58 (April), pp. 129-130 with Nancy Frost.

## CONFERENCES ORGANIZED AND HOSTED

**Co-Chair American Marketing Association Summer Educator's Conference-Chicago Illinois, August 2009.**

Eighth Annual International Conference of the Corporate Identity/Associations Research Group CI/ARG.  Harriman School of Business, Stony Brook University. 2009

Third Annual International Conference of the Corporate Identity/Associations Research Group CI/ARG.  University of Southern California. 2004

AMA Conference on Marketing and Public Policy and Risk Workshop, Long Beach California and the University of Southern California. 2006.

## MANUSCRIPTS IN REVIEW:

"The Construct of Reverse Confusion in trademark Law: Conceptualization and Methodological Consideration," Under first review: <u>The Trademark Reporter</u>.

"Smoking Can't Hurt Me!!" and Other Death-Related Thoughts: A Test of Terror Management, Self-Affirmation and Risk Perceptions' with Ingrid Martin (Lead author) and Aditi Grover.  Under Review: <u>Journal of Marketing</u>.

## WORKS IN PROGRESS:

"The Dual Effect of Signaling on Regret in On-Line Auctions: When the Loser is the Winner and the Winner is the Loser," with Avi Noy, David Mazursky and Yael Steinhart. Target: <u>Journal of Consumer Research</u>.

**EXHIBIT 2**
**PAGE 27**

"What Counts: Getting There or How We Got There: Mental Construal as a Function of Regulatory State and Time Horizon," with David Mazursky, Yael Steinhart and Avi Noy. Target: Journal of Consumer Research.

"Complimentary Relationships between Brand and Human Personality," With Susan Whelan and Gary Davies: Target: <u>Journal of Consumer Psychology</u>.

"When The Consumer Sees Red, Sales Can Be Blue: The Match-Up Between Product Image and Color In Advertising," with Lars Perner. In preparation for submission (write-up stage): Target: <u>Journal of Consumer Research</u>.

"The Impact of the Bundling of Bundles on Final Sale Price in On-line Auctions: When Bundling Makes Sense," with Alexander Fedorikhin and Valerie S. Folkes In preparation for submission  (write-up stage) Target: <u>Journal of Marketing</u>.

"Understanding and Regulating Contrast and Assimilation Effects in the Relationship Between Corporate Associations and Consumer Product Responses," in pretest stage.  With Peter Dacin and Tom Brown.  Target: <u>Journal of Marketing</u>.

"Avoiding Ego-defensive Responses to Health Risk Communications: Social MortalitySalience versus Physical Mortality Salience" with Paul Connell and Ingrid Martin.  <u>Target: Journal of Consumer Research</u>.

"A Separate Piece?: Constructing Optimal Structural Alignments' in The Decision to Offer A Supplemental Product as an Add-On Or As A Bundle with Valerie Folkes and Sasha Fedorikhin. Target: <u>Journal of Consumer Research</u>.

"The Impact of Social Pressure on Cause Donation," with Amrapali Agrawal and Peter Caperiello. Target: <u>Journal of Economic Literature.</u>

"The Consumption Continuum: Towards a Theoretical Framework to Understand Maladaptive Behaviors with Ingrid Martin and Dante Pirouz." Target: <u>Journal of Business Research</u> as an Invited Paper.

**SELECTED PRESENTATIONS:**

"Researching Consumption Addiction: Developing A Theoretical Framework of Understanding," A Round Table (2012), Marketing and Public Policy Conference, Atlanta, Georgia. With Ingrid Martin.

"Whether You Win or Whether You Lose: The Differential Effect of Priming the Deliberative and Affective Systems in On-Line Auctions," (2010), Society

EXHIBIT 2
PAGE 28

for Consumer Psychology Annual Conference, St. Petersburg, Florida with Avi Noy, David Mazursky and Yael Steinhart.

"The Dual Effect of "Signaling" on Regret in Online Auctions," (2010) Society for Consumer Psychology Annual Conference, St. Petersburg, Florida with Avi Noy, David Mazursky and Yael Steinhart.

"Self-Affirmation and Smoking Self-esteem in Social Death Anti-Smoking Advertisements," (2010) AMA Winter Educators' Conference, New Orleans, Louisiana with Adidi Grover and Ingrid Martin.

"Enough is Enough! When Identification no Longer Mitigates the Detrimental Effects of Negative Information" (2005) invited presentation at the Academy of Marketing Science Conference, Tampa Florida.

"When the Internet Gavel Falls: A Field Study Replication of the Effects of Uncertainty on Auction Bids," (2002) at Griffith University, Brisbane Australia.

"Teaching about Teaching," (2002) at the Academy of Marketing Science Annual Congference, Fort Myers, Florida.

"Product Evaluation As A Function of The Company As An Innovator And/Or Market Leader," (2002) at the first annual conference on Corporate Associations, Oklahoma State University, Stillwater, Oklahoma.

"Content Analysis of German and Japanese Advertising" (1993) at the Fourth Symposium of Cross-Cultural Research, Kahuku, Hawaii.

"Context-Induced Mood Effects in Advertising," Association for Consumer Research, Twenty-first Annual Conference, (1990) New York, New York (with Tina Kiesler and Henni Sanft).

"Investigating the Experiential Dimensions of Product Evaluations," Association for Consumer Research, Eighteenth Annual Conference, October 8th – 11th, 1987, Boston, Massachusetts (with Larry J. Marks and Susan Higgins).

"Sidedness in a Pricing Context:  The Effectiveness of Two-Sided Price Appeals," Marketing Science Conference, Paris, France, June 25, 1987.

"An Investigation Into the Use of Product Sampling and Advertising:  The Effect of Sequence of Exposure and Degree of Advertising Claim Exaggeration on Consumers' Attitudes," Joint USC-UCLA Seminar, May 29, 1987.

"The Effect of Framing and Advertising Sequencing on Attitude Consistency and Behavioral Intentions," Association for Consumer Research, Seventeenth Annual

EXHIBIT 2
PAGE 29

Conference, October 16-18[th], 1986, Toronto, Ontario, Canada (with Larry J. Marks).

"The Effects of Level of Expertise on the Processing of Framed and Unframed Pictorial Print Advertisements," American Marketing Association Summer Educators Conference, August 3-6[th], 1986, Chicago, Illinois (with Larry J. Marks).

"The Attainment of Cognitive and Affective Educational Objectives," at the American Marketing Association's Global Marketing in the Next Decade" Conference, Singapore, June 16-18[th], 1986 (with Dennis Sandler).

"The Effect of Commitment and Product Performance Disconfirmation on Consumer Evaluations," American Marketing Association Summer Educators Conference, August 11-14, 1985, Washington, D.C. (with John W. Keon).

"The Effect of Two-Sided Appeals upon Post-Trial Performance Evacuation, Advertiser Credibility and the Disconfirmation Level," at Conference Sur La Communication/Promotion, Aix-En-Provence, France, May 29-31, 1985.

"What Are the Causes and How Can One Control for Television Advertising Wearout?" ORSA/TIMS Market Measurement Conference, March 13-15, 1981, New York University.

"One-Way Design Multiple Comparison Techniques with Confidence Interval Applications," Presented at the <u>American Society of Quality Control Annual Meeting</u>, August 10, 1977, Middlesex, New Jersey.

## INVOLVEMENT IN PROFESSIONAL PROGRAMS AND SERVICE ACTIVITIES:

Co-Chair of the 2009 **AMA Summer Educators Conference**-Chicago.

Program Organizer and co-chair of the 7[thd] Annual **Conference on Corporate Reputation** held at Stony Brook University in May of 2009.

Program Organizer and co-chair of the 3rd Annual **Conference on Corporate Reputation** held at the University of Southern California in April of 2004.

Co-Chair of the Public Policy & Marketing Conference 2005. Long Beach California.

Session Chairperson for the 2001 Winter AMA Conference.

Consumer Behavior Track Co-chair for the 1998 AMA Summer Educators'

**EXHIBIT 2 PAGE 30**

Conference.

Department of Marketing Acting Chairperson, Spring 1994.

Editorial Review Board Member – <u>Journal of Advertising</u>, 1993 – present.

Reviewer, <u>Journal of Advertising</u>, <u>Journal of the Academy of Marketing Science</u> (1991).

Co-chair and discussant for 1990 <u>Association for Consumer Research</u> conference special session titled "Segmentation in Consumer and Market Research: Applications, Current Issues and Trends."

Member of the 1990 Association for Consumer Research Program Committee-Conference Site:  New York City.

Editorial Review Board Member.  Appointed 1989 to the Consumer Behavior Track, <u>Journal of Business Research</u>.

Session Chairperson, ORSA/TIMS Marketing Science Conference, Durham, North Carolina, March 17, 1989.

Session Chairperson, ORSA/TIMS Marketing Science Conference, Seattle, Washington, March 23, 1988.

Reviewer, <u>Journal of Marketing Research</u>, on an Ad Hoc Basis (1987 – present).

Session Chairperson, American Marketing Association's "Global Marketing in the Next Decade" Conference, Singapore, June 16-18, 1986.

Session Chairperson, ORSA/TIMS Marketing Science Conference, Dallas, Texas, March 16, 1986.

Reviewer, American Marketing Association Annual Conference, 1988 – present.

Reviewer, Association for Consumer Research Annual Conference, 1985, 1989.


**SELECTED CONSULTING ASSIGNMENTS:**

| | |
|---|---|
| Zillow | (2016) |
| Trump University | (2015) |
| Jay-Z | (2014) |
| Taylor Swift | (2013) |
| Samsung | (2012) |
| Facebook | (2011) |

**EXHIBIT 2
PAGE 31**

| | |
|---|---|
| MetroPCS | (2009) |
| Emac | (2007) |
| Pinkberry | (2006) |
| American Express | (2005) |
| Lexus | (2005) |
| Michael Medavoy | (2004) |
| New York Attorney General | (2004) |
| Cingular Wireless | (2003) |
| Banc One | (2002) |
| Bill Medley | (2001) |
| Dole Pineapple | (2001) |
| Muhammad Ali | (2000) |
| Banc One | (2000) |
| Sharp Electronics | (2000) |
| Billy Blanks & Tae-Bo | (1999) |
| Weider Nutrition | (1999) |
| Tri-Star | (1997) |
| MGM | (1997) |
| Canon U.S.A. | (1996) |
| AT&T Capital Leasing | (1995) |
| Breath Assure | (1995) |
| Thompson's Minwax Co. | (1995) |
| Barpassers | (1994) |
| Kareem-Abdul Jabbar | (1993) |

**PROFESSIONAL ORGANIZATIONS:**

Academy of Marketing Science
American Marketing Association
Association for Consumer Research

**HONORS AND AWARDS:**

**Awarded the "Best Professor in the Business School" by Graduate students June 2008- Harriman School of Business, Stony Brook University SUNY.**

Awarded the Academy of Marketing Science "Outstanding Marketing Teacher Award" (2002).

Awarded Summer Faculty Research Fund Grant 1990-2005.

Awarded CIBEAR Grant 1996.

Awarded the 1989 Dean's Scholarship, School of Business, University of

14

**EXHIBIT 2**
**PAGE 32**

Southern California.

Awarded the 1988 May Company Scholarship.

Winner of the 1987-1988 Golden Apple Award for Excellence in Teaching. Graduate School of Business Administration, University of Southern California.

Nominated to:  Who's Who in California; Who's Who in the West; Who's Who in Advertising; and Who's Who Among Emerging Leaders in America.

Summer Research Grant Support Awarded for the Summer of 1986, 1987 and 1988.  The University of Southern California.

Voted by the New York University student body as one of the five outstanding professors at the School of Business and Public Administration.   1982,1983.

Nominated for membership in the American Marketing Association's National Honor Society (Alpha Mu Alpha), April 1982.

Represented New York University at the American Marketing Association Doctoral Consortium in Madison, Wisconsin, August 1979.

Graduated Magna Cum Laude – Bernard M. Baruch College, 1974.

Elected as a member of the Business Honor Society –Beta Gamma Signa, 1974.

Awarded the Morton Wollman Medal for Excellence in the Study of Statistics at Baruch College, 1974.

Awarded the Jack Schlosser Memorial Scholarship at Baruch, 1974.

Awarded an Assistantship for the United States Department of Agriculture, Fall 1974, Iowa State University.

**MAJOR UNIVERSITY AND COLLEGE COMMITTEES:**

Member, University Wide Health Committee
Deans' Advisory Board Member
Design Team (re-design of the MBA Second Year)
Teaching/Design Team (re-design of the MBA Core)
Faculty Senator, University Wide
Member, Athletic Tickets Committee, University Wide, USC
Member, CORE Redesign Committee, School of Business Administration
Member, Master's Curriculum Committee, Marketing Department
Organizer, Research Fair 1987/1988 for Marketing Department

**EXHIBIT 2**
**PAGE 33**

## DISSERTATION COMMITTEE MEMBERSHIP

Aditi Grover (Chair)
Mathew Lancellotti              Matt Thomson
Joseph Johnson                  Frank Alpert
Yun-Oh Whang                    Nick Anderson
David Ackerman                  Kamal Gupta
Lars Perner (Chair of Committee)  Ingrid Martin

16

**EXHIBIT 2**
**PAGE 34**

# APPENDIX B

**EXHIBIT 2**
**PAGE 35**

# DR. MICHAEL A. KAMINS-PRIOR EXPERIENCE IN TRIAL AND DEPOSITION IN LAST 6 YEARS

| CASE | DEPOSITION | | TRIAL/HEARING |
|---|---|---|---|
| Playtex V. **Munchkin** (Cameron Garrison Latham & Gage) | Yes | (2/12) | Yes (Trial-6/12) |
| Apple V. **Samsung** (Albert Bedecarre-Quinn Emanuel-San Francisco) | Yes | (5/12) | Yes (Trial-7/12 Did Not Testify) |
| Discount Tire Centers V. **Discount Tire/ America's Tire** (Brian LaCorte-Ballard-Spar) | Yes | (9/12) | No |
| Rembrandt V. **Facebook** (Reuben Chen-Cooley law) | Yes | (8/13) | No |
| **Widenbeck** V. Cynergy Health (Laufenberg & Jassek) | Yes | (9/13) | Pending |
| **Dryer** v. NFL (Mark Passin- Robins, Kaplan Miller & Cerisi) | Yes | (3/14) | No |
| Utopia v. **United States of America** (Nicholas Jabbour & Shari Rose- U.S. Justice Department) | Yes | (6/14) | No |
| U.S. Neutraceuticals LLC v. **Cyanotech** Corporation (John Boudet-Roetzel & Andruss) | Yes | (10/14) | No |
| **Donald Scholz** v. Barry Goudreau (Erik Paul Belt- McCarter & English) | Yes | (11/14) | No |
| **Osama Famhy** v. Jay-Z (Jonathan Gottfried Browne, George Ross). | Yes | (7/15) | No |
| **Berkson** v. GoGo Internet (Michael Reese Reese LLP)-Testimony before Judge Jack Weinstein Brooklyn Federal Court | No | (11/15) | Yes |
| **Schnabel** v. Trilegiant (Rose Luzon-Sheppard Finkleman, Miller & Shah | Yes | (12/15) | Pending |
| **Art Cohen** v. Donald J.Trump (Dan Pfefferbaum- Robins,Geller, Rudman & Dowd) | Yes | (3/16) | No |

**EXHIBIT 2 PAGE 36**

| CASE | DEPOSITION | TRIAL/HEARING |
|---|---|---|
| Move v. **Zillow** (Judy Jennison-Perkins Coie) | Yes  (3/16) | No |
| **Grasso** v. Electrolux Home Products Inc. Amy Keller (Wexler & Wallace) | Yes  (11/16) | Pending |
| **Yeti** v. RTIC (Marc Cooperman-Banner & Witcoff) | Yes  (12/16) | Pending |
| **Bautista** v. Valero (Stuart Davidson - Robbins Geller, Rudman % Dowd) | Yes  (7/17) | Pending |
| **Michael A. Kamins** v. United HealthCare (Anthony Maul-Maul Law Firm) | Yes  (12/17) | Pending |
| Edmundson v. **Odyssey2001** (Eric Zivitz - Butler, Weihmuller, Katz & Craig) | Yes  (5/18) | Pending |
| **Schechner** v. Whirlpool Corporation (Mark Reich - Robbins, Geller, Rudman & Dowd) | Yes  (5/18) | Pending |
| Diaz, Et. Al., v. **Gossip** (Andrew Adler (Traub, Lieberman, Straus & Shrewsberry) | Yes  (6/18) | No |

**Bold** Print indicates whether I was employed by plaintiff or defendant.

**EXHIBIT 2**
**PAGE 37**