# EXHIBIT
# 7

**Plaintiffs' Motion for Class Certification**
**Re:   Moorer, et. al. v. Stemgenex Medical Group,Inc., et. al.**
**Case No.: 3:16-cv-02816-AJB-NLS**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SELENA MOORER, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br>   vs.<br><br>STEMGENEX MEDICAL GROUP, INC., a California Corporation; STEMGENEX, INC., a California Corporation; STEM CELL RESEARCH CENTRE, INC., a California Corporation; ANDRE R. LALLANDE, D.O., an Individual; SCOTT SESSIONS, M.D., an Individual; RITA ALEXANDER, an Individual,<br><br>                Defendants. | Case No. 3:16-CV-2816-AJB-NLS |

VIDEOTAPED DEPOSITION OF RITA ALEXANDER

Taken at San Diego, California
March 21, 2018

Tadzia A. Martin, CSR
Certificate No. 3613

Exhibit 7
Page 129

1    Q.   And you, yourself, had access to records showing

2 which patient advocates brought in those patients; is

3 that correct?

4    A.   Uh-huh.   Yes.

5    Q.   Sorry.   We can't slip into "huh-uh/uh-huh."

6         I have been calling this surgery, but typically

7 would you call it a surgery or would you call it a

8 treatment?

9    A.   Typically a treatment.

10    Q.   But when I have been saying surgery throughout

11 this deposition today, you've understood me to mean

12 treatment?

13    A.   Yes.

14    Q.   Okay.   And also I have been using the word

15 patients, but I understand that sometimes for patient

16 advocates they were called clients?

17    A.   Yes.

18    Q.   Yes.   How did you term those customers of

19 StemGenex?

20    A.   I would say clients because I'm not a medical

21 professional.   If I was referring to the physician, they

22 were the physician's patients.

23    Q.   Okay.   But as to yourself and your employees,

24 you would call them clients?

25    A.   Yes.

                                                    89

1          So explain why -- this is No. 3:  Explain why

2  StemGenex is superior.  And there is a thing about cell

3  counts there.

4          Can you read that to me?

5      A.  Sure.

6          "Cell counts - StemGenex patients receive

7  anywhere from 500 million to a billion -- excuse me --

8  stem cells during their treatment."

9      Q.  So earlier when you told us that patient

10  advocates were instructed not to use numbers, you were

11  not including this particular aspect of --

12      A.  That's correct.

13      Q.  Okay.  You have at No. 4, StemGenex -- answer

14  patient's questions typically.  And then if you'll look

15  at No. C there, what is your success rate?  Do you see

16  that?

17      A.  Uh-huh.

18      Q.  And there is nothing listed by that to tell us

19  the instruction to the patient advocate; is that right?

20      A.  That's right.

21      Q.  Do you know of anything in writing in training

22  materials that is already in existence that addresses

23  what patient advocates should say when asked as a typical

24  question:  What is your success rate?

25      A.  I do not know of anything.

                                                        101

1          MR. ROSENBERG:  In writing?

2          THE WITNESS:  In writing, no.

3 BY MS. BANHAM:

4     Q.   What about verbally?  Do you know of any

5 training that addresses that typical question -- what is

6 your successes says rate -- verbally?

7     A.   I don't.

8     Q.   How much training does a patient advocate go

9 through prior to being put on the telephones?

10     A.   Well, typically they can go through several

11 weeks.  It depends on how astute the patient advocate is.

12 But the training is ongoing.

13     Q.   Do you have any idea how much training Audrey

14 Ellis went through?

15     A.   I do not.

16     Q.   I see that this was labeled 2014.  Do you know

17 whether this same document -- if you know -- was used at

18 times after 2014?

19     A.   I don't.

20     Q.   And I see that when necessary, the doctor will

21 be contacted to address any of your medical needs.

22          Is this a typical part of the training at their

23 posttreatment followup?

24          MR. HUDSON:  Vague and ambiguous.

25          MR. ROSENBERG:  Join.

                                                    102

```
 1          THE WITNESS:  No.
 2 BY MS. BANHAM:
 3     Q.  What are patient satisfaction ratings in
 4 relation to StemGenex, Incorporated?
 5     A.  They are based on an exit survey following the
 6 patient's stem cell treatment.  It's a three-day process,
 7 gathering information about their personal experience
 8 with car service, staff, hotel, you know, a number of --
 9 I think meals may be even included in there.  Our
10 professionalism.  So it's about their overall experience
11 with our company.
12     Q.  And whose idea was it to create patient
13 satisfaction ratings?
14     A.  Joe Perricone.
15     Q.  And did Joe Perricone propose that idea to you?
16     A.  Yes.
17     Q.  And did you agree with that idea?
18     A.  Well, I liked the idea, yes.
19     Q.  And whose -- whose idea was the different
20 categories of rating?
21     A.  Well, I -- I don't know.  I don't know.  I don't
22 know if it was Joe or if it was a collective effort.
23     Q.  I notice that underneath your hand right now is
24 one of these ratings.  I don't know if that was being
25 talked about or just happened to fall to that page.
```

121

1 record.

2     Q.  So you don't remember whether you did a press

3 release about the patient satisfaction ratings?

4     A.  I don't.

5     Q.  Okay.  We will mark this Exhibit 29.

6        Sorry, Annette.  I'm sorry.  Okay.

7        MR. ROSENBERG:  No. 29, correct, Elizabeth?

8        MS. BANHAM:  Yes, correct.  This is "StemGenex

9 Announces Patient Satisfaction Ratings for Stem Cell

10 Centers," dated December 17, 2013.

11        (Exhibit 29 marked for identification.)

12 BY MS. BANHAM:

13     Q.  Can you take a minute to look at that, please.

14     A.  Okay.

15        MR. ROSENBERG:  Do we have one that -- I

16 overheard Clark say -- is there a missing word?

17        MS. BANHAM:  We can go online and figure that

18 out right now if you like.  I think this is online but,

19 yeah.

20     Q.  Do you -- there is a small missing word there

21 where a hole is.  And that is not the point of showing

22 you this.

23        Do you recognize this press release?

24     A.  I don't recognize it, no, but we have done many,

25 many press releases, so --

                                                123

1    Q.   So you're not recognizing it because of the fact

2  that it's one of many press releases?

3    A.   Correct.  Yes.

4    Q.   But it does not look like something that you did

5  not do; is that correct?

6         Let me ask you again.  You have no reason to

7  believe that this is not a product of StemGenex,

8  Incorporated, correct?

9    A.   It's possible that it is.

10   Q.   Did you use a company called PR Newswire at any

11 time?

12   A.   Uh-huh.  Yes.

13   Q.   Okay.  And this is put out by PR Newswire and

14 purports to be a press release:  StemGenex announces

15 patient satisfaction ratings for stem cell centers.

16   A.   Uh-huh.

17   Q.   At some point did you feel it was important to

18 tell the public that you were announcing patient

19 satisfaction ratings?

20   A.   Joe Perricone would have been responsible for

21 doing this, preparing it.

22   Q.   And he would not have put out a press release

23 without your okay; is that correct?

24   A.   That's correct.

25   Q.   And why did -- why was it important for

                                                      124

1  StemGenex to tell people about the patient satisfaction

2  ratings?

3       A.  Well, we constantly received accolades about how

4  well we took care of a patient from the time they called

5  us and our education process, how we treated them in

6  preparing them for their trip to have treatment.  Many of

7  them would say it was the best experience they had ever

8  had.  And actually there were many patients that said

9  people need to know about this.  And it was an unusual --

10  it was unusual in not only this field, but in the medical

11  field in general.  So we prided ourselves on the customer

12  care we gave.

13       Q.  So now when you were giving the answer you just

14  gave, are you giving that based on the patient

15  satisfaction ratings that were done on the postop day?

16       A.  Yes.  They completed it on the last day, yes.

17       Q.  Because it's true that you knew that there were

18  many -- is it true that you knew of people who were

19  complaining that they had no result after a StemGenex

20  treatment?

21       A.  This has nothing to do with results.

22       Q.  Okay.

23       A.  It has to do with their experience in being

24  picked up at the airport and having service at a hotel

25  and being treated kindly and being treated with a

                                                        125

1 professional clinical staff, but it has nothing to do

2 with their treatment outcome.

3     Q.   Okay.  So now the item that you have under your

4 hand there is an exhibit to Candace Henderson's

5 deposition.

6          MR. HUDSON:  Can I have an exhibit number?

7          MS. BANHAM:  Yes.  I'm trying to look backwards

8 and upside down.

9          MR. ROSENBERG:  It's Exhibit 12.

10          Are we going to make it Exhibit 30 here?

11          MS. BANHAM:  Yes, let's do that.  I ran out of

12 stickies.

13          MR. ROSENBERG:  Hold it.  I have got some right

14 here.  We should have them right here for that very

15 purpose.  We keep them underneath the cookies.

16          MS. BANHAM:  Thanks.  Got them.  We will make

17 that 30.  I've got some.  Thanks.

18          MR. ROSENBERG:  You don't want mine?  Fine.  You

19 can't have them now.

20          (Exhibit 30 marked for identification.)

21 BY MS. BANHAM:

22     Q.   Does this look like a representative sampling of

23 the reporting of the patient satisfaction ratings?

24     A.   It looks like it, yes.

25     Q.   And does this look like a representative

126

1      A.   It would.

2      Q.   Okay.

3      A.   At times.

4      Q.   Who directed the admins to send the brochures?

5      A.   Candace Henderson was the person they reported

6  to.

7      Q.   And if you learned that Candace Henderson

8  testified that ideally, yes, each person who got the

9  brochure would get the patient satisfaction ratings

10  inside the brochure, would that surprise you?

11      A.   No.  She would know more about it than I because

12  she was over this team.

13      Q.   But it's with your -- it's with your authority

14  and okay that that insertion would be made in a brochure

15  to go to potential candidates; is that right?

16      A.   Correct.

17      Q.   Is it your testimony that patient satisfaction

18  ratings were only done to reflect the patient experience

19  with facility, staff interactions with StemGenex staff

20  and StemGenex Medical Group -- StemGenex Medical Group

21  staff?

22      A.   I'm not sure if that's the defined finite list.

23      Q.   Okay.

24      A.   It did not include anything medically related.

25      Q.   Okay.  It's your testimony that all the patient

                                                        128

1 satisfaction ratings had nothing to do with results of
2 treatment?

3    A.  Absolutely.

4    Q.  Okay.  I'm handing you what we will mark -- the
5 last one was No. 30, so this will be No. 31.  I only have
6 one more of those.

7        (Exhibit 31 marked for identification.)

8 BY MS. BANHAM:

9    Q.  No. 31 is entitled "StemGenex Positions Itself
10 Among Best Stem Cell Centers in the U.S.," PR Newswire,
11 April 1st, 2014.

12       Ms. Alexander, did you have anything to do with
13 the publication of this press release?

14    A.  I approved it.

15    Q.  Do you have an independent recollection of
16 approving this?

17    A.  I do not.

18    Q.  Sorry.  You do not?

19    A.  No.

20    Q.  But you believe you did approve it?

21    A.  I believe I approved it.

22    Q.  And that would be your custom and practice of
23 approving press releases before they went out to the
24 public?

25    A.  Correct.

129

1      Q.   I'd like you to turn to Page 2.

2      A.   May I also add.  This is -- this is the -- we

3  had a recent addition with Jeremiah McDole who is a

4  Ph.D., and So I would certainly have approved this

5  because of his position at the company.

6      Q.   Thank you.

7           So I'd like you to turn to Page 2.  This is

8  along the lines of our earlier press release.  I'm giving

9  it to you -- this one doesn't have any holes or blank

10  spots in it.

11          So could you look at the third paragraph there.

12  "Patient satisfaction is also a primary focus of

13  StemGenex.  StemGenex is the only stem cell organization

14  that actively tracks their patient satisfaction ratings,

15  proudly displaying them on their website."

16          Is this the same patient satisfaction ratings

17  that we are talking about in Exhibit 30 with the graph

18  that you were just discussing?

19      A.   Yes.

20      Q.   So this press release is referring to the -- the

21  ratings that have nothing to do with medical treatment?

22      A.   Yes.  Treatment outcomes; that's right.

23      Q.   Do you have anywhere in writing where a press

24  release has gone out that would clarify that there is

25  nothing talking about medical treatment -- medical

                                                          130

1 treatment outcomes?

2      A.  I don't know that I do.  You know, it says at

3 the very top that we insist that all patients be treated

4 like one of our loved ones.  Hope, compassion and the

5 relentless pursuit is our primary focus.

6      Q.  But that does not tie the patient satisfaction

7 ratings that are published to -- to your goals as just

8 stated?

9      A.  I understand the point, but the only patient

10 satisfaction ratings we have are the ones about their

11 experience and not about treatment.

12      Q.  So you have no other patient satisfaction

13 ratings other than the ones that are made from surveys

14 done on the postop date; is that right?

15      A.  Yes, that's correct.

16      Q.  Okay.  Why is it important for the public to

17 know those particular outcomes, the ones you just talked

18 about?

19      A.  It's a really good question.  Most of these

20 people have been unfortunately mistreated by the current

21 traditional medicine they have to go through.  And I

22 experienced that myself.  Once you're diagnosed with a

23 disease in many cases you are not treated very well.  And

24 these people have suffered terribly.  And when they come

25 to StemGenex, we want them to know how important they are

                                                    131

1      A.   Someone informed me that he said that.  He

2   didn't talk to me personally.

3      Q.   Okay.

4      A.   And I didn't -- I was just told that that is

5   what he said.

6      Q.   Was Mr. B███████ offered any money by StemGenex,

7   Incorporated or any of the StemGenex entities to not

8   speak publicly about his complaints?

9           MR. ROSENBERG:   That's a matter of a

10  confidential nature and attorney-client privilege.  I'm

11  going to advise her not to respond to that because I

12  believe that is part of a settlement agreement that

13  involves confidentiality.

14  BY MS. BANHAM:

15     Q.   Were you aware of Mr. B█████ making public

16  complaints about StemGenex?

17     A.   I was made aware, yes.

18     Q.   And who made you aware of that?

19     A.   Jamie Schubert.

20     Q.   What was the nature of Mr. B█████s public

21  complaints that you were made aware of?

22     A.   That he was -- he had not had a response to

23  treatment.

24     Q.   Anything else?

25     A.   I believe he wanted another treatment at no

134

```
 1  cost.

 2       Q.  Anything else?

 3       A.  And at one time wanted his money back.

 4       Q.  Anything else?

 5       A.  No.

 6       Q.  Where was Mr. ████ making these public

 7  complaints?

 8       A.  I don't know specifically.  I think they were

 9  online.

10       Q.  Did he make them on the StemGenex website?

11       A.  I don't know.

12       Q.  Maybe I should ask you.  Is there an ability for

13  people to comment on the StemGenex website itself?

14       A.  I believe it's on our Facebook account.

15       Q.  Okay.  So not on the www.StemGenex.com?

16       A.  I honestly don't know for sure.

17       Q.  Who is the person most knowledgeable about your

18  own website?

19       A.  Jamie Schubert.

20       Q.  And is Jamie Schubert also the person most

21  knowledgeable about the Facebook?

22       A.  Yes.

23       Q.  Mr. B████ is not the only person that you

24  heard of who was asking for his money back -- his or her

25  money back during the class period, is he?
```

                                                            135

```
 1        A.   Most likely not.

 2        Q.   Well, you're the president, so we want your --

 3   your actual answer.

 4        A.   Well, I can't give you those names.

 5        Q.   No, I don't want any names.  My question was,

 6   Mr. ███████ is not the only person who wanted his money

 7   back; isn't that correct?

 8        A.   That's correct.

 9        Q.   In 2014, how many people did you know of that

10   wanted their money back?

11        A.   I don't know the answer to that question.

12        Q.   Do you have an estimate?

13        A.   I do not.

14        Q.   Do you have a range?

15        A.   I do not.

16        Q.   Is it more than 500?

17             MR. BERGER:   In 2014?

18             MS. BANHAM:   Yes, in 2014.

19        Q.   You were the president, so people asking for

20   their money back, we need to know --

21        A.   No.

22        Q.   Is it less than 100?

23        A.   Yes.

24        Q.   Is it less than 50?

25        A.   I believe the answer to that is yes.
```

                                                          136

```
 1        Q.   Okay.  Are you able to give us any more of a
 2   range other than less than 50?
 3        A.   No.
 4        Q.   In 2015, are you able to give us a range as to
 5   how many people you were aware of were asking for their
 6   money back?
 7        A.   I think it would be the same as the previous
 8   year.
 9        Q.   Less than 50?
10        A.   Yes.
11        Q.   And no better ability to give a closer range?
12        A.   That's right.
13        Q.   In 2016, do you have a range as to how many
14   people you were aware of who were asking for their money
15   back?
16        A.   It would be the same.
17        Q.   Less than 50?
18        A.   Yes.
19        Q.   But no ability to give a closer range?
20        A.   (Witness shakes head.)
21        Q.   In 2017, how many people were you aware of were
22   asking for their money back?
23        A.   It would be the same.
24        Q.   Less than 50?
25        A.   Yes.
```

                                                                137

1      Q.   But no ability to give a closer range?

2      A.   Can you clarify for those that are asking for

3  their money back, why are they asking for their money

4  back?

5      Q.   Did you have various reasons for people asking

6  for their money back?

7      A.   Yes.

8      Q.   Okay.  Can you give us some of those reasons?

9           MR. BERGER:  Just before we go to that, just for

10 clarification, so in 2015 the best estimate you can give

11 for the people asking for money back is less than 50, but

12 you can't tighten that it other than that --

13          THE WITNESS:  I cannot.

14          MR. BERGER:  -- correct?

15          THE WITNESS:  Yes, correct.

16          Some people changed their mind and didn't want

17 to have treatment.  Some people were medically

18 disqualified by the doctors.  So there were reasons other

19 than what you have identified with Mr. Bausano.

20 BY MS. BANHAM:

21     Q.   Great.  Thank you very much.

22          So I want to go quickly if we can through those

23 people.

24     A.   Sure.

25     Q.   Because I was -- my intention in asking the

                                                          138

1 question was to gather the patients who had already gone
2 through with the treatment --
3      A.   Uh-huh.
4      Q.   -- versus anybody who had either a change of
5 heart or mind prior to actually having the treatment.  My
6 questions were all to people who had had the treatment.
7           So in 2014, are you able to give us a range on
8 how many people were requesting their money back who had
9 actually already gone through with the treatment?
10     A.   I can't -- no, I don't -- I can't give it.
11     Q.   Would it be less than 50?
12     A.   Yes, I believe it would be.
13     Q.   And would you be able to tighten that range any
14 more than less than 50?
15     A.   No.
16     Q.   Same 2015.  Any range as to how many people who
17 had already gone all the way with the treatment who were
18 asking for their money back in 2015?
19     A.   My answer would be the same for 2015, '16 and
20 '17.
21     Q.   Okay.  Thanks.
22          While you were -- or as the president, did you
23 ever look online to see what types of reviews patients
24 were giving you online?
25     A.   Yes.

1      Q.   Okay.  How often would you do that?

2      A.   Oh, gosh.  It could be anywhere from a weekly to

3  a monthly --

4      Q.   And did you --

5      A.   -- exercise.

6      Q.   I'm sorry.

7           Did you, yourself, ever respond to negative

8  reviews online?

9      A.   No.  I would have the PR team prepare something

10  appropriate.

11     Q.   And this is generally as to all these years.

12  When you saw something negative online, you would have

13  the PR team respond back?

14     A.   Someone other than myself.

15     Q.   Okay.  So I'm giving you what we will mark as

16  32, which is focusing on the person there named Karen

17  Vaughan.

18          (Exhibit 32 marked for identification.)

19  BY MS. BANHAM:

20     Q.   For the record, it says:  "I had the stem cell

21  implant for Parkinson's in January and it has only gotten

22  worse since this.  Did the hyperbaric oxygen for 30

23  sessions, the diet, et cetera.  There was very -- there

24  was a little improvement to my stamina for a bit,

25  although that could be placebo, and a temporary

                                                         140

1 improvement of foot inflammation.  Certainly not worth

2 the almost $20,000 that I spent on the treatments.  Their

3 followup is pretty erratic, too."  August 9, 2015.

4          Is this the type of review that you would assign

5 to your PR team to address?

6     A.  Typically, yeah.  It would be typically someone

7 like Joe or Jamie, or someone that we were working with

8 with PR.

9     Q.  Okay.  Someone you were working with -- you mean

10 outside of the company?

11    A.  Sure.  A consultant.

12    Q.  And which consultant would that be?

13    A.  Wright On is one of the companies we worked

14 with.

15    Q.  Did you also work with a company call Porter

16 Novelli?

17    A.  Yes.

18    Q.  And when did you work with Porter Novelli?

19    A.  I don't know the dates.

20    Q.  When did you work with Wright On?

21    A.  I believe Porter Novelli was first and Wright On

22 was second.  I'm not sure, but I know we worked with both

23 of them.

24    Q.  What was your direction to Wright On and/or

25 Porter Novelli when you saw a review -- and this we are

                                                      141

1  just using as an exemplar, because you don't have an

2  independent recollection of this particular person Karen

3  Vaughan?

4       A.   I don't.

5       Q.   Okay.

6       A.   But --

7       Q.   So using this only as an exemplar --

8       A.   Yeah.

9       Q.   -- what would be your direction to those -- to

10  Joe, Jamie, Wright On and/or Porter Novelli when you saw

11  something of this nature online?

12      A.   Well, we want to make sure that there is

13  accurate information or that we -- and that we are

14  responding to these people to support them.  It's

15  challenging to have a disease that doesn't respond to a

16  treatment or -- it's very challenging.

17      Q.   Okay.  So at any time did you instruct Wright

18  On, Porter Novelli, Joe Perricone or Jamie Schubert to

19  remove, if they could, negative reviews on the web?

20      A.   If there was inaccurate information, we don't

21  want inaccurate information there.  We --

22           MR. ROSENBERG:  No, no.  Excuse me.  Excuse me.

23  I missed the question.  Can you ask the question again,

24  please.

25           MS. BANHAM:  Yes.

                                                          142

1      Q.   At any time did you instruct Joe Perricone,

2 Jamie Schubert, Wright On and/or Porter Novelli to remove

3 negative reviews from the web?

4           MR. ROSENBERG:   That's yes, no, or I don't know.

5           THE WITNESS:   I don't know.

6 BY MS. BANHAM:

7      Q.   So, as you sit here today, you don't know

8 whether you instructed any of those people or companies

9 to ever remove negative information from the web?

10     A.   I don't know.

11     Q.   What about M█████ B█████████   He had negative

12 information on the web we heard about earlier.

13     A.   Yeah.   M█████ B█████████ is a different case.

14     Q.   Okay.   How did he not apply to the question I

15 asked you earlier about instructions?

16     A.   I was working with my counsel, with my legal

17 counsel.

18     Q.   Okay.   So now I want to segregate so that we

19 have a clear record.   In cases where you were not working

20 with legal counsel or getting legal instruction to remove

21 negative reviews from the web, did you ever instruct Joe

22 Schubert, Jamie -- Joe Perricone, Jamie Schubert, Wright

23 On, Porter Novelli or any other online

24 reputation-management company to remove negative

25 information or reviews from the web?

                                                        143

1    A.   I don't know.

2    Q.   Do you recall a person named Anne Carter?

3    A.   I do.

4    Q.   Did you see negative reviews from Anne Carter on

5 the web?

6    A.   In the last couple of months I have seen

7 something negative, yes.

8    Q.   Did you instruct anyone to take down the reviews

9 by Anne Carter on the web?

10    A.   I don't recall doing so.

11    Q.   Would you be surprised to find that reviews --

12 negative reviews by Anne Carter were removed from the

13 web, not at her -- involuntarily as to her; she did not

14 remove them?

15    A.   I'm not surprised.  There -- company's manage

16 their reputation.

17        MR. ROSENBERG:  Excuse me.  The question was

18 only would you be surprised.

19        THE WITNESS:  No, I would not be surprised.

20 BY MS. BANHAM:

21    Q.   Okay.  And would that be because individuals

22 under your supervision had independent authority to

23 request the removal of negative information from online

24 platforms?

25        MR. HUDSON:  Lacks foundation; calls for

                                                    144

2e8f42d7416bab9f

1  speculation.

2          MR. FARNAES:  It's vague.

3          MR. ROSENBERG:  It assumes facts not in

4  evidence.

5  BY MS. BANHAM:

6      Q.  Why would you not be surprised?

7      A.  Because companies manages their reputation.

8      Q.  So StemGenex, Incorporated manages its

9  reputation online?

10     A.  We -- we want to put information out that is

11 accurate, and the posting that Anne --

12         MR. ROSENBERG:  Excuse me.  The question says,

13 does StemGenex manage their reputation on the web.  That

14 is yes, no, I don't know.

15         THE WITNESS:  Yes, as much as we can.

16 BY MS. BANHAM:

17     Q.  This will be number -- okay.

18         Did you authorize Jamie Schubert to remove

19 negative comments from the web?

20     A.  At times, yes.

21     Q.  And did you authorize Joe Perricone to remove

22 negative comments from the web?

23     A.  At times, yes.

24     Q.  Did you authorize any other person to remove

25 negative comments from the web?

145

```
 1        A.   Not to my knowledge.

 2        Q.   Did you authorize Wright On to remove negative

 3  comments from the web?

 4        A.   I don't recall.

 5        Q.   Did you authorize Porter Novelli to remove

 6  negative comments from the web?

 7        A.   I don't recall.  They were primarily used for

 8  marketing, not web management.

 9        Q.   Porter Novelli?

10        A.   (Witness nods head.)

11        Q.   And --

12        A.   And Wright On.

13        Q.   Did you authorize Joe Perricone to ask that the

14  FDA information on the website about it not being --

15  about the stem cells not being FDA approved be moved down

16  lower into the website and not so prominent at any time?

17        A.   I don't know.

18        Q.   You don't know or you don't remember?

19             MR. ROSENBERG:   Objection.   It's argumentative.

20             THE WITNESS:   I don't know.

21  BY MS. BANHAM:

22        Q.   I'm marking as 33 -- I only have one copy, and

23  this is an exhibit to an earlier deposition.   I just

24  don't remember, but I'll show it to your counsel first.

25             (Exhibit 33 marked for identification.)
```

```
 1              MR. HUDSON:  What are we calling Exhibit 33?

 2              MS. BANHAM:  It is --

 3              MR. ROSENBERG:  View Customer Reviews.

 4              MR. FARNAES:  Is it the BBB?

 5              MS. BANHAM:  This is the BBB, starting with

 6   "Totally disappointed."

 7              MR. HUDSON:  BBB?

 8              MS. BANHAM:  Better Business Bureau review.

 9         Q.  Before we move on to that exhibit, at some point

10   did you add a tag line -- did you authorize the adding of

11   a tag line to the -- any page of the website that said

12   "Stem cells are not FDA approved"?

13              MR. ROSENBERG:  Hold it.  Hold it.  I think it's

14   an incomplete hypothetical.  And -- you mean stem

15   cells -- they are approved or not approved.  It's the

16   therapy, correct?  You meant to say stem cell therapy,

17   correct?

18   BY MS. BANHAM:

19         Q.  If you can answer the question, I will tell you

20   the exact language.

21              It's:  "Stem cell therapy is not FDA approved

22   and is not cure for any medical condition."  At some

23   point did you authorize that to be put onto the -- all

24   the pages of the website?

25         A.  Yes.
```

                                                              147

1    Q.   Okay.  And when did you authorize that to be put

2  onto all the pages of the website?

3    A.   I don't know.

4    Q.   Was it in 2014?

5    A.   I don't know.

6    Q.   Was it in 2015?

7    A.   I don't know.

8    Q.   Was it in 2016?

9    A.   I still don't know.

10    Q.   Okay.  And was it in 2017?

11    A.   I don't know.

12    Q.   Okay.  Was it in relation to the filing of this

13  lawsuit?

14    A.   I don't know the answer to that.  We had legal

15  counsel look at what we needed to do to update our

16  website.  I don't know.

17    Q.   At some point during the class period this tag

18  line that I just read -- stem cell therapy is not FDA

19  approved and is not a cure for any medical condition --

20  was not on the website; is that correct?

21        MR. HUDSON:   It's argumentative as phrased.

22        THE WITNESS:   I don't know.

23        MR. FARNAES:   Join.

24  BY MS. BANHAM:

25    Q.   The class period being December 8, 2013 until

                                                    148

 1 present, at some point in that period you authorized this

 2 tag line to be added; is that correct?

 3     A.   I don't know.

 4          MR. HUDSON:  Can we go off the record?

 5          MS. BANHAM:  Yeah, sure.

 6          VIDEOGRAPHER:  Off the record at 2:09 p.m.

 7          (Recess taken.)

 8          VIDEOGRAPHER:  Back on the record at 2:24 p.m.

 9 BY MS. BANHAM:

10     Q.   Ms. Alexander, are you aware of any -- any

11 patient advocate director asking your web company to

12 remove the FDA tag line that we have just discussed

13 and/or place it in a place on the website of less

14 prominence?

15     A.   I'm not aware of that.

16     Q.   So if that had occurred, that would not have

17 been with your authority; is that right?

18     A.   I don't know.  I don't know that.

19     Q.   Okay.

20          MR. ROSENBERG:  I'm going to object.  Assumes

21 facts not in evidence.  So based on that, your answer

22 stands.

23 BY MS. BANHAM:

24     Q.   So now we've moved on to another exhibit, 33,

25 there in front of you.

                                                        149

```
 1              MR. HUDSON:  I'll get it.

 2              MS. BANHAM:  We can keep going.

 3              THE WITNESS:  Thank you.

 4  BY MS. BANHAM:

 5     Q.  I don't have a copy, so you don't mind if we

 6  share, I hope.

 7              So this is a review --

 8              MR. ROSENBERG:  Excuse me.  Do you want me to

 9  run and make copies?

10              MS. BANHAM:  No.  That's okay.  We will be done

11  with this in a minute.

12     Q.  4/28/16 review, BetterBusinessBureau.org:

13  "Totally disappointed.  They charged 14,500; treated that

14  day; experienced no improvement.  They said I claimed to

15  make great progress walking over a mile to check the

16  mail; not true.  They refused to return my call when I

17  voiced my dissatisfaction with their business practices.

18  It was nine months after treatment they also stated that

19  I should received two more treatments, $29,000.  I remain

20  with no balance, paralyzed on my right said, and they are

21  trying to talk me into buying additional hope.  No

22  improvement.  Beware."

23              Below that there is what is titled "Comment from

24  the Business," dated 5/19/2016.  I just want to see if

25  you had any involvement in that comment from the
```

                                                          151

**Exhibit 7**
**Page 158**

1  business.

2       A.   Okay.  I've read it.

3       Q.   Okay.  The question pending was, did you have

4  any involvement in that comment from the business?

5       A.   I didn't prepare it.  Someone else prepared it.

6            MR. ROSENBERG:  No.  The question was, did you

7  have anything to do with it.

8            THE WITNESS:  No.

9            MR. ROSENBERG:  Did you approve it?

10           THE WITNESS:  Yes.

11           MR. ROSENBERG:  Then you did have something to

12  do with it, right?

13           THE WITNESS:  Well, I -- okay.

14           MR. ROSENBERG:  You said that you approved it.

15  That's your involvement.

16           THE WITNESS:  That's my only involvement, yes.

17  BY MS. BANHAM:

18       Q.   Okay.  So this statement:  "Lastly, our patient

19  satisfaction surveys are received the day after a patient

20  has had treatment, upon their departure" -- you already

21  said that that is the case today; is that correct?  The

22  patient --

23       A.   Yes.  We still collect that information for

24  those that want to provide it.

25       Q.   Okay.  So you approved of this to be published

                                                    152

1  on the web?

2       A.   Yes.

3       Q.   Did you ever make an effort to find out who Bill

4  H. was?

5       A.   I think we did know at the time, but I don't

6  know today.

7       Q.   Okay.  I didn't want his name, but you did know

8  at the time who he was.  Did you --

9       A.   We didn't know for sure, but we had our ideas.

10      Q.   Okay.  And do you remember whether you reached

11 out to Bill H.?

12      A.   I don't know.  I don't -- no, I don't.

13      Q.   I'm going to hand you what we will mark as

14 Exhibit 34.

15           (Exhibit 34 marked for identification.)

16 BY MS. BANHAM:

17      Q.   This is a December 12, 2017 -- what is this

18 StemGenex response?

19      A.   What is the response?

20      Q.   Yeah.  Where -- is this a Facebook response from

21 StemGenex to a person commenting?

22      A.   I don't know.  I can only go by what's there.

23      Q.   Okay.  Did you have anything to do with the

24 drafting of this response?

25      A.   I don't think so.

                                                    153

1      A.   So we --

2      Q.   It is not StemGenex's registered trademark.  You

3  are talking about Stem Cell Centers for Excellence?

4      A.   Correct.

5      Q.   Because StemGenex -- is StemGenex the name that

6  you use on a daily basis to refer to your company?

7      A.   Correct.

8      Q.   And you don't distinguish during your everyday

9  work life by walking around making distinctions all day

10 about Stem Cell Research Center, Inc. versus StemGenex,

11 Inc. versus Stem Cell Biologic Labs, LLC?

12     A.   (Witness shakes head.)

13     Q.   And is that an audible answer?

14     A.   No, I don't do that.

15     Q.   Okay.  So I'm -- so you said that Stem Cell

16 Centers for Excellence is a trademark?

17     A.   Yes.

18     Q.   Did you register that trademark?

19          MR. ROSENBERG:  Well -- or did you have an

20 attorney do it for you or someone --

21          MS. BANHAM:  Oh, sorry.

22          THE WITNESS:  An attorney registered it for me.

23 BY MS. BANHAM:

24     Q.   At your request?

25     A.   Yes.

                                                        171

1  Q. Okay. And does the money come directly from the

2 patient to Pacific Coast Surgical Center or does it go

3 through someone else -- another entity first?

4  A. It goes through another entity first.

5  Q. What entity is that?

6  A. That would be Stem Cell Research Center.

7  Q. When a patient pays for his or her treatment,

8 does he or she pay Stem Cell Research Center?

9  A. They do.

10  Q. And has that always been the case throughout the

11 class period?

12  A. No.

13  Q. When did that change?

14  A. It began changing in either October or November

15 of last year.

16  Q. Of 2017?

17  A. Correct.

18  Q. And why did that change?

19  A. We took on a new client.  Dr. Sessions.

20  Q. And is Dr. Sessions' role now similar to the

21 role that Dr. Lallande served before the business

22 dispute?

23  A. It is.

24  Q. And your involvement with Stem Cell Research

25 Center, though --

                   179

1     A.   Excuse me.

2     Q.   -- predates, does it not, the October 2017

3 involvement with Dr. Sessions?

4     A.   It does.

5     Q.   If that's the case then, just could you explain

6 for us why this list says established October 2017?

7     A.   I'd be happy to, yes.

8          Initially Stem Cell Research Center was

9 established to manage the outcome-based studies that we

10 had established.  And we -- I believe we stopped using it

11 for that.  So it was -- it was basically either an S Corp

12 or C Corp that we were not using.  And so when

13 Dr. Sessions became our client, we had an entity that we

14 could basically convert into a PC, and it was -- it cost

15 us a minimal amount of money and was pretty efficient to

16 do so.

17     Q.   Okay.  So what we're seeing on the third entry

18 there, July 2014, Stem Cell Research Center, Inc. was the

19 predecessor to what is now Stem Cell Research Center, PC;

20 is that right?

21     A.   Correct.

22     Q.   Could you please tell us the distinction of

23 StemGenex Biologic Laboratories, LLC from the other

24 entities here?

25     A.   It is basically an entity that's going to be

180

```
 1  StemGenex-affiliated entity actually registered studies
 2  with the FDA?
 3       A.  It would have only been StemGenex or Stem Cell
 4  Research Center.  Those two entities.
 5       Q.  When you said StemGenex, do you mean StemGenex,
 6  Inc.?
 7       A.  Yes.
 8       Q.  So it's either StemGenex, Inc. or StemGenex
 9  Research Center that would have registered with the FDA?
10       A.  To the best of my knowledge, yes.
11       Q.  Do you understand what clinicaltrials.gov is?
12       A.  I do.
13       Q.  What is that?
14       A.  It's a government website where clinical trials
15  are registered.  A wide variety.
16       Q.  Okay.  Were these clinical trials ever
17  registered with the FDA, to your knowledge?
18       A.  What clinical trials?
19       Q.  The ones we just referred to.
20       A.  Those are not clinical trials.
21       Q.  I'm sorry.  Clinical studies.  Thank you.
22       A.  So the NIH does register clinical trials and
23  clinical outcome-based studies on the same website.
24       Q.  So it's this clinicaltrials.gov?
25       A.  Yes.
```

                                                          192

1      Q.   Okay.  So it's the NIH that either StemGenex,

2  Inc. or StemGenex Research Center registered with the NIH

3  through clinicaltrials.gov?

4      A.   Yes.

5      Q.   Thank you.

6           Do you know if that was clinical -- I'm sorry --

7  Stem Cell Research Center, Inc. or Stem Cell Research

8  Center, PC that registered?

9      A.   What was the second one?

10     Q.   Stem Cell Research Center, PC.

11     A.   No, the PC has not registered.

12     Q.   And the followups that were done by these --

13  these followup calls to patients, who did those calls?

14     A.   There were a number of admin personnel that did

15  them.

16     Q.   They were not nurses?

17     A.   No.

18     Q.   And were any -- did Dr. Lallande or Dr. Brody

19  ever tell you they reached any conclusions as a result of

20  any of these studies?

21     A.   They did not tell me that.

22     Q.   So, as far as you know, as of right now, no

23  conclusions have been reached by Dr. Brody or

24  Dr. Lallande regarding any of the studies they did

25  associated with StemGenex?

                                                        193

```
 1       A.  That's correct.
 2            MR. ROSENBERG:  Okay.  How is the court reporter
 3 doing?  Are you okay?  Do you need a break at all?
 4            THE REPORTER:  I can always use a break.
 5            MR. ROSENBERG:  We have been going about an hour
 6 and a half.  Let's give her ten minutes.
 7            VIDEOGRAPHER:  Off the record at 3:25 p.m.
 8            (Recess taken.)
 9            VIDEOGRAPHER:  Back on the record at 3:47 p.m.
10
11                    ·     FURTHER EXAMINATION
12 BY MS. BANHAM:
13       Q.  Ms. Alexander --
14       A.  Yes.
15       Q.  -- back on.  You have your mic on.
16            We have been informed that your counsel has to
17 leave at 5:00 o'clock, so we're going to go a little
18 faster through the rest of the information.
19            MR. ROSENBERG:  Excuse me.  I will be leaving,
20 but Annette will be here; Clark will be here, and so will
21 Malte.  So, you know, I know it's hard for anyone to
22 continue without me, my presence.  I know how important
23 that is for everybody, but --
24 BY MS. BANHAM:
25       Q.  During the class period, as we have been
```

                                                          194

```
 1              MR. FARNAES:  Objection.  Vague.

 2              MR. ROSENBERG:  Also misstates the testimony.

 3   She said very rarely.

 4              MS. BANHAM:  She did see them, is my --

 5        Q.  Is what you said, correct?

 6        A.  Well, I would see something like this.  The car

 7   service is a C; it's not an A.

 8        Q.  I'm going to go back, because we are focusing

 9   now on the top question:  How would you describe your

10   overall experience in terms of meeting your expectations.

11              Did you see any of these surveys come back at

12   any time with failed to meet my expectations?

13        A.  Overall I don't believe I saw anything like that

14   for the entire experience.

15        Q.  So are we able to identify in some manner all of

16   the patients that had stem cell treatment in a single

17   month?

18        A.  That turned in their form.

19        Q.  No, no.  What I mean is, in some manner does

20   StemGenex keep a record of all the patients that were

21   treated in any given month?

22        A.  Yes.

23        Q.  And what would we -- how would we ask for that?

24   Where is that kept?

25        A.  It's kept in our database.
```

                                                      210

```
 1  website?
 2      A.   Quite often, but there are a lot of pages on
 3  that website.
 4      Q.   These patient satisfaction ratings appeared on
 5  the home page; isn't that right?
 6      A.   I believe that is correct.
 7      Q.   Was that at your direction?
 8      A.   Joe Perricone placed this on the website or had
 9  them placed.
10      Q.   And you approved of their placement?
11      A.   Yes.
12      Q.   And you were quite proud of these patient
13  satisfaction ratings; is that correct?
14      A.   We were proud.
15      Q.   And you wanted them to have a place high up on
16  the website; is that right?
17      A.   I wanted them to be in the appropriate place.  I
18  don't know if it was high up.
19      Q.   You wanted them to be on your home page?
20      A.   I wanted them to be on the appropriate page, and
21  Joe Perricone made that decision.
22      Q.   Prominent -- a prominent position on your
23  website?
24      A.   I think I've answered that.
25      Q.   No.  I'm asking you did you want these patient
```

226

1  satisfaction ratings to appear in a prominent place on

2  your website?

3      A.  I wanted them to appear where someone could see

4  them.

5      Q.  Okay.  Now, we have been talking about

6  Exhibit 40, the website.  After you received notice

7  through learning of this legal issue that we are here

8  about today, did you take any steps to remove the

9  mailers -- the patient satisfaction ratings from the

10 mailers which is the exhibit --

11     A.  From the brochure that goes out after the

12 patient schedules an appointment?

13     Q.  Yes.

14     A.  That would have been a question for Candace

15 Henderson, because she managed the documents that went

16 into that.

17     Q.  My question to you is, did you, Rita, take any

18 steps to remove or order that that not go out any longer

19 to patients or prospective patients in the

20 brochure/mailer?

21     A.  I don't recall.

22     Q.  Do you recall talking with Candace Henderson

23 about the brochure/mailer patient satisfaction rating

24 inserts after you learned of this issue in this lawsuit?

25     A.  I don't recall.

227

1          THE WITNESS:   We were having such -- we put so

2   much effort into supporting these patients before, during

3   their treatment and their experience, and it was way

4   above anything they had ever experienced, and they were

5   raving about it.  And they said people should know about

6   it, and I thought, yes, people should know what an

7   experience this is.

8   BY MS. BANHAM:

9          Q.  Did you intend to drive people to StemGenex to

10  purchase the treatment with these patient satisfaction

11  ratings?

12         A.  Well, I wanted them to know what their

13  experience with us would be like if they made that

14  dispositive decision.

15         Q.  Was the website the main driver of people to

16  call StemGenex, in your knowledge, if you have that

17  knowledge?

18         A.  It was one of the drivers.

19         Q.  Okay.  Was it the largest driver?

20         A.  I don't know.

21         Q.  What were the other drivers?

22         A.  Advertising.

23         Q.  What other advertising were you doing throughout

24  the class period?

25         A.  Well, I don't think it was through the entire

                                                        233

1       Q.   Is it correct that each person who is a patient

2  of StemGenex or was during the class period has a client

3  owner?

4          MR. HUDSON:   It's vague and ambiguous.

5  BY MS. BANHAM:

6       Q.   Do you understand my meaning of "client owner"?

7       A.   (Witness shakes head.)

8       Q.   In your database, in the records that we have

9  for the patients, there is something called client owner

10 and a line and it says the name of a patient advocate;

11 for example --

12      A.   Uh-huh.

13      Q.   -- Andrea Locicero -- Sosa-Locicero; are you

14 familiar with that?

15      A.   Yes.

16      Q.   And are you familiar with those patient

17 advocates being given credit for a commission if they are

18 the client owner if the patient goes through with a

19 treatment?

20      A.   If the patient has treatment, there is a

21 commission component in the patient advocate's

22 compensation.

23      Q.   So in the same place where the client owner is

24 listed, there is also a line for patient history origin;

25 isn't that correct?

                                                    235

1 exhibit in another deposition, and there were so many I

2 don't know what the number was previously.

3          (Exhibit 41 marked for identification.)

4          THE WITNESS:  Okay.  There is another one down

5 here.  This is our response.

6 BY MS. BANHAM:

7     Q.  That is your response.

8     A.  There is another one down here, but it's

9 actually our response, StemGenex's response to --

10         MR. FARNAES:  There is no question pending.

11         MS. BANHAM:  Okay.

12         MR. FARNAES:  Have you marked this?

13         MS. BANHAM:  Yes, 41.

14         MR. FARNAES:  Do we have one that is marked?

15 Are we out of stickie?

16 BY MS. BANHAM:

17     Q.  Before we move on to this one that we are

18 marking 41, how often did you and Dr. -- your team, which

19 I understand consists of Dr. Lallande -- meet regarding

20 marketing?  Say, last year, 2017, how often would you all

21 get together to meet regarding marketing?

22     A.  Whenever there was something new that needed to

23 be reviewed.  And that was -- there was no consistency in

24 when that happened.

25     Q.  Did you have consistent meetings on other topics

                                                    250

1  such as a regularly schedule meeting?

2      A.   Medical executive meetings.

3      Q.   And when would those take place?

4      A.   Initially once a month, and then I think we

5  moved them to once a quarter.

6      Q.   And why did you move them to once a quarter?

7      A.   We didn't have enough business to go over to

8  warrant taking up that time once a month.  And we could

9  call a special meeting if we needed to.

10      Q.   So how often in 2017 -- can you say how often in

11  2017 you met to talk about marketing issues?

12      A.   Like what kind of issues?

13      Q.   Any issues relating to marketing or advertising.

14      A.   We didn't meet -- we didn't have issues that I'm

15  aware of that we had to talk about.  We actually sent for

16  his approval or review a posting that we were thinking of

17  doing or a news letter we were thinking of releasing or a

18  press release.  So we didn't have to be in a room and

19  physically be there for him to review those.

20      Q.   So, for instance, if you were posting something

21  about clinical trials, would you send that to

22  Dr. Lallande for review?

23      A.   We wouldn't post anything about clinical trials.

24  We would post something about clinical outcome-based

25  studies.  But we would send those over for his review.

                                                        251

1  of the sales team claiming over 90 percent success rate

2  that we looked at earlier today?

3      A.  That's an anomaly.  I mean an anomaly.

4      Q.  Do you find it unusual that the exact number is

5  used in this review as is in the e-mail -- direct e-mail

6  to a patient?

7          MR. HUDSON:  Argumentative as phrased; lacks

8  foundation

9          MR. FARNAES:  Join.

10         THE WITNESS:  If we had a 10 percent result, we

11 wouldn't be in business.

12 BY MS. BANHAM:

13     Q.  At some point you tell patients that their money

14 is nonrefundable; is that correct?

15     A.  We do.

16     Q.  And when is that?

17     A.  Typically three business days -- their

18 deposit -- three business days following their decision.

19     Q.  How about the balance?  So the deposit is 2500

20 you testified earlier.

21     A.  Yes.

22     Q.  And that's across the board and has been

23 throughout the class period?

24     A.  Yes.

25     Q.  Okay.  And so the balance to make up the

262

1  14,900 -- do you ever tell -- did you during the class

2  period tell patients that that was nonrefundable at a

3  certain point?

4        A.   We typically want them to know once the surgery

5  is scheduled and -- we don't want them cancelling their

6  appointments two weeks prior to that occurring.  But if

7  we have a patient arrive, and for whatever reason they

8  decide this is just not for them, they are not happy with

9  meeting the doctor or whatever it is, we will refund

10  their money.

11        Q.   Do you tell them that ahead of the surgery?

12        A.   It has been told to some patients that were, you

13  know, sceptical and needed more reassurance.

14        Q.   Did you ever tell patients during the

15  orientation meeting that the money is nonrefundable, the

16  full 14,900 is nonrefundable at some point?

17        A.   It was not something -- a topic to be discussed

18  then.  That had already been handled in advance.

19        Q.   Handled in advance by whom?

20        A.   Their patient advocate typically.

21        Q.   When did you collect the balance?

22        A.   After they met with their physician.  After they

23  had their preop.

24        Q.   Did you ever collect the balance at the

25  orientation meeting?

                                                        263

1       A.   Only if a patient left it in the room or it was

2   something that was unusual about it.

3       Q.   Left it in the room?

4       A.   Left their payment.  Didn't bring it with them.

5            The orientation happens after they meet with

6   their doctor.  So if for some reason they forgot it and

7   it was in their room -- and that happened occasionally

8   where they would say, here's -- you know, they would give

9   their --

10      Q.   So your memory of the custom and practice was

11  that the balance was collected before the orientation

12  meeting typically?

13           MS. FARNAES:  Misstates the testimony.

14  BY MS. BANHAM:

15      Q.   You said the orientation was after they meet

16  with the doctor.

17      A.   We have changed orientation times from time to

18  time.

19      Q.   I see.

20      A.   So it hasn't always been the same.  So today the

21  orientation is following the physician appointment.

22      Q.   And is it true that it has not changed at any

23  time; that these events -- the meeting with the physician

24  and the orientation -- all occur on the day before the

25  surgery?

                                                        264

1      A.   That is typical, yes.

2      Q.   And has stayed that way throughout time?

3      A.   Yes.

4      Q.   Who decided whether someone was a suitable

5  candidate for treatment?

6      A.   The doctor.

7      Q.   So during the time that Dr. Lallande was your

8  primary surgeon, it would have been Dr. Lallande's

9  decision who would receive this treatment and who would

10 not?

11     A.   Dr. Lallande is not a surgeon, but, yes, he made

12 the final decision as to who was treated and who was not

13 treated.

14     Q.   Who decided what treatments would be offered by

15 StemGenex?  And by that I mean you have certain things

16 that you advertise, ailments or conditions that are

17 advertised.  Can you give us some examples of those

18 things?

19          MR. FARNAES:   Objection.   Vague.

20          Go ahead.

21 BY MS. BANHAM:

22     Q.   You treat people for rheumatoid arthritis?

23     A.   All five of those indications that we have

24 studies for.

25     Q.   Yes.   Okay.   So those five are COPD,

                                                        265

1      A.   No.   No.   But a large -- we had -- a large

2  percentage of the patients that sought treatment through

3  StemGenex did have MS.   We worked with more MS cases than

4  any other indication.

5      Q.   And there were more MS patients involved in the

6  clinical study than the other studies?

7      A.   Correct, yes.

8      Q.   Do you know how much data has been analyzed on

9  behalf of MS patients that was collected in the MS

10 observational study under the auspices of StemGenex?

11         MS. FARNAES:   Asked and answered.

12         MS. BANHAM:   By Harvey?

13         MR. HUDSON:   Vague and ambiguous.

14         MS. FARNAES:   No, no.   She said that nothing has

15 been sent out to be analyzed.

16         MS. BANHAM:   No, no.   Okay.   But -- thanks.

17     Q.   I understand that during a portion of time

18 Dr. Brody was analyzing data; is that right?

19     A.   He was looking at it, yes.

20     Q.   Do you know how much data he was looking at?

21     A.   I do not.

22          I'm very excited to get to the point to have a

23 specialist analyze it, though.

24     Q.   Most of your patients come from other places

25 besides California; is that right?

                                                         268

```
 1        A.   Yeah, but I don't call them patients.
 2        Q.   Right.  Most of your clients --
 3        A.   Uh-huh.
 4        Q.   -- come from outside of California?
 5        A.   We have a good percentage that come from
 6  California.  I don't know what that percentage is, but --
 7  I don't know what the percentage is.
 8        Q.   Do you know what percentage of your clients have
 9  to engage in fundraising -- personal fundraising efforts
10  to pay for your treatment?
11        A.   I do not.
12        Q.   Were you aware of people who had to -- who put
13  the cost on a credit card?
14        A.   Yes, I was aware people were doing that.
15        Q.   Were you aware of people who were borrowing from
16  family?
17        A.   Yes.
18        Q.   Were you aware of people who were having events
19  at their church, for instance?
20        A.   Yes.  I knew that was going on.
21        Q.   Were you aware of people using Go Fund Me?
22        A.   Yes.
23        Q.   Were you aware of patients using Help Hope Live?
24        A.   Yes.
25        Q.   You have no share in any fundraising --
```

269

1  are having trouble getting some basic items.  Any

2  challenges that we are having, any potential staffing

3  issues or potential candidates for staffing.

4      Q.  Do you recall the reason Dr. Sessions purchased

5  or was given a two percent interest in Pacific Coast

6  Surgical Center?  Was there a reason you are not

7  100 percent owner after Dr. Youseff left?

8      A.  Because I couldn't be 100 percent owner.  It's a

9  regulatory requirement that a physician have an ownership

10  interest.

11      Q.  Okay.  But you are the decisionmaker when it

12  comes to Pacific Coast Surgical Center in terms of

13  business decisions?

14      A.  Dr. Sessions and I both make those decisions

15  together.

16      Q.  Okay.  And how often do you meet with

17  Dr. Sessions about Pacific Coast Surgical Center?

18      A.  We typically include that in our medical

19  meetings.  So about once a quarter.

20      Q.  And so other things are discussed?

21      A.  As they come up.

22      Q.  And those are -- when you say medical meetings,

23  what are discussed in the medical meetings besides the

24  affairs of Pacific Coast Surgical Center?

25      A.  Well, it can be anything from something that is

277

1  impression that they were dissatisfied with StemGenex?

2      A.   Following their treatment?

3      Q.   Following their treatment.

4      A.   I think if someone is asking for their money

5  back, they are probably not happy.

6      Q.   Okay.  So you knew that not 100 percent of the

7  patients were satisfied?

8      A.   Yeah.  I think a heart surgeon understands that

9  not all of his patients are satisfied either.

10     Q.   Okay.  While you may not -- okay.  So you just

11 told us that the data for the observational studies is

12 going to be analyzed?

13     A.   Yes.

14     Q.   And that is your intention to have that analyzed

15 at some point in the future?

16     A.   Yes.

17     Q.   While you may now have that intention, at any

18 time did you involve your company in these studies just

19 to give your business and air of legitimacy?

20         MR. FARNAES:  Objection.  Argumentative.

21         MS. FARNAES:  Argumentative.

22         THE WITNESS:  No.

23 BY MS. BANHAM:

24     Q.   So it has always been your intention to get that

25 data analyzed?

                                                    282

1  BY MS. BANHAM:

2      Q.   So your answer was "I believe so"; is that

3  correct?

4      A.   Uh-huh.

5      Q.   And then we have the internet pulled up here,

6  and it looks like you are doing same.  It says StemGenex

7  Stem Cell Research Center.

8           MS. FARNAES:  How are we going to identify what

9  you just --

10          MS. BANHAM:  I know.

11     Q.   I'm just going to ask you.  When you pull up

12  StemGenex.com today, you come to the main page saying

13  StemGenex Stem Cell Research Center; is that correct?

14     A.   Yes.

15     Q.   Why is your website using that as its banner

16  headline currently?

17     A.   Well, Stem Cell Research Center is the medical

18  group.

19     Q.   Okay.  And why is StemGenex, Incorporated using

20  StemGenex Medical Group -- yeah, got it.

21          MR. FARNAES:  Objection.  Vague.

22          MS. BANHAM:  There was no question pending.

23     Q.   So this is Dr. Sessions' company now?

24     A.   Yes.

25     Q.   Okay.  So the intent is that this company

287

1  stepped into the shoes of StemGenex Medical Group, which

2  previously had the banner on the website?

3        MR. HUDSON:   It's argumentative; lacks

4  foundation.

5        MR. FARNAES:   Join.

6  BY MS. BANHAM:

7     Q.   Is that right?

8     A.   That was not the intent.

9     Q.   What was the intent?

10    A.   To add a new client as an MSO company.

11    Q.   Okay.   To add a new client as a company to the

12  website?

13    A.   To manage, yes.

14    Q.   To manage what?

15    A.   Dr. Sessions does stem cell treatments, and to

16  offer the same services that we have offered to

17  Dr. Lallande.

18    Q.   When we go to the website it says StemGenex Stem

19  Cell Research Center.   It does not say Stem Cell Research

20  Center, PC.   Is PC different than your previous

21  corporation?

22    A.   Yes.   We are still working on the website and

23  updating it.

24    Q.   Okay.   So is it your intent to add the full true

25  name of that to your website?

                                                           288

1          Madam Reporter, you are relieved of your duties

2   under the Code.

3          MS. BANHAM:  I would add to that stipulation

4   that if for any reason it's not signed or -- nor changes

5   made, a copy -- an unsigned copy can be used for any and

6   all purposes.

7          MR. BERGER:  And if the original is not signed

8   for any reason, a certified copy may be used as though

9   the original has not been made with any changes.

10          And I would ask that the deposition be signed

11   within 21 days because of the discovery cutoff date we

12   have in the case as presently constituted and --

13          MR. FARNAES:  So 21 days from delivery here.

14          MR. HUDSON:  Agreed.

15          MR. FARNAES:  Agreed.

16          MS. BANHAM:  Okay.  Off the record.

17          VIDEOGRAPHER:  This concludes today's

18   deposition.  Off the record at 6:33 p.m.

19

20                    *    *    *    *    *

21

22

23

24

25

                                                      297