1   Janice F. Mulligan (SBN 99080)
    *mulligan@janmulligan.com*
2   Elizabeth A. Banham (SBN 131734)
    *banham@janmulligan.com*
3   Brian K. Findley (SBN 251172)
    *findley@janmulligan.com*
4   **MULLIGAN, BANHAM & FINDLEY**
    2442 Fourth Avenue, Suite 100
5   San Diego, California 92101
    Telephone: (619) 238-8700
6   Facsimile: (619) 238-8701

7   Harvey C. Berger (SBN 102973)
    *berger@bwrllp.com*
8   Timothy G. Williams (SBN 193810)
    *williams@bwrllp.com*
9   Stephanie Reynolds (SBN 220090)
    *reynolds@bwrllp.com*
10  **BERGER, WILLIAMS & REYNOLDS, LLP**
    401 B Street, Suite 2000
11  San Diego, California 92101
    Telephone: (619) 595-1366
12  Facsimile: (619) 236-9677

13  Attorneys for Plaintiffs

14              **UNITED STATES DISTRICT COURT**

15         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

16

17  SELENA MOORER, individually and on          Case No.: 3:16-cv-02816-AJB-NLS
    behalf of others similarly situated,        Class Action

18        Plaintiffs,                           **PLAINTIFFS' OPPOSITION TO
                                                DEFENDANTS' "MOTION TO
19  vs.                                         EXCLUDE PLAINTIFFS' EXPERT
                                                WITNESSES: DR. MICHAEL
20  STEMGENEX MEDICAL GROUP,                    KAMINS AND DR. ELIOT
    INC., a California corporation;             HARTSTONE" RE PLAINTIFFS'
21  STEMGENEX, INC., a California               MOTION FOR CLASS
    corporation; STEM CELL RESEARCH            CERTIFICATION**
22  CENTRE, INC., a California Corporation;
    ANDRE P. LALLANDE, D.O., an                **[By Order Entered 12/27/18, Dkt. No.
23  Individual; SCOTT SESSIONS, M.D.,          120]**
    and Individual; RITA ALEXANDER, an
24  Individual; and DOES 1-100,                Hearing:
                                                Judge: Hon. Anthony J. Battaglia
25        Defendants.                           Courtroom 4A
                                                Hearing Date: April 18, 2019
26                                              Hearing Time: 2:00 p.m.

27

28  / / /

Pursuant to Court Order entered December 27, 2018, Dkt. No. 120 (Order Nos. 3 and 4), Plaintiffs SELENA MOORER, REBECCA KING, JENNIFER BREWER, and ALEXANDRA GARDNER, individually and on behalf of others similarly situated ("Plaintiffs"), submit this Opposition to the motion filed by Defendant ANDRE P. LALLANDE, D.O. to Strike Reports of <u>Dr. Michael Kamins and Dr. Eliot Hartstone</u> (Dkt. No. 110), and the Joinder filed by Defendants STEMGENEX MEDICAL GROUP, INC., STEMGENEX, INC., STEM CELL RESEARCH CENTRE, INC., and RITA ALEXANDER (Dkt. No. 112), regarding Plaintiffs' Motion for Class Certification.

This Court's December 27, 2018 Order construed Defendants' Motion (and Joinder) as one of the two of Defendants' "Motions to Exclude Plaintiffs' Expert Witnesses," and permitted Plaintiffs to separately oppose the Motion.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ……………………………………….   ii

I.  SUMMARY OF OPPOSITION ……………………………….   1

II.  ADMISSION OF EXPERT WITNESS TESTIMONY …………...   3

III.  CLASS ACTIONS AND SURVEY TESTING …………………..   5

IV.  PLAINTIFFS' EXPERTS ARE EMINENTLY QUALIFIED …...   8

V.  DEFENDANTS' EXPERTS ARE UNQUALIFIED TO
     RENDER OPINIONS AND CRITICISMS OF
     PLAINTIFFS' EXPERTS …………………………………………   9

VI.  PLAINTIFFS' SURVEY WAS PROPERLY CREATED
      AND ADMINISTERED BY EXPERTS IN THE FIELD ……. .   11

VII.  THE SURVEY METHODOLOGY WAS SOUND …………….   13

VIII.  DEFENDANTS' CHALLENGES TO THE SURVEY
       REVEAL A LACK OF EXPERTISE …………………………   14

IX.  CONCLUSION …………………………………………………   19

PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE KAMINS/HARTSTONE
RE: MOTION FOR CLASS CERTIFICATION          3:16-cv-02816-AJB-NLS

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>:

*Alcantar v. Hobart Serv.*
No. ED CV 11–1600 PSG (SPx), 2013 WL 156530
(C.D. Cal. Jan. 15, 2013) ………………………………….. 7

*Ass Armor, LLC v. Under Armour, Inc.*
2016 WL 7156092 (S.D. Fla. 2016) ………………………… 14

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*
2006 WL 5187497 (C.D. Cal. Mar. 2, 2006) …………………… 6

*Clicks Billiards, Inc. v. Sixshooters, Inc.*
251 F.3d 1252 (9th Cir. 2001) …………………………….. 6, 7

*Comcast Corp. v. Behrend*
569 U.S. 27 (2016) ………………………………………… 5, 20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
509 U.S. 579 (1993) …………………………………….. 3, 4, 5, 20

*Ellis v. Costco Wholesale Corp.*
657 F.3d 970 (9th Cir. 2011) ………………………........ 4

*Estate of Barabin v. AstenJohnson, Inc.*
740 F.3d 457 (9th Cir. 2014) …………………………….... 4

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*
2018 WL 3126385 (N.D. Cal. 2018) ……… ………………… 4

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*
618 F.3d 1025 (9th Cir. 2010) …………………………….. 6

*Gallo Winery v. Gallo Cattle Co.*
967 F.2d 1280 (9th Cir.1992) …………………………….... 7

*GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D., P.C.*
769 F.Supp.2d 630 (S.D.N.Y. 2011) ………………………… 13

*Guido v. L'Oreal USA, Inc.*
2014 WL 6603730 (C.D. Cal. 2014) …………………….......... 3

*Hadley v. Kellogg Sales Company*
324 F.Supp.3d 1084 (N.D. Cal. 2018) …………………………. 5, 6

*Icon Enterprises Int'l, Inc. v. Am. Prod. Co.*
No. CV 04-1240 SVW PLAX, 2004 WL 5644805
(C.D. Cal. Oct. 7, 2004) ………………………………………… 7

# <u>TABLE OF AUTHORITIES (CONTINUED)</u>

<u>CASES (CONTINUED)</u>:

*In re 5-Hour Energy Marketing and Sales Practices Litigation*
   2017 WL 2559615 (C.D. Cal. 2017) ……………………………    8

*In re ConAgra Foods, Inc.*
   90 F.Supp.3d 919 (C.D. Cal. 2015) …………………………......   3, 4, 5, 8

*In re Sony Vaio Computer Notebooktrackpad Litigation*
   2013 WL 12116137 (S.D. Cal. 2013) ……………………………    4, 5

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*
   No. C12-03762 SI, 2014 WL 572290
   (N.D. Cal. Feb. 11, 2014) ………………………………………    7

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*
   780 F.Supp. 1283 (N.D. Cal.1991) ………………………………    7

*Mannion v. Coors Brewing Co.*
   No. 04-cv-1187, order entered Dec. 7, 2007
   (S.D.N.Y. 2007) …………………………………………………    10

*Microsoft Corp. v. Motorola, Inc.*
   904 F.Supp.2d 1109 (W.D. Wash. 2012) ………………………    6

*Morales v. Kraft Foods Group, Inc.*
   2017 WL 2598556 (C.D. Cal. 2017) ……………………………    6, 8

*Plasti Dip International, Inc. v. Rust-Oleum Brands Company
and Rust-Oleum Corporation*
   No. 14-cv-1831, order entered Feb. 13, 2017
   (D. Minn. 2017) …………………………………………………    10

*Primiano v. Cook*
   598 F.3d 558 (9th Cir. 2010) ……………………………………    5

*Sali v. Corona Regional Medical Center*
   909 F.3d 996 (9th Cir. 2018) ……………………………………    6

*Sementilli v. Trinidad Corp.*
   155 F.3d 1130 (9th Cir. 1998) …………………………………..    5

*Southland Sod Farms v. Stover Seed Co.*
   108 F.3d 1134 (9th Cir.1997) ………………………………….......    7

*Stone v. Advance America, Cash Advance Centers Inc.*
   278 F.R.D. 562 (S.D. Cal. 2011) ………………………………..    4, 6

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

<u>CASES (CONTINUED)</u>:

*THOIP v. Walt Disney Co.*
      690 F.Supp.2d 218 (S.D.N.Y. 2010) ……………………………    14

*Wendt v. Host Int'l, Inc.*
      125 F.3d 806 (9th Cir. 1997) ……………………………………    6


<u>STATUTES & RULES</u>:

Fed. R. Evid. 403 ………………………………………………….    9

Fed. R. Evid. 702 ………………………………………………….    3, 9

Fed. R. Evid. 703 ………………………………………………….    3, 9


<u>SECONDARY AUTHORITY</u>:

*Manual for Complex Litigation*
      (4th ed. 2018) ……………………………………………………    13, 14

William B. Rubenstein, Newberg on Class Actions
      (5th ed. 2016) …………………………………………………...    3, 4

PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE KAMINS/HARTSTONE
RE: MOTION FOR CLASS CERTIFICATION                3:16-cv-02816-AJB-NLS

## I.  <u>SUMMARY OF OPPOSITION</u>

The crux of Plaintiffs' case and their underlying Motion for Class Certification ("Motion") is that medically disabled individuals were induced by "Defendants"[1] (also known as "StemGenex") into purchasing a "stem cell therapy treatment" ("SCTT") after seeing Stemgenex's "Patient Satisfaction Ratings" ("PSR") used on its website home page and in advertisement emails. As illustrated in Plaintiffs' Motion, the PSR was presented in a circular pie-chart depicting surveyed patient responses such as:



_____

[1] As used in Plaintiffs' Motion, and for purposes of this opposition, the term "Defendants" includes STEMGENEX MEDICAL GROUP, INC.; STEMGENEX, INC.; STEM CELL RESEARCH CENTRE, INC.; ANDRE P. LALLANDE, D.O.; and RITA ALEXANDER.

PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE KAMINS/HARTSTONE RE: MOTION FOR CLASS CERTIFICATION         3:16-cv-02816-AJB-NLS

Evidence supporting Plaintiffs' Motion demonstrates that class members relied on that PSR advertising when deciding to purchase StemGenex's SCTT. Plaintiffs argue that StemGenex did not have cumulative 100% satisfaction with its SCTT (combining "83% Exceed My Expectations" and "17% Met My Expectations"), and the PSR was therefore false and misleading. Plaintiffs' Motion includes documentary and testimonial evidence—affidavits, and deposition transcripts from class members, witnesses, and Defendants—supporting their claims. While the legality of the marketing is a trial issue, its materiality is relevant to class certification, and Plaintiffs' evidence supports the conclusion that class treatment is appropriate because of the significant effect the PSR had on class members.

Separate from the documentary and testimonial evidence obtained from Defendants and class members, and in accordance with accepted survey methodology, Dr. Michael Kamins and Dr. Eliot Hartstone designed and conducted a survey of a similar group of potential consumers to determine the effect of the Defendants' advertisements on their decision-making. The survey revealed that reasonable consumers were influenced by Defendants' PSR, finding that the advertising was a material factor in choosing StemGenex's SCTT.

While Defendants do not deny the PSR was prominently displayed on their website home page, an undercurrent of Defendants' opposition to certification seeks to establish that the PSR could not possibly have been a compelling reason that consumers select StemGenex; in the Motion to Strike as to Drs. Hartstone and Kamins, they make the same argument (without supporting evidence). Defendants also lodge several ancillary attacks on Plaintiffs' experts' qualifications and on the survey design from two individuals unqualified to make those attacks (Dr. Chiagouris and Mr. Falkenhagen). Moreover, Defendants offer no competing survey they conducted. Ultimately, Defendants' objections are unavailing because Plaintiffs' experts' survey is admissible, and its weight supports Plaintiffs' contentions that the PSR was a material factor in consumers' decision-making process to select

2

StemGenex. This provides an additional pillar of evidence supporting class certification.

## II.  <u>ADMISSION OF EXPERT WITNESS TESTIMONY</u>

"Scientific, technical, or other specialized knowledge" by a qualified expert will be admitted if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. An expert witness may provide opinion testimony if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. Additionally, Rule 703 provides that "an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed," regardless of whether they are admissible. Fed. R. Evid. 703.

Expert testimony is admissible pursuant to Rules 702 and 703 if it is both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589 (1993). Reliability translates into a two-part inquiry: is the expert qualified, and is the testimony reliable. *Newberg on Class Actions* § 20:63 (5th ed. 2016).

> "In addition to evaluating an expert's reliability, a trial court must also determine whether an expert has "appropriate qualifications—i.e., some special knowledge, skill, experience, training or education." [Citation.] "Rule 702 contemplates a broad conception of expert qualifications."

*Guido v. L'Oreal USA, Inc*., 2014 WL 6603730, *7 (C.D. Cal. 2014) (internal citation). "In the Ninth Circuit, an expert may be qualified to offer a particular opinion either as a result of practical training or academic experience." *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919, 953 (C.D. Cal. 2015) (internal citations), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 Fed.Appx. 654 (9th Cir. 2017).

> "The threshold for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience suffices." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.,* No. C 10–00544 JW, 2011 WL 5417090, *4 (N.D. Cal. Oct. 27, 2011). Prior experience need not consist of prior expert testimony on the same issue. See *Matuez v. Lewis,* No. CV 11–7411–JVS (JPR), 2012 WL 3582122, *8 (C.D. Cal. May 9, 2012), report and recommendation adopted, 2012 WL 3582629 (C.D. Cal. Aug. 20, 2012) ("If witnesses could not testify for the first time as experts, we would have no experts").

*Id.*

Once an expert is deemed qualified, "[t]he duty falls squarely upon the district court to 'act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards.' " *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). "Before admitting expert testimony, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " *In re Sony Vaio Computer Notebooktrackpad Litigation*, 2013 WL 12116137, *8 (J. Battaglia) (S.D. Cal. 2013), citing *Daubert*. Where research evidences a "valid and widely used scientific method to measure certain issues," it is admissible. *Stone v. Advance America, Cash Advance Centers Inc.*, 278 F.R.D. 562, 568 (J. Battaglia) (S.D. Cal. 2011). Other factors include: whether the expert's opinion is based on reasonable assumptions at least arguably grounded in reliable data; whether reliable methodologies were applied to the facts; whether the expert accounted for possibilities of alleged injury flowing from conduct other than the alleged unlawful conduct; and whether any reasonable alternatives were considered. *Newberg* § 20:63.

Yet, the trial court's duty "is to evaluate the soundness of the expert's methodology, not the correctness of the expert's conclusions." *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 2018 WL 3126385, *2 (N.D. Cal. 2018), citing

4

*Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). In fact, the inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564; *see also Hadley v. Kellogg Sales Company*, 324 F.Supp.3d 1084, 1107 (N.D. Cal. 2018), quoting *Primiano*, 598 F.3d at 564, and citing *Daubert*, 509 U.S. at 594, 596. "In other words, '[t]he Court has broad discretion and flexibility in assessing an expert's reliability.' " *Hadley*, 324 F.Supp.3d at 1107 (internal citations). Overall, "[i]n determining whether expert testimony is admissible under Rules 702, the district court must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact." *In re Sony Vaio Computer Notebooktrackpad Litigation*, 2013 WL 12116137, *8, citing *Sementilli v. Trinidad Corp.*, 155 F.3d 1130,1134 (9th Cir. 1998). When an expert's proposed methodology is not attacked, and indeed, where it is well-accepted in the scientific community, it is admissible. *See, e.g., In re ConAgra Foods, Inc.*, 90 F.Supp.3d at 947 (where experts disagreed on the appropriateness of a certain methodology, "the disagreements go to the weight of the results produced by ... [the] methodology, not to its reliability"). And when the attack is made simply on the expert's proposal to conduct the testing and conclusions, it is error to exclude it. *See Hadley*, 324 F.Supp.3d at 1107 (internal citations).

## III. CLASS ACTIONS AND SURVEY TESTING

Whether an expert's opinion is "sufficiently reliable from a methodological standpoint—and therefore admissible under *Daubert*—is also a different issue from whether [it] satisfies *Comcast Corp. v. Behrend*, 569 U.S. 27 (2016). *In re ConAgra Foods, Inc.*, 90 F.Supp.3d at 946 ("Admissibility [under *Daubert*] turns on whether [an expert's] methodology is sufficiently reliable; whether it satisfies *Comcast* and shows that a class should be certified is another question altogether."); *see also Hadley*, 324 F.Supp.3d at 1106.

5

Indeed, in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*. *Ellis*, 657 F.3d at 982. But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage. This approach accords with our prior guidance that a district court should analyze the "persuasiveness of the evidence presented" at the Rule 23 stage. *Id.*

*Sali v. Corona Regional Medical Center*, 909 F.3d 996, 1006 (9th Cir. 2018).

In addition, in the Ninth Circuit as a general matter, "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *Hadley*, 324 F.Supp.3d at 1107, quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997); *see also Microsoft Corp. v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1120 (W.D. Wash. 2012) ("Microsoft's criticisms of Mr. Sukumar's survey go to issues of methodology, survey design, reliability ... [and] critique of conclusions, and therefore go to the weight of the survey rather than its admissibility.") Criticisms about a survey's "fail[ure] to replicate real world conditions"—"valid as they may be"—"go to 'issues of methodology, design, reliability, ... and critique of conclusions,' and therefore 'go to the weight of the survey rather than its admissibility.' " *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037-38 (9th Cir. 2010) (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)). Attacks on such testing, surveys or analysis are to be made at trial. *Morales v. Kraft Foods Group, Inc.*, 2017 WL 2598556, *14 (C.D. Cal. 2017); *Hadley*, 324 F.Supp.3d at 1108; *Stone,* 278 F.R.D. at 568 (criticisms of a margin of error go to the weight ascribed at trial, not admissibility). As one court has commented, "[a]ny survey is of necessity an imperfect mirror of actual customer behavior under real life conditions. Any flaws in the survey may be elucidated on cross-examination, so that the finder of fact can appropriately adjust the weight it gives to the survey's results." *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 2006

WL 5187497, *7 (C.D. Cal. Mar. 2, 2006) (internal quotation marks omitted and alteration adopted)).[2]

As a general rule, "courts within the Ninth Circuit are reluctant to exclude survey evidence on the basis of an overinclusive or underinclusive target population." *Icon Enterprises Int'l, Inc. v. Am. Prod. Co.*, No. CV 04-1240 SVW PLAX, 2004 WL 5644805, at *26 (C.D. Cal. Oct. 7, 2004). . . . *Kwan Software Eng'g, Inc. v. Foray Techs.*, *LLC*, No. C12-03762 SI, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014), considered a survey of law enforcement personnel who used photographs at work. *Id.* at *4. The plaintiff sought to have the survey admitted to prove that the defendant's advertising for VeriPic software, which provided digital evidence-related software to police and fire departments, was false or deceptive. *Id.* at *1. *Kwan Software* adopted the following standard:

> To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance

---

[2] As Judge Morrow also summarized regarding survey evidence in *In re ConAgra Foods, Inc.*, 90 F.Supp.3d at 949: "See *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n. 8 (9th Cir.1997) ("However, 'as long as they are conducted according to accepted principles,' survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value," quoting *Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir.1992)); *id.* at 1143 (the fact that a survey that was conducted only in the southern portion of the state and asked leading questions went to the weight of the evidence, not the admissibility of the survey); see also *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir.2001) ("Treatment of surveys is a two-step process. First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge. Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues for a jury or, in a bench trial, the judge"); *Alcantar v. Hobart Serv.*, No. ED CV 11–1600 PSG (SPx), 2013 WL 156530, *4 (C.D. Cal. Jan. 15, 2013) ("[A]ny problems with the response rate affect the weight, and not the admissibility of the study"); . . . *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F.Supp. 1283, 1296 (N.D.Cal.1991) (holding that the alleged under-inclusiveness of a survey in a copyright infringement action affected "the weight of the survey, not its admissibility"), aff'd, 964 F.2d 965 (9th Cir.1992), cert. denied, 507 U.S. 985, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993)."

7

with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts. Id. at *4 (quoting *Medisim Ltd. v. BestMed LLC*, 861 F.Supp.2d 158, 166 (S.D.N.Y. 2012)).

*Morales v. Kraft Foods Group, Inc.*, 2017 WL 2598556, at *12.

"[U]sing current research results to draw inferences about past consumer behavior is a regular practice in litigation." *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919, 1028 (C.D. Cal. 2015). This is because the existence of a consumer survey or other market research testing consumer reactions to an advertising statement, and how they valued it compared to other attributes, lends support to evidence of materiality across the class. *See In re 5-Hour Energy Marketing and Sales Practices Litigation*, 2017 WL 2559615, *8 (C.D. Cal. 2017) (Plaintiffs failed to establish materiality because they presented no such survey, nor explain how tested statements were a factor in decision-making.) Applying these legal criteria to the survey conducted by Drs. Hartstone and Kamins, this Court should conclude it is admissible, entitled to great weight, and supports class certification.

## IV.  **PLAINTIFFS' EXPERTS ARE EMINENTLY QUALIFIED**

Dr. Eliot Hartstone has a B.S. degree, and both an M.S. degree and a Ph.D. from NYU. Dkt. No. 95-11, p. 5. He has been working in the field of market research for over 30 years, which has included conducting hundreds of surveys (including in litigation). *Id.* He has also authored over a dozen written works in the field. *Id.*, at pp. 6-7. Dr. Hartstone is unquestionably a qualified market research expert. Defendants do not argue otherwise.

Dr. Michael Kamins has both B.B.A and M.B.A. degrees in Statistics, and a Ph.D. in Marketing with a minor in Quantitative Methods from NYU. Dkt. No. 104, p. 63. He has over 30 years' experience teaching, authoring scores of works, speaking, and working in the market research field, including litigated matters. *Id.*, at pp. 63-78.

8

Dr. Kamins has been retained as an expert witness and testified in a myriad of cases in his career, for the very issues he was retained in this case. *Id.*, at pp. 80-81. He is also currently the Director of Online Programs and a professor at Claremont University. *Id.*, at p. 2, ¶ 2. Relative to his work in this case, Dr. Kamins has extensive teaching and consulting experience. Dkt. No. 104, pp. 9-12, ¶¶ 11-12 and 18. His 30+ year career has focused on how consumers interpret advertising and promotional materials. *Id.*, at p. 10, ¶ 13. Dr. Kamins has conducted **over 600 consumer surveys** in both theoretical study and applied research. *Id.*, at p. 10, ¶ 14, and p. 11, ¶ 17. He is extensively published in the area of survey research. *Id.*, at pp. 10-11, ¶¶ 15-16. Dr. Kamins is exceptionally qualified as a market research expert, and Defendants do not seriously contend to the contrary.

## V. <u>DEFENDANTS' EXPERTS ARE UNQUALIFIED TO RENDER OPINIONS AND CRITICISMS OF PLAINTIFFS' EXPERTS</u>

Plaintiffs object that Dr. Chiagouris and Mark Falkenhagen are not qualified to render the opinions they have offered as "expert" witnesses in Defendants' motion concerning Plaintiffs' survey. Drs. Hartstone and Kamins each have more than thirty years of experience and practice in survey and marketing. By contrast, neither Dr. Chiagouris nor Mark Falkenhagen qualify as an "expert" witness for the purposes offered by Defendants under Federal Rules of Evidence 702/703 because: neither have the qualifications or knowledge required to offer opinions about Plaintiffs' survey evidence; their testimony is not based on sufficient facts or data about the survey conducted; and they have not demonstrated their opinions are rooted in reliable principles and methods concerning survey methodology. Their opinions are thus inadmissible and should be stricken. *See also* Fed R. Evid. 403.

According to Dr. Chiagouris, his experience is rooted in marketing and branding, not consumer surveys. While Dr. Chiagouris contends he relied on the same treatises as Dr. Kamins, Dkt. No. 117-28, ¶ 16, unlike Dr. Kamins and Dr. Hartstone, Dr. Chiagouris has no litigation or academic experience, education, or training in

survey design. He is also not a statistician (as is Dr. Kamins), yet he seeks to provide testimony about Dr. Kamins's statistical analyses. Dr. Chiagouris also has no peer reviewed publications or recognition related to survey work or statistics. He is simply not qualified to offer the opinions Defendants solicited from him.

In *Mannion v. Coors Brewing Co.*, No. 04-cv-1187, order entered Dec. 7, 2007 (S.D.N.Y. 2007), Dr. Chiagouris was designated as an expert for plaintiff in a trademark infringement case, but he was deemed unqualified to testify as an expert witness. The court observed that Dr. Chiagouris rendered opinions without the information he regarded was necessary, he had no empirical basis for his assumptions, **and there was "no data" underlying his conclusions**. Here, because Dr. Chiagouris conducted no survey of his own, he has no data to offer to contradict Drs. Hartstone and Kamins's data. More recently, in *Plasti Dip International, Inc. v. Rust-Oleum Brands Company and Rust-Oleum Corporation*, No. 14-cv-1831, order entered Feb. 13, 2017 (D. Minn. 2017), Dr. Chiagouris was retained by plaintiffs to assist in their case pursuing trademark violations based on brand confusion. The Magistrate Judge granted Defendants' motion to disqualify Dr. Chiagouris in part, because of several deficiencies with Dr. Chiagouris's work. Principally, Dr. Chiagouris sought to offer opinions based on his own observations of product placement, **without conducting any type of survey**. Most critically, Dr. Chiagouris's attempts to testify about brand confusion were excluded because by **failing to conduct a survey** and **failing to interview any consumers** he did not apply branding and marketing expertise to his determinations regarding confusion. These cases are illustrations of how Dr. Chiagouris's criticisms of Drs. Hartstone and Kamins are specious. He has attempted to offer his own opinions about consumer confusion issues with far less information than the survey Plaintiffs' experts conducted, and without having applied appropriate expert analysis to his work. All of his opinions should be excluded as inadmissible.

Defendants' other purported expert witness, Mr. Falkenhagen, submitted a declaration (Dkt. No. 117-29) without information sufficient to deem him an expert

witness in this case. He is certainly not an expert for the matters on which he attests, even based on his summary of qualifications. His qualifications are limited to paragraph 3 on page 4 of his declaration, in which he generally describes that he is a partner in a forensic consulting firm. He has a B.S. in Business Administration but he has no advanced degrees, and his only connection to anything in this case is that he generally claims to have calculated damages in class actions. *Id*. No CV is submitted with his declaration. Mr. Falkenhagen's declaration alludes to his "qualifications and experience" in an Attachment B to his declaration, *id*, but there is no such document attached to his declaration or elsewhere filed with Defendants' filings as far as Plaintiffs can find.

Mr. Falkenhagen has no experience, education, or training in market or survey design or consumer research. He has no peer reviewed publications, and offers no recognition in any field remotely related to market or survey work. He has no experience in health care cases, consumer behavior, or marketing or advertising generally. Mr. Falkenhagen simply has offered no qualifications to be accepted as an expert witness on the survey issues his declaration opines at pages 12-17, paragraphs 19-23 of Dkt. No. 117-29. Neither Plaintiffs nor this Court can evaluate any of his opinions or conclusions in the context of any experience he claims to have, and in fact, his declaration suggests that he has no experience with market research or surveys at all. All of his opinions should be excluded as inadmissible.

## VI. <u>PLAINTIFFS' SURVEY WAS PROPERLY CREATED AND ADMINISTERED BY EXPERTS IN THE FIELD</u>

Despite the deficiencies with Defendants' witnesses' qualifications and experience, criticisms of Plaintiffs' experts' survey are not well-formed in the underlying evidence when viewed under the correct legal standards. As Dr. Hartstone described in his original declaration, he was retained to work with Dr. Kamins to conduct a survey of target market consumers to determine both the relative importance of StemGenex's PSR in their decision-making, and if they were at all misled by the

11

PSR. Dkt. No. 95-11, p. 2, ¶ 3. Dr. Hartstone worked with Dr. Kamins to conduct an online panel survey, review and test data. *Id*., at p. 2, ¶ 4. Dr. Hartstone monitored and collected data, including by setting survey parameters as is customary in the field. *Id*., at pp. 2-3, ¶¶ 5-7. Ultimately, Dr. Hartstone tabulated data to explain the results of the survey regarding consumers' beliefs about the relative importance of factors in considering stem cell therapy, and what they believed about the PSR. *Id*., at p. 3, ¶ 8.

Dr. Kamins similarly described that he was retained to conduct the study to examine consumer responses to StemGenex's PSR and its website. Dkt. No. 104, p. 2, ¶ 3. He reviewed excerpts from defense witness deposition testimony to obtain background information for the project. *Id*., at p. 2, ¶ 5. Ultimately, Dr. Kamins generated a 40–page report of his work with Dr. Hartstone, including the entire survey process, and his conclusions. *Id*., at p. 2, ¶ 4, and pp. 5-44. Dr. Kamins's material also incorporated Dr. Hartstone's "Methodology Report." *Id*., at pp. 100-104. And the entirety of Dr. Hartstone and Dr. Kamins's survey, results, and raw data were all revealed by Dr. Kamins and are on file with this Court. Dkt. No. 104, pp. 106-219.

Drs. Hartstone and Kamins's survey design was simple, yet intended to examine a key issue: Did StemGenex's addition of a small disclaimer to its allegedly misleading PSR alter the decision-making of consumers in deciding whether to purchase stem cell therapy? Quite simply, the survey was designed to test the materiality of the allegedly misleading PSR. To perform this test, Dr. Kamins designed the survey to compare the responses of two groups of identical consumers when viewing StemGenex's main website page with the PSR: one version of the StemGenex page from March 21, 2015, *without* the added "disclaimer," and one version of the StemGenex page from May 16, 2016, *with* the added "disclaimer." Dkt. No. 104, pp. 5-7, ¶¶ 1-6. The survey was able to test consumers to evaluate their responses by adding nine other factors to consider and weigh, assessing how much influence the StemGenex statements had on consumers and how the information was

PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE KAMINS/HARTSTONE
RE: MOTION FOR CLASS CERTIFICATION                    3:16-cv-02816-AJB-NLS

interpreted by consumers. *Id*., at pp. 6-7, ¶¶ 4-5.[3] After conducting the survey, Dr. Kamins' was able to evaluate consumer responses and see that the PSR *without* a disclaimer was more influential than the PSR *with* a disclaimer. Dkt. No. 104, pp. 7-9, ¶¶ 7-10. He concludes that tends to show the PSR's materiality in consumer decision-making. *Id*.

## VII.  THE SURVEY METHODOLOGY WAS SOUND

Drs. Hartstone and Kamins designed a survey to comport with a Federal Judicial Center survey research reference guide, *Daubert*, and an American Bar Association legal, scientific and design publication. Dkt. No. 104, p. 13, ¶ 20. The web-based survey designed here was deemed to be particularly effective because, as the ABA treatise advises, deceptive advertising studies make web surveys advantageous for four reasons:

- Target consumers (here, chronically ill individuals) are more easily identified;
- Internet survey eliminate "interviewer" errors;
- Respondent are geographically diverse; and
- Visual stimuli are available, as they were for class members.

*Id*., at pp. 13-14, ¶¶ 21-22.

The survey conducted by Drs. Kamins and Hartstone also complied with the parameters discussed in the *Manual for Complex Litigation*: the population was properly chosen and defined; the sample chosen was representative of the population; the data gathered was accurately reported; and the data was analyzed in accordance with accepted statistical principles. *Manual for Complex Litigation* § 11.493 (4th ed. 2018); *see also GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D., P.C.*, 769 F.Supp.2d 630 (S.D.N.Y. 2011). Dr. Kamins was mindful to set up the survey to meet these admissibility and reliability factors. Dkt. No. 104, p. 14, ¶ 23. Dr. Kamins's report explains, in detail, how the survey design and implementation actually met each of

---

[3] The survey had secondary goals as well, to ask consumers about their perspective of the time-period represented by the PSR and the number of patients about whom the PSR was based. *Id*., at p. 7, ¶ 6.

13

these criteria, including detailing: population considerations; sample considerations; design of the questionnaires; interviewing procedures; ensuring the data was accurately recorded, analyzed and reported; and ensuring its objectivity. *Id*., at pp. 14-23, ¶¶ 24-44. Defendants suggest the survey group was somehow incompatible with the class population, but they cannot deny the individuals surveyed were people with the same type of ailments as those in the class. Offering no evidence to show a population mismatch, this argument fails.

The *Manual* espouses additional factors which support the survey used here, in that its questions should be "clear and not leading," and conducted by qualified persons. *Manual* § 11.493. In such instances, "survey evidence should ordinarily be found to be sufficiently reliable under *Daubert*, . . . ." *Id.*; *see also Ass Armor, LLC v. Under Armour, Inc.*, 2016 WL 7156092 (S.D. Fla. 2016). Even a survey which only uses a **single piece of evidence** to test consumer confusion can be sufficiently reliable, probative, and admissible, if it sufficiently replicates the market condition. *See generally THOIP v. Walt Disney Co*., 690 F.Supp.2d 218 (S.D.N.Y. 2010). Drs. Hartstone and Kamins's survey met these criteria, as outlined in their declarations.

Finally, Dr. Kamins devotes twenty pages to explaining the results of the survey, and his opinions and conclusions. Dkt. No. 104, pp. 23-43, ¶¶ 45-69. He identifies the questions, answers, rates of responses, and provides an analysis of each set of consumers' ratings of the PSR at issue. Dr. Kamins opines that StemGenex's advertising of its PSR is a material and motivating factor in consumer decision-making, and further that the PSR is misleading to reasonable consumers. *Id*., at pp. 42-43, ¶ 68.

## VIII. <u>DEFENDANTS' CHALLENGES TO THE SURVEY REVEAL A LACK OF EXPERTISE</u>

Dr. Chiagouris actually agrees with several of the results that Plaintiffs obtained in their consumer survey, yet Defendants contend the survey was flawed without providing relevant and credible criticism. In fact, most of the contentions in the

14

reports by Dr. Chiagouris and Mr. Falkenhagen are irrelevant "straw man" arguments created simply to be knocked down. On closer examination, these factors compel denial of Defendants' motion.

As Dr. Kamins explains in his supplemental declaration responding to Drs. Chiagouris and Mr. Falkenhagen,[4] the general design utilized for the survey was sound methodologically, and followed trustworthy research protocol. Kamins Supp. Dec., ¶ 4. Dr. Chiagouris's complaint is really a rejection of the study because Dr. Chiagouris thought Plaintiffs should have examined a different research phenomenon. *Id*. But, proposing alternative studies does not equate to a flaw in the one Plaintiffs' experts conducted, and as noted, Defendants' experts did not present any other empirical results of their own. *Id*.

Drs. Hartstone and Kamins's survey did not lack from proper controls. Dr. Kamins introduced multiple research controls into the study to establish that the appropriate respondents were queried and that the findings were trustworthy, valid, and reliable. *See* Kamins Supp. Dec., ¶ 5. The study did not require a separate "control group" because the research goal was to examine "the presence or absence" of the StemGenex PSR in an attempt to causally establish the impact that such charts had on the consumer's decision whether to undergo stem cell surgery. *Id*. Therefore, to include a control group condition where the patient satisfaction claims are absent is nonsensical, since a disclaimer is not needed if no charts are presented. *Id*. Dr. Chiagouris's lack of relevant qualifications exposes this flaw in his criticism. In addition, that Dr. Chiagouris has essentially theorized an entirely different research study with different research goals does not serve to invalidate the survey design. *Id*. Dr. Chiagouris also failed to conduct his own survey, as he did in other cases cited

---

[4] Concurrently filed with Plaintiffs' opposition is the supporting "Supplemental Declaration of Michael A. Kamins, Ph.D., in Support of Plaintiffs' Opposition to Defendants' 'Motion to Exclude Plaintiffs' Expert Witnesses: Dr. Michael Kamins and Dr. Eliot Hartstone' Re Plaintiffs' Motion for Class Certification" ("Kamins Supp. Dec."). The declaration provides extensive rebuttal to points raised by Dr. Chiagouris and Mr. Falkenhagen critical to a thorough understanding of the reasons why Defendants' arguments are not based in proper survey science.

above where his resulting opinions were excluded. Finally, if a further control condition had been included, it would have been impossible to determine the rank order of attributes. *Id*. A multitude of other proper control mechanisms were used in the survey. *Id.*, at ¶¶ 6-19. Thus, Defendants' control and control group arguments are inapplicable.

Dr. Kamins's work was directly relevant to the issue presented by Plaintiffs' Motion. Defendants strain to convince the Court that while the survey was designed to measure a consideration to obtain the SCTT, a consumer's decision to purchase is vastly different. This is non-expert semantics. As Dr. Kamins explains, the survey was able to measure whether the promotional material linked to StemGenex moved consumers down the purchase path through purchase consideration. *See* Kamins Supp. Dec., ¶ 34. Dr. Kamins also explained there is a wealth of literature linking purchase consideration to actual purchase. *Id*. "[I]t is deceptive to suggest that only purchasers can be surveyed in a decision making process, especially when those purchasers cannot and should not be sampled for the reasons specified above. It is traditional in marketing research that purchase intention can serve as a surrogate measure for actual purchase in a range of 'real-world' marketing applications as well as academic research." *Id.*, at ¶ 37. As Dr. Kamins also notes, a consumer decision whether to spend $14,900 on a stem cell treatment is "a relatively high involvement process," unlike other ordinary purchase decisions. *Id.*, at ¶ 38. Therefore, although Mr. Falkenhagen suggests the questions are materially different, it is inappropriate from a marketing and survey perspective to ask respondents whether or not they would purchase stem cell therapy; the best that can be done in a survey is to ask whether they were "very likely," or "somewhat likely," which are standard survey phrases. *Id.* Here again, this exposes Mr. Falkenhagen's lack of survey expertise.

The survey design also used proper stimuli and was unbiased. Dr. Kamins and Dr. Hartstone implemented proper survey interviewing and quality control techniques. They reviewed the survey for errors in "branching, comprehension and consistency"

16

before it was launched, and did a stop-and-start pause early in the study. Kamins Supp. Dec., ¶ 20. Elimination of bias was a pillar of the study from the inception by random assignment of survey cells. *Id*., at ¶ 5. Further, to suggest the survey was biased because it was evaluating the importance of the PSR defies logic, since the causal premise of the study was whether the PSR—with and without a disclaimer—impacted potential consumers perceptions of either the importance or interpretation of the various attributes studied. *Id*., at ¶ 7.[5] Secondary research was not implicated by the study. *Id*., at ¶ 21. The survey population was also consistent with the class population. *Id*., at ¶ 23.

Plaintiffs' experts' survey further accurately replicated Defendants' website. *See, e.g.*, Kamins Supp. Dec., at ¶¶ 10, 17, 40, and 42. Defendants claim that because the entirety of the StemGenex website was not made available in the survey, it undermines the survey's questions about the materiality of the PSR. This ignores the theory of Plaintiffs' Motion that the PSR is a significant piece of the common evidence supporting certification, and the very point of conducting the survey. A myriad of other items might have been considered by consumers, and, in fact, the survey considered the PSR among nine factors, yet it was still shown to be the most material factor to consumers.

Dr. Chiagouris also did not understand the statistical analysis Dr. Kamins used to the data in the survey, because he suggested that Dr. Kamins use a "chi-square procedure" rather than a "t-test," even though they are **identical tests**. Kamins Supp. Dec., ¶ 6. Dr. Chiagouris also suggested a new and different analysis on a set of data on which Dr. Kamins reported, which becomes problematic when that suggestion addresses a different set of data and an entirely different research question. *Id*. Dr. Kamins's analysis addressed the data presented in Figures 2a and 2b of his report

---

[5] Defendants' reference to an *Edmondson* case for comparison on bias is nonsensical, because the passage they cite undermines their argument. As Dr. Kamins's testimony reveals, he criticized a study in that case for injecting bias with a description of the study itself: whether "models" were "models." To argue that by asking consumers about a PSR, its meaning and its relative importance in decision-making is not remotely equivalent. Defendants do not appear to appreciate that distinction.

relating to the subject's interpretation of the **meaning** of the patient satisfaction charts; Dr. Chiagouris's suggestion, though, related to Figures 1a and 1b, relating to the **importance** of the patient satisfaction charts. *Id.* That suggests a different survey, not a problem with the survey that Dr. Kamins conducted.

Defendants' motion also discusses "numerous disclaimers" that should have been addressed in the survey. However, there is no evidence offered of these "disclaimers," nor how they support the contention offered by Dr. Chiagouris. Additionally, a review of Dr. Chiagouris's report indicates he only considered certain of Defendants' evidence in formulating opinions, rather than a complete record of all available evidence. For example, Dr. Chiagouris reviewed and relied upon witnesses who supplied declarations supporting Defendants' position, but appears to have entirely discounted other documentary evidence, and testimonial evidence in affidavits and deposition transcripts. Selectively citing only the evidence that might support his conclusions renders the record on which Dr. Chiagouris relied incomplete.

Even as Defendants failed to submit evidence to attempt to qualify Mark Falkenhagen as an expert witness, they complained that a portion of the data used by Dr. Kamins was not timely made available to them until the filing of Dkt. No. 104. But, Defendants omit several key facts. First, they had four months to prepare opposition briefing, from August 6, 2018 to December 17, 2018; second, they had the vast majority of Dr. Kamins's data on August 6, 2018, and had all of the data about which they complain on October 24, 2018; they deposed Dr. Kamins on October 22, 2018, and were able to depose him further (but declined); and they deposed Dr. Hartstone on October 25, 2018. Dkt. No. 105, 3:27-5:1. Most importantly, Defendants requested, and were granted 30 additional days to prepare oppositions solely because of this issue. Dkt. No. 106. In sum, it is disingenuous to complain about any delays in obtaining data after the Court granted Defendants all of the remedies they requested, and all of the survey data had been made available to them well before their opposition deadlines.

18

Finally, Defendants quibble with the conclusions Dr. Kamins reached based on the survey results. Defendants are, of course, free to argue that the survey results should support other conclusions. But, that does not support a conclusion the survey is inadmissible, it is an argument as to the weight that should be ascribed to it. It also does not undermine the materiality of the evidence about the PSR. This Court is fully capable of evaluating Drs. Hartstone and Kamins's reports and declarations, and ascribing the appropriate weight to those items in the context of its analysis of class treatment.[6]

## IX.  **CONCLUSION**

Drs. Hartstone and Kamins constructed and implemented an appropriate survey in accordance with their expert credentials. They collected responses from relevant consumers regarding the materiality of Defendants' PSR. Based on that survey, Dr. Kamins opined that the PSR was material to consumers' decisions to purchase SCTT because it was confusing to a significant percentage of consumers, and its meaning misinterpreted. Although Defendants' motion contends that different studies could have been conducted, as Dr. Kamins notes, that other studies could have been performed does not invalidate the study that was performed with Dr. Hartstone. As Dr. Kamins concludes in Paragraph 35 of his Supplemental Declaration:

> Although Dr. Chiagouris identifies six areas of concern with my report, a deeper dive into his identified issues shows that for the most part they relate to different, but not better methodological approaches that he would have taken, as opposed to what I actually did empirically. While he critiques me for this, it is important for the reader to understand that there are many ways, and many issues which could have been addressed in this action, but I chose to study two specific issues: Mainly, the importance and consumer interpretation of nine common statements (or factors) which appeared on the StemGenex website for a long period of time, inclusive of the presence or absence of a disclaimer on the patient satisfaction charts. The fact that Dr. Chiagouris may believe other

---

[6]  The balance of Dr. Kamins's Supplemental Declaration provides additional responsive reasoning why Dr. Chiagouris's and Mr. Falkenhagen's opinions on other areas are unsound.

questions are more important to study in no way subtracts from the validity, reliability and trustworthiness of my report.

Overall, the survey by Drs. Hartstone and Kamins was fundamentally sound in both design and execution. The proper universe was examined and the representative sample was drawn from that universe; the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; the questions were not leading or suggestive; the data gathered was accurately reported; and the experts conducting the survey are recognized experts. It is admissible under *Daubert*. The survey and Dr. Kamins's opinions are also entitled to great weight because the methodology is sufficiently reliable. Finally, it satisfies *Comcast* and supports that a class should be certified because it shows the materiality of the PSR consistent with Plaintiffs' theory of the case and other documentary and testimonial evidence.

For all of the above reasons, Defendants' Motion to Strike Reports of Dr. Michael Kamins and Dr. Eliot Hartstone (Dkt. Nos. 110 and 112) regarding Plaintiffs' Motion for Class Certification should be DENIED.

Respectfully submitted,

Dated: January 25, 2019          **MULLIGAN, BANHAM & FINDLEY**

**BERGER, WILLIAMS & REYNOLDS, LLP**

By: /s/ Harvey C. Berger
Harvey C. Berger
Attorneys for Plaintiffs

20