UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Selena Moorer,<br><br>         Plaintiff,<br><br>v.<br><br>Stemgenex Medical Group, Inc., et al.<br><br>         Defendants. | Case No.: 16-cv-2816-AJB-NLS<br><br>**ORDER:**<br><br>**(1) GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (Doc. No. 95),**<br><br>**(2) DENYING DEFENDANTS' MOTIONS TO STRIKE (Docs. No. 109, 110)** |

  This is a complex and troubling case. The question before the Court today is narrow: whether the case is certifiable. As to that question, the Court finds it is. However, the Court warns of dangers down the road, as stated in the briefing and discussed extensively at the oral argument hearing. Finding the class is narrowly certifiable at this stage, the Court **GRANTS** Plaintiffs' motion to certify the class. (Doc. No. 95.) The Court **DENIES** both Defendants' motions to strike the reports of Dr. David Stewart, (Doc. No. 109), and Dr. Michael Kamins and Dr. Eliot Hartstone, (Doc. No. 110), with some caveats.

### I.  BACKGROUND

  On August 22, 2014, Plaintiffs filed a putative class action complaint against Defendants in the Superior Court of California, County of San Diego, alleging violations

of California's Unfair Competition Law, Business and Professions Code section 17200, et seq., ("UCL"), California's False Advertising Law, Business and Professions Code section 17500, et seq., ("FAL"), California's Consumer Legal Remedies Act, California Civil Code section 1770, et seq., ("CLRA"), California's Health and Safety Code section 24170, et seq., ("Human Experimentation"), 18 U.S.C. section 1961, et seq., ("RICO"), Fraud, Negligent Misrepresentation, and Unjust Enrichment. (Doc. No. 1-2.) On September 15, 2016, Plaintiffs filed a First Amended Complaint, ("FAC"), to include a claim for damages under the CLRA. (Doc. No. 1-3.) The FAC contained similar factual allegations, but added Plaintiff Stephen Ginsberg to the action and alleged an additional claim for Financial Elder Abuse. (Id.) On November 16, 2016, Defendants removed the action to this Court pursuant to 28 U.S.C. § 1441(a) and (b). (Doc. No. 1.)

The operative complaint alleges that Defendants engage in a nationwide scheme to "wrongfully market and sell 'stem cell treatments'" to consumers who are often "sick or disabled, suffering from incurable diseases and a dearth of hope." (Doc. No. 24 at 3.) Specifically, Plaintiffs allege that Defendants advertise their "stem cell treatments" to consumers via their website and make misrepresentations that the treatments "effectively treat a multitude of diseases," when in actuality, Defendants maintain "no reasonable basis" to make these claims. (*Id.*) Plaintiffs further allege that Defendants represent to consumers that "100% of its prior consumers are satisfied with its service," while omitting material information about its services, including consumer dissatisfaction and complaints regarding the ineffectiveness of the treatments. (*Id.*) These statements were based upon "Patient Satisfaction Ratings" or "PSR" collected by defendant. Plaintiffs seek to represent a class of all consumers nationwide who purchased Stem Cell Treatments from StemGenex between December 8, 2013 and present, and a subclass of all members of the nationwide class aged 65 years or older at the time of purchase. (*Id.* ¶¶ 64–65.) Plaintiffs allege that each customer was exposed to Defendants' website, relied on Defendants' "false and misleading marketing" of the Stem Cell Treatments, and have been harmed as a result. (*Id.*) Specifically, Plaintiff Moorer, suffering from lupus, and Plaintiff Gardener, suffering from

diabetes, each relied upon the customer satisfaction statistics posted on the StemGenex website in deciding to purchase Defendants' Stem Cell Treatments. (*Id.* ¶¶ 8–9A.) Plaintiffs allege that each Plaintiff paid a total of $14,900.00 for the treatment, did not benefit from the treatment, and informed Defendants of their dissatisfaction. (Id. ¶¶ 8–9A, 11.) Further, Plaintiffs allege they would "not have paid for the Stem Cell Treatment had they known that the statistics on the StemGenex website regarding consumer satisfaction were false, and that StemGenex had no reasonable basis for its marketing claim that the Stem Cell Treatments were effective to treat diseases as advertised." (*Id.* ¶ 10.)

## II. MOTIONS TO STRIKE

Defendants seek to strike two of Plaintiffs' expert reports from Dr. Stewart and Drs. Kamins and Hartstone. (Doc. No. 109, 110.)

### A. LEGAL STANDARDS

On a motion for class certification, courts apply *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) to expert testimony. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). Expert testimony is admissible if the party offering such evidence shows that the testimony is both reliable and relevant. Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert*, 509 U.S. at 590–91. Federal Rule of Evidence 702 permits expert testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702. An expert can be qualified "by knowledge, skill, experience, training, or education. *Id.*

At class certification, district courts do not have to conduct a full *Daubert* analysis. *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. Dec. 20, 2012). Instead, "district courts must conduct an analysis tailored to whether an expert's opinion was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria,

3

16-cv-2816-AJB-NLS

such as commonality and predominance." *Id.* For this tailored analysis, district courts apply *Daubert*'s relevance and reliability requirements as "useful guideposts but the court[s] retain[ ] discretion in determining how to test reliability as well as which expert's testimony is both relevant and reliable." *Id.* (quoting *Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 635 (N.D. Cal. 2007) affirmed on this point by *Ellis*, 657 F.3d at 982 (holding the district court "correctly applied the evidentiary standard set forth in *Daubert*")). But courts still must "resolve any factual disputes necessary to determine" whether the putative class satisfies Rule 23. *Id.* (quoting *Ellis*, 657 F.3d at 982).

### B. DR. STEWART'S REPORT

Defendants seek to strike Dr. Stewart's report, which attempts to analyze what effect the PSR impacted a consumer's decision to purchase the treatment. Essentially, Dr. Stewart's report relates to the proposed class's damages. Defendants argue the report ought to be disqualified because Dr. Stewart is unqualified and touches on efficacy—a charge that has been excluded from Plaintiffs' complaint. The Court finds both Defendants' objections without merit and thus **DENIES** the motion. (Doc. No. 109.) However, the Court **DIRECTS** Plaintiffs to change the survey question in accordance with its directions below.

First, the Court finds Dr. Stewart is qualified. Federal Rule of Civil Procedure 702 provides "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Plaintiffs state Dr. Stewart has researched and published extensively regarding market analysis, consumer behavior, branding, marketing communications, research, and management. (Doc. No. 124 at 19.) Plaintiffs assert his publications have "included market effects and the financial dimensions and financial outcomes of marketing." (*Id.*) They state "[h]e has examined how consumers and managers search for and use information in decision making, effective communication with consumers, methods for the study of consumers and their behavior, and the effective and

4

efficient design of marketing programs, including marketing research that focuses on pricing strategy." (*Id.*) As the Court is allowing Dr. Stewart's survey to discuss damages only and not efficacy of treatment, the Court overrules Defendants' objections.

The proposed survey to determine damages will ask two initial questions, in sum, (1) how important is the recommendation of previous customers to your decision to pursue a medical procedure, and (2) how important are price differentials in out-of-pocket expenses for a procedure. (*Id.* at 4.) Respondents to each question can choose between: very important; important; moderately important; slightly important; not at all important; or don't know. (*Id.* at 5.) Next, the survey will ask the following:

> Assume that there was a procedure that could substantially improve [their medical condition]. The procedure costs $14,900, all of which you would have to pay yourself. Everyone who has had the procedure (100% of all patients receiving the procedure) report satisfaction with the results, that is, all patients reported that the procedure met or exceeded their expectations and were satisfied or extremely satisfied with the outcome. Now assume that you are considering this procedure and learn that not all patients were satisfied. In fact, you learn that only 50% of all patients who obtained the procedure reported any major improvement. Would you still consider this procedure given what you now know about the potential benefit?

(*Id.*) Respondents can answer with: Yes, I'll try anything that might help; Yes, if I were offered a discount on the price; No; or Don't know. For those who indicated they required a discount, the respondents would then be asked how much of a discount they would want before giving the procedure further consideration, starting with a minimum discount of 5% and up to "more than 65%." (*Id.*)

The Court finds Dr. Stewart's survey question to be a relevant concept with a few changes. The Court directs Dr. Stewart to change the survey to address the actual language Defendants' used on its website and in marketing materials. The Court offers an example:

> Assume that there was a procedure that could substantially improve [their medical condition]. The procedure costs $14,900, all of which you would have to pay yourself. The providers of the procedure report that 100% of it's prior consumers were satisfied with the provider's service. Now assume that you are considering this procedure and learn that the patient's statements of

5

satisfaction were obtained in exit interviews following receiving the procedure. Further you learn that only 50% of all patients who obtained the procedure reported any major improvement following the procedure. Would you still consider this procedure given what you now know about the potential benefit?

Plaintiffs are free to accept or reject this specific example but must comply with the Court's order to use the actual language used. Thus, the Court **DENIES** Defendants' motion to strike this report so long as edits are made to the question which follow the Court's guidance stated herein. (Doc. No. 109.)

### C. DRS. KAMINS & HARTSTONE

Defendants also argue the report proposed by Dr. Kamins and Dr. Hartstone must be stricken. (Doc. No. 110.) This report establishes that the Pie Chart is material and misleading to consumers. (Doc. No. 110 at 4–5.) The proposed survey seeks to establish that the Overall Experience Pie Chart was material to consumers in choosing to consider stem cell treatment. In the survey, respondents were shown non-interactive screenshots of the defendants' web homepage. Respondents, split into two groups, were shown different screenshots from two different dates: March 21, 2015, and May 16, 2016. The March group—"Cell A"—was shown four pie charts regarding satisfaction with overall experience, the medical team, if StemGenex was a trusted partner, and whether patients would recommend StemGenex. The May group—"Cell B"—was shown a screenshot with nine pie charts, however, in this version all pie charts included a disclaimer stating, "patient satisfaction ratings above represent data received from patient exit surveys evaluating patient experience and care, accommodations, staff and facilities." (*Id.* at 5.)

The report then asks respondents to rank various statements which appeared on the screenshots to show which statement "most generated [their] interest in StemGenex stem cell therapy." (*Id.*) Defendants note the survey only includes one specific option based from factual information—selected from the overall experience Pie Chart; the others were puffery about StemGenex's treatment. Anything ranked in the top four were considered material to the decision.

6

The next part of the survey asked respondents what they thought patients were referring to in the Overall Experience Pie Chart. Respondents were given five options, one of which being effectiveness of the product. Defendants note that only 38% stated the Pie Chart meant effectiveness. However, Dr. Kamins concluded that they survey showed the overall experience Pie Chart was confusing to a significant number of consumers.

Defendants assert that the survey design did not adhere to necessary quality controls or have a proper control mechanism necessary for a causal survey. (Doc. No. 110 at 8.) Defendants allege Dr. Kamins' survey essentially shows causation (confusion, materiality, and reliance) but that Dr. Kamins' own assertions state the study is not appropriate to determine causality. To determine causality, a control group must be formed, and his study did not have one.

Defendants cleverly rely on Dr. Kamins' own testimony in a Florida case in which he purported to claim that proving materiality necessarily involves determining causality. *See Edmondson v. 2001 Live, Inc. et al.*, No. 8:16-cv-3243-T-17AEP (M.D. Fla.). Dr. Kamins stated: "To be false or misleading means the consumers have to have beliefs that are not based on truth, meaning that elements in the ad have to cause those false beliefs --- because they're reading the ads. So that's causality." (Doc. No. 110 at 8.) He also states, regarding whether an ad had a material effect on a consumer: "Material effect? So just the nature of the statement, how do you determine if something has a material effect? You have to compare it to a control group, which means is causal." (*Id.* at 9.) Plaintiff does not directly respond to this argument.

Defendants also argue that Dr. Kamins' "survey results and opinions are not relevant to this case because the questions Dr. Kamins asked respondents and the conclusions he drew from those questions have no bearing on whether a causal nexus exists between the Pie Chart and putative class members' purchase of stem cell treatment." (*Id.* at 10.)

Plaintiffs argue the survey meets all relevant standards because it shows whether the altering of the patient satisfaction ratings disclaimer alter consumers' decision making to purchase stem cell therapy. (Doc. No. 123 at 18.) The tests are well designed, Plaintiff

asserts, because they compare two groups of identical consumers comparing the same page with one main difference—the disclaimer—then evaluating consumers' responses to show that the patient satisfaction ratings without a disclaimer were more influential than with. Plaintiffs also note no control group was used because the research goal was to examine "the presence or absence" of the patient satisfaction ratings to causally establish the impact the charts had on the consumers' decisions whether to undergo stem cell therapy. (Doc. No. 123 at 21.) Thus, Plaintiffs argue a control group without a disclaimer is "nonsensical" because a disclaimer would not be needed if there were no charts presented. (*Id.*)

The Court **GRANTS IN PART AND DENIES IN PART** Defendants' request. (Doc. No. 110.) To the extend the report is to be used to show causation, the Court **GRANTS** the motion. However, to the extent that Plaintiffs will use the report to show whether or not the pie chart was material in considering stem cell therapy, the Court **DENIES** the motion. The simple.; fact is that Defendants' put out an overly vague statement and created confusion where different interpretations might lie. Defendants cannot then turn around and use that confusion as a shield.

### III. MOTION TO CERTIFY CLASS

Plaintiffs move to certify their class under Federal Rule of Civil Procedure 23. (Doc. No. 95.)

#### A. Rule 23(a) Requirements

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only. In order to justify a departure from that rule, a class representative must be a part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citations omitted). A plaintiff seeking class certification must affirmatively show the class meets the requirements of Rule 23. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citing *Dukes*, 131 S. Ct. at 2551–52). To obtain certification, a plaintiff bears the burden of proving that the class meets all four

requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).

### 1. Adequately Defined

A class must be adequately defined to proceed and must rely on objective, verifiable criteria. *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 521 (C.D. Cal. 2012).

Here, Plaintiffs seek to certify a class defined as:

> All persons residing in the United States who purchased Stem Cell Therapy Treatment from StemGenex for at least $14,900 between December 8, 2013 and the time of trial, after (a) visiting www.stemgenex.com when the website contained Patient Satisfaction Ratings and/or (b) receiving an email from StemGenex with Patient Satisfaction Ratings.

(Doc. No. 95-1 at 26.) Thus, Plaintiffs assert, the class "ensures only those patients who were exposed to the offending misrepresentation qualify to make a claim." (*Id.*)

Defendants argue that the class "cannot be readily determined" because it seeks people who merely visited the website without requiring that those people have seen the PSRs, read them, or understood them. (Doc. No. 107 at 16.) Thus, the class would contain consumers who were uninjured by the misleading PSRs or never even exposed to them. This would lead to each member of the class having to self-identify whether they were injured, which Defendants argue is infeasible.

Defendants also argue the class is overbroad because it includes dates before and after Dr. Lallande's affiliation with StemGenex, includes a period of time in which the disclaimer accompanies the pie charts, and it continues past when the PSRs were removed from the website. (*Id.*)

During oral argument, Plaintiff asserted the class was adequately defined by two predominating issues: core liability and materiality. Counsel argued that in class actions when a misrepresentation is material, reliance can be inferred, and class members could have been exposed even when they did not see the Pie Chart. *United States ex rel. Terry v. Wasatch Advantage Group, LLC*, 327 F.R.D. 395, 417 (E.D. Cal. 2018) ("California courts often find predominance satisfied in CLRA cases because 'causation, on a classwide basis,

9

may be established by materiality, meaning that if the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to that class[.]'" (listing cases)).

The Court agrees that the class is adequately defined, however, thinks the case is best served by subdividing the classes per Fed. R. Civ. P. 23(c)(5) based on those exposed to the PSR with the disclaimer and those exposed to the PSR without the disclaimer. The Court defines the subclasses as follows: Subclass A is defined as the persons who saw the Pie Chart without the disclaimer, dated from December 2013 to April 2016. Subclass B is defined as the persons who saw the Pie Chart with the disclaimer, dated from April 2016 to March 2017, or when the information was no longer on the website or being used in emails or advertising materials.

### 2. Numerosity

To establish numerosity, a plaintiff must show that the represented class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 444 (N.D. Cal. 2001). A court may reasonably infer based on the facts of each case to determine if numerosity is satisfied. *Ikonen v. Hartz Mtn. Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988). "As a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Id.*

Here, Plaintiffs assert Defendants' records and Class Members declarations show the Class is "comprised of hundreds, at the very minimum 500. . . ." (Doc. No. 95-1 at 27.) Defendants do not challenge this requirement. Thus, the Court finds this factor is met.

### 3. Commonality

As to commonality, Rule 23(a)(2) requires Plaintiff to show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 131 S. Ct. at 2551. "That common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve

an issue that is central to the validity of each one of the claims in one stroke." *Id.* "'What matters to class certification . . . is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Id.* (emphasis in original) (citation omitted). "[C]ommonality only requires a single significant question of law or fact." *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) (commonality not disputed as to whether Honda "had a duty to disclose or whether the allegedly omitted facts were material and misleading to the public"); *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (Commonality is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.") (quoting *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Commonality has been construed permissively. *Ellis*, 657 F.3d at 981.

Here, Plaintiffs' claims all arise from a uniform misrepresentation regarding patient satisfaction ratings, "the truth or falsity of which will resolve a common issue central to all claims 'in one stroke.'" (Doc. No. 95-1 at 27 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).) Plaintiffs also argue that materiality is also a common issue because "this inquiry focuses on *the Defendants' representations*." (*Id.* at 28 (quoting *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 537 (C.D. Cal. 2011)).) Thus, because several significant questions of fact are presented, Plaintiffs assert the commonality requirement is satisfied.

Defendants argue that there are too many dissimilarities in the case which "will impede the generation of common answers." (Doc. No. 107 at 17.) Defendants state as examples that "[m]ateriality, reliance, injury, and damages vary from patient to patient and are not subject to common proof." (*Id.*) Many class members have already testified they did not see the PSRs or did not rely on them. Defendants further argue that individualized issues predominate as to if and how the PSRs influenced Plaintiffs. Factors as to why members received StemGenex, such as individualized medical histories, budgetary

11

concerns, specific circumstances leading to consider stem cell therapy, personal goals, expectations, sources of information relied on, research performed, and more, widely vary.

The Court recognizes Defendants' concerns. However, as Plaintiffs' affirmed during oral argument, this is a marketing case, not a medical one. Thus, differences in patient medical histories and the other concerns Defendants raise are irrelevant in a consumer class action case. Where Plaintiffs might find trouble, however, is in its damages analysis. However, as Plaintiffs' noted, this is a class certification motion and not summary judgment, and the issue of damages does not defeat class certification. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987–88 (9th Cir. 2015) (holding "that damage calculations alone cannot defeat class certification."). Thus, this factor is met.

### 4. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Where a Plaintiff's "unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class," certification should be denied. *Id.*

Here, Plaintiffs argue that typicality is met because "Plaintiffs and the proposed Class assert the same claims arising from the same course of conduct: Defendants' uniform misrepresentation of patient satisfaction via the PSR, receipt of the same SCTT, and payment of a similar fee to StemGenex." (Doc. No. 95-1 at 29.) Defendants assert the class is not typical because the class is "enormously diverse, such that no member's knowledge or experience in choosing StemGenex for stem cell therapy is typical of the class as a whole." (Doc. No. 107 at 17.)

Plaintiffs argued at the motion hearing that Plaintiffs' claims can coexist with the rest of the class as they are the same or similar injury based on the same legal theory. Plaintiffs also asserted that if Defendants' defenses can apply uniformly to the entire class, as Defendants state they would, then the class ought to be tried as one case. Finally, Plaintiffs note that Defendants can present their defenses in a motion for summary

judgment.

Plaintiffs' point is notable. Here, Defendants' defense, i.e. whether a person signed a consent form or waiver which may have cured any misrepresentations before receiving stem cell treatment, can be applied evenly to all class members. This is not a medical case arguing the efficacy of stem cell treatment, but rather a marketing misrepresentation case. Thus, the individualized patient experiences is irrelevant. Rather, the test looks at what an objective consumer would have considered and how relevant or not the misrepresentation was. Looking at the motion through this lens, the Court finds the Plaintiffs' claims are typical. Thus, this element is met.

### 5. Adequacy

The adequacy requirement is satisfied if the class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit requires an evaluation of two factors: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d at 1011, 1020 (9th Cir. 1998).

Here, Plaintiffs assert that Brewer's and Gardner's interests are "aligned with those of the Class Members because they have been harmed by the same common misconduct and seek the same or similar relief. (Doc. No. 95-1 at 29.) Defendants argue Brewer is not a typical class representative because (1) she has no claim against Dr. Lallande because her treatment was before Dr. Lallande's involvement and that (2) as a nurse, Brewer has specific efficacy knowledge that other class members lack. (Doc. No. 107 at 17–18.)

The Court notes neither of these arguments show the named Plaintiffs have a conflict of interest or will fail to prosecute the action vigorously. Thus, the Court rejects Defendants' objections.

### B. Rule 23(b) Requirements

If a proposed class satisfies Rule 23(a)'s requirements, then the proposed class must also qualify as one of the types of class actions Rule 23(b) identifies. Fed. R. Civ. P. 23(b);

13

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Rule 23(b)(3) is satisfied if the court finds that common "questions of law or fact" of the class "predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Here, Plaintiffs assert that common issues predominate. Regarding Plaintiffs' fraud-based claims, Plaintiffs state that there are two common questions: **"(1) whether Defendants misrepresented the PSRs; and (2) whether the misrepresentation was likely to deceive a reasonable consumer."** (Doc. No. 95-1 at 31.) Plaintiffs assert the first question—a binary question—predominate over any potential individualized issues because it is the single most significant aspect of the case and "can be resolved for all members of the class in a single adjudication." (*Id.* (quoting *Hanlon*, 150 F.3d at 1022).) Plaintiffs note if each member were to try his or her own case, the evidence going to this question would be identical.

Plaintiffs further argue the second of the two questions raised is an objective inquiry—whether a reasonable consumer would be deceived—and is the same test for all Plaintiffs' claims. Plaintiffs importantly note that individualized factors which went into the decision to undergo stem cell therapy is immaterial. *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK (MRWx), 2014 WL 1410264, at *11 (C.D. Cal. Apr. 9, 2014) (finding whether "a large number of factors may have gone into each consumer's decision to purchase Defendants' products is immaterial here given the objective materiality of the alleged misrepresentations.").

Defendants rely on a California Court of Appeal case in which the court held that individualized issues predominated for failure to disclose the risks of a medical treatment because what each consumer would consider a "material risk" would vary. *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (Cal. Ct. App. 2009). Defendants also point to a case finding that generalized proof could not be used to determine whether class members were likely to be deceived or relied on the misrepresentations because each member used

14

the medical device "in the context of a host of individualized factors." *Lucas v. Berg, Inc.*, 212 F. Supp. 3d 950, 969 (S.D. Cal. 2016). The *Lucas* Court also stated, "Although a presumption of reliance may hold in the prototypical consumer protection case where a consumer buys a product against the backdrop of a uniform, broad-based advertising campaign, in this case the common question of reliance inevitably breaks down into individualized inquiries." *Id.* at 969–70.

Defendants make an interesting point. This is unlike a false advertising case where a snack manufacturer makes misrepresentations about the ingredients or consumer satisfaction. The decision to undergo stem cell therapy has a multitude of individualized factors. However, the Court reminds itself of plaintiffs' two questions and neither, it seems, are affected by these individualized decisions. One asks a binary question and the other is an objective test: (1) whether Defendants misrepresented the PSRs; and (2) whether the misrepresentation was likely to deceive a reasonable consumer.

Finally, Plaintiffs assert that reliance and causation issues do not defeat the predominance of Plaintiffs' claims under the UCL, CLRA, Negligent Misrepresentation, and Fraud claims. (Doc. No. 95-1 at 32.) This is because under these statutes, Plaintiffs only need to "show that members of the public are likely to be deceived." *Moorer*, 2017 WL 1281882, at *8. Plaintiffs emphasize that the test is based on a "**reasonable** consumer, not the **particular** consumer." (*Id.* at 33 (emphasis in original).)

Under these theories, Plaintiffs only need to show that members of the public are likely to be deceived—no proof of individualized reliance is necessary. Thus, Plaintiffs argue, for these claims, reliance and causation must only be established for lead Plaintiffs, who have testified they saw the PSR and relied on it. (Brewer Decl. ¶ 6; Gardner Decl. ¶ 6; Class Member Decl.) However, Defendants point out that there is confusion amongst the Plaintiffs on what the PSRs are, and that one Plaintiff testified she never saw the pie chart before.

Plaintiffs assert that only exposure is necessary class wide—not reliance. Further, under the CLRA, reliance is inferred for fraudulent and negligent misrepresentation claims

if material misrepresentations are made to an entire class. *In re Brazilian Blowout Litig.*, No. cv 10-8452-JFW (MANx), 2011 WL 10962891, at *8 (C.D. Cal. Apr. 12, 2011) (recognizing presumption of reliance for and certifying common law fraud and negligent misrepresentation claims).) Materiality, Plaintiffs assert, is an objective one and can be perceived through evidence common to the class.

The Court ultimately agrees with Plaintiffs. The questions asserted are common questions of fact and, as Plaintiffs acknowledge, the answers can apply to all class members in one swoop.

## IV. CONCLUSION

Thus, the Court **DENIES** Defendants' motions to strike, albeit with caveats and changes as noted herein. (Docs. No. 109, 110). The Court **GRANTS** Plaintiffs' motion for class certification as set forth below and **ORDERS** the following:

1. The following Rule 23(b)(3) classes are **CERTIFIED**:

*Subclass A*

All persons residing in the United States who purchased Stem Cell Therapy Treatment from StemGenex for at least $14,900 between December 8, 2013 and April 2016, after (a) visiting www.stemgenex.com when the website contained Patient Satisfaction Ratings and/or (b) receiving an email from StemGenex with Patient Satisfaction Ratings.

*Subclass B*

All persons residing in the United States who purchased Stem Cell Therapy Treatment from StemGenex for at least $14,900 between April 2016 and March 2017, or when the information was no longer on the website or being used in emails or advertising materials, after (a) visiting www.stemgenex.com when the website contained Patient Satisfaction Ratings and/or (b) receiving an email from StemGenex with Patient Satisfaction Ratings.

2. Plaintiffs Jennifer Brewer and Alexandra Gardner are appointed class representatives of Subclass A, as they both received treatment prior to April 2016.

3. Plaintiffs are to submit a class representative(s) for Subclass B for the Court's approval within **three weeks** of this Order.

16

4. Under Fed. R. Civ. P. 23(g), Plaintiffs' attorneys are appointed as class counsel. Collectively, they are Elizabeth Banham, Janice Mulligan, Brian Findley, Harvey Berger, Timothy Williams, and Stephanie Reynolds.

5. Under Fed. R. Civ. P. 23(c)(2)(B), the parties will meet and confer, and submit to the Court an agreed-upon form of class notice that will advise individual members of, among other things, the nature of the action, the relief sought, the right of class members to intervene or opt out, and the binding effect of a class judgment on members under Rule 23(c)(3). The parties shall also jointly submit a plan for dissemination of the proposed notice. The proposed notice and plan of dissemination shall be filed with the Court on or before August 1, 2019.

**IT IS SO ORDERED**.

Dated: June 24, 2019

Hon. Anthony J. Battaglia
United States District Judge